1  Katharine B. Miller,
2  8302 Gladstone Street
3  Juneau, AK 99801
4  (907) 523-8991
5  Dio36dio@gmail.com
6  *Plaintiff (Pro Se)*

7

**RECEIVED**

JUL 3 0 2024

Clerk, U.S. District Court
Juneau, AK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| KATHARINE B. MILLER,<br>    8302 Gladstone Street,<br>    Juneau, AK 99801,<br>                          Plaintiff,<br><br>                v.<br><br>U.S. FOREST SERVICE,<br> Sidney R. Yates Federal Building,<br> 2014 14th Street SW,<br> Washington, DC 20227,<br><br>                &<br><br>FRANCES SHERMAN, Forest Supervisor<br>    Tongass National Forest<br>    648 Mission Street, Suite 110,<br>    Ketchikan, AK 99901-6591,<br><br>                          Defendants. | No. 1:24-CV-00013-SLG<br><br><br>**COMPLAINT FOR<br>DECLARATORY AND<br>INJUNCTIVE RELIEF** |

## NATURE OF THE ACTION

1.     This action challenges the December 2023 Record of Decision ("ROD"), a final

agency action authorizing the Mendenhall Glacier Visitor Facility Improvements Project

("Project") in the Juneau Ranger District of the Tongass National Forest. Plaintiff

1

Katharine Miller ("Plaintiff") seeks judicial review of the ROD pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §702.

2.      The ROD substantially increases the existing cap on visitor capacity and commercial allocation of that capacity in the Mendenhall Glacier Recreation Area ("MGRA"). Because commercial visitor capacity in the MGRA is capped, commercial visitor growth potential is severely restricted. Commercial capacities are incorporated into the 1996 MGRA Management Plan which can only be amended through the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347, process. The Forest Service prejudged the outcome of the environmental impact statement ("EIS") by specifying in the Purpose and Need of the project a specific rate of projected commercial visitor growth and a total commercial visitation that will only occur by choosing the selected alternative in the EIS, by biasing the need for the project toward meeting the needs of the visitor industry, and by claiming that the need is to support the economy of Southeast Alaska but limiting benefit analysis to the Forest Service commercial special use permit holders. The selected alternative creates the need for the project.

3.      The EIS proceeds from the assumption that commercial capacities will increase, even though the determination to increase capacity is a choice, not a mandate, and is a major federal action significantly affecting the quality of the human environment. The Forest Service has failed to prepare an environmental analysis of its decision. The EIS also states that a Purpose and Need for the action is to meet the needs of the visitor industry. Not only is this decision also a major federal action significantly affecting the quality of the human environment, but it violates the requirements of the National Forest

2

1  Management Act to weigh competing recreational demands on national forests. There can

2  be no fair analysis when the needs of one user sector are paramount.

3  4.    The process used to determine capacities for MGRA management units and trails

4  is not based on any scientific methodology. The sole criterion for MGRA capacity

5  changes is that they meet the level of visitor growth and total visitation levels that the

6  Forest Service has selected. The desired resource conditions for the proposed action are

7  the same as those that were the basis for establishing the existing capacity cap, yet the

8  proposed action increases capacities by over 100 percent. Trail capacities are grossly

9  overinflated rendering them neither probable nor possible and are tens of thousands of

10  people over actual trail use. This can only be the result of a desire to misrepresent the

11  actual proportion of capacity allocated to commercial use, and to create "under used

12  capacity" to be allocated to commercial use in the future.

13  5.    The decision fails to evaluate the direct effects on solid and wastewater

14  infrastructure from the decision to construct facilities to accommodate over 1,200,000

15  visitors.

16  6.    The decision fails to adequately account for displacement of local residents from

17  the MGRA even though the Forest Service committed to investigate displacement as

18  mitigation for the 2015 Environmental Assessment.

19  7.    Plaintiff seeks a declaration that defendant's decision to proceed with the Project

20  violates NEPA and its implementing regulations; the National Forest Management Act

21  ("NFMA"), 16 U.S.C. §1600-1687, and its implementing regulations; the Administrative

3

1  Procedures Act (APA); and the Tongass National Forest Land Management Plan

2  ("TLMP").

3  8.      Plaintiff seeks vacatur of the ROD and to enjoin Defendants from implementing it

4  unless and until they comply with NEPA, NFMA, APA and TLMP requirements.

5  **JURISDICTION AND VENUE**

6  9.      This action arises under the judicial review provisions of the APA, 5 U.S.C §§

7  704, 706. This Court has jurisdiction over this action pursuant to 28 U.S.C §1331.

8  10.     Pursuant to 28 U.S.C §1391, venue is proper in this Court and Division because

9  project at issue will take place in the Juneau Borough, Juneau, Alaska.

10  **PARTIES**

11  11.     Plaintiff Katharine Miller is a resident of Juneau Alaska, and a regular user of the

12  MGRA. For the past 21 years, Ms. Miller and her husband have owned property adjacent

13  to the Glacier Spur Road that accesses the MGRA. Their property also directly abuts the

14  Dredge Lakes Management Unit of the MGRA. Ms. Miller and her family have used the

15  MGRA extensively year around for hiking, skiing, and outdoor education for her children

16  and their peers. She derives deep personal satisfaction from her visits to the MGRA.

17  12.     Ms. Miller has been an active participant with the Beaver Patrol since 2006. The

18  Beaver Patrol is a Forest Service sanctioned community group that assists in monitoring

19  and opening beaver dams to provide salmon passage and reduce trail flooding. Ms. Miller

20  provided information to the Beaver Patrol on the value of beaver habitat for salmon. She

21  has also been involved as a volunteer using her environmental expertise for school

22  activities.

4

13.     The proposed capacity increases, commercial use allocations, and other

components of the MGRA project directly harm Ms. Miller as a landowner, Juneau

taxpayer, and recreational user of the affected area. The considerable increase in traffic

(e.g., an estimated 40 buses per hour) along the 2-lane Mendenhall Loop Road and

Glacier Spur Road from the project's expansion of visitor capacity and commercial

transporter allocations will substantially increase the level of bus and vehicle traffic

congestion, noise, and safety concerns for humans and dogs adjacent to Ms. Miller's

property. Bus noise can be heard for over ½ a mile through the trees. This increased noise

and congestion will adversely affect property values in Ms. Miller's neighborhood.

14.     The creation of facilities to accommodate over 1 million people in the Visitor

Center Unit of the MGRA will adversely impact municipal waste treatment facilities and

landfill capacity which directly affect property taxes and landfill disposal fees. Upgrades

to wastewater treatment facilities required by the project would be largely financed from

the municipal property taxes since the Forest Service failed to include any analysis of

direct impacts to infrastructure in the EIS. The proposal introduces food and other

additional solid waste sources coming from the MGRA to the Juneau Landfill. The

landfill has an estimated 20-year remaining life, and rates for residential disposal were

recently substantially increased to accommodate current disposal levels. Dramatically

increasing the amount of waste produced by the MGRA will reduce that life expectancy

and result in additional costs for waste management for Juneau residents.

15.     As the Forest Service has expanded commercial use of the MGRA since Ms.

Miller purchased her property in 2004, the overcrowding has displaced local recreational

5

1  users such as herself from areas they have previously enjoyed. The considerable

2  additional visitation that will result from the proposed action will exacerbate this process.

3  To accommodate this many visitors, the Forest Service will fundamentally change the

4  nature of the MGRA from a natural forest area to a developed urban park. These changes

5  affect year around recreational uses and degrade the forest experience for non-

6  commercial users even outside the tourist period.

7  16.    Ms. Miller participated in the MGRA Improvement EIS process since the

8  development of the Master Plan in 2016. She has submitted detailed and specific

9  comments during all phases of the project and submitted an objection to several aspects

10  of the project following issuance of the draft FEIS in 2023. Ms. Miller repeatedly pointed

11  out flaws in the Forest Service's implementation of the NEPA process. Along with 4500

12  other mostly negative comments that the Forest Service received on the project, Ms.

13  Miller's comments implored the Forest Service to justify changes to the capacity limits

14  and the favoritism for commercial transporters and the visitor industry and requested the

15  Forest Service to consider the carrying capacity of the area. None of these requests were

16  evaluated.

17  17.    Defendant United States Forest Service is a federal agency within the U.S.

18  Department of Agriculture that is responsible for managing the nation's forests including

19  the Tongass National Forest.

20  18.    Defendant Francis Sherman is the Forest Supervisor for the Tongass National

21  Forest. As Forest Supervisor, Mr. Sherman is responsible for the actions challenged in

22  this complaint. Mr. Sherman is sued in his official capacity.

6

## STATUTORY AND REGULATORY FRAMEWORK

### A.  National Environmental Policy Act

19.  The National Environmental Policy Act (NEPA) is the "basic charter for protection of the environment." 40 C.F.R. §1500.1(a).  NEPA's primary purposes are to ensure that federal agencies take a "hard look" at the environmental consequences of their proposed actions and to make information on the environmental consequences available to the public which may then offer its insight to assist the agency's decision making through the comment process. The Council on Environmental Quality (CEQ) promulgated uniform regulations for implementing NEPA that are binding on federal agencies. 40 C.F.R. §§ 1500 *et seq.*

20.  NEPA requires federal agencies to prepare an environmental impact statement (EIS) for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. §4332(2)(c).  The CEQ defines a major federal action as a discretionary action under the control and responsibility of a federal agency. In determining whether actions are significant, agencies must consider the intensity (severity) of the impact including inter alia the "unique characteristics of the geographic area" and "the degree to which the effects on the quality of the human environment are likely to be highly controversial." 40 C.F.R. §1508.27(3) and (4).  NEPA provides that agencies "shall …study, develop, and describe appropriate alternatives to recommended courses of action for any proposal which involved unresolved conflicts concerning alternative uses of available resources. (42 U.S.C. §4332(E).

7

21.     An adequate EIS must consider the direct, indirect, and cumulative environmental impacts of a proposed action. Id. at §1508.8. Direct effects are caused by the action and occur at the same time and place. 40 C.F.R. §1508.1(g)(1). Indirect effects are those which are caused by the action and are later in time or farther removed in distance but are still reasonably foreseeable. 40 C.F.R. §1508.1(g)(2). Reasonably foreseeable means "sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision." 40 C.F.R. §1508.1(aa). The environmental impacts that require analysis under NEPA are far broader than just those affecting the ecosystem itself; such effects include "ecological…aesthetic, historic, cultural, economic, social, or health." 40 C.F.R. §1508.8(b).

22.     Each EIS must consider the underlying purpose and need "to which the agency is responding in proposing alternatives including the proposed action." 40 C.F.R. §1502.13. The Purpose and Need statement in an EIS sets the parameters for the range of reasonable alternatives the agency will consider and informs the scope of effects the agency must analyze. Inherent in the NEPA process is the consideration of the public interest when developing a purpose and need statement, including analyzing proposed actions and alternatives. 86 FR 55757. The agency must take a "hard look" at the effects of the proposed action and "rigorously explore and objectively evaluate" the environmental impacts of "all reasonable alternatives" to the proposed action. 40 C.F.R. §1502.14. NEPA regulations promulgated by the CEQ require the Forest Service to "insure the professional integrity, including the scientific integrity, of discussions and analyses" in environmental impact statements. Agencies "shall identify any methodologies used and

8

1    shall make explicit reference by footnote to scientific and other sources relied upon for

2    conclusions in the statement." 40 CF §1502.24.  The EIS "shall serve as a means of

3    assessing the environmental impact of proposed agency actions, rather than justifying

4    decisions already made."  40 CF §1502.2(g).

5    23.    When an agency is evaluating reasonably foreseeable significant adverse effects

6    from a proposed action and there is incomplete or unavailable information, NEPA

7    requires the agency to obtain the information and include it in the EIS if the information

8    is "essential to a reasoned choice among alternatives and the overall costs of obtaining it

9    are not exorbitant." 40 C.F.R. §1502.22.

10   24.    The Forest Service chose to utilize the 1978 CEQ NEPA regulations for

11   implementation of this project.

12        **B.    National Forest Management Act (NFMA)**

13   25.    In 1976 Congress enacted the National Forest Management Act (NFMA), 16

14   U.S.C. §§ 1600-1614, which governs the Forest Service's management of national forests

15   under the principals of the Multiple Use Sustained-Yield Act of 1960.  The NMFA

16   requires the Forest Service to develop comprehensive land and resource management

17   plans for each unit of the National Forest System. 16 U.S.C. §1604(a) u. Subsequent

18   "plans, permits, contracts, and other instruments for the use an occupancy" of the national

19   forests must be consistent with the local land and resource management plan, in this case,

20   the Tongass National Forest Land and Resource Management Plan, as amended.

21   Congress mandated that the Forest Service "shall provide for public participation in the

22   development, review, and revision of land management plans." 40 C.F.R. §1604(d).  Site-

9

specific actions must be consistent with the applicable plan and, if not, "the responsible official may modify the proposed decision to make it consistent with the plan, reject the proposal, or amend the plan to authorize the action." Id. §219.10. Under the NFMA, the Forest Service must balance multiple uses of forest with consideration given to the relative value of the resources not the greatest economic return. Special uses of national forest lands are to be managed to protect the public interest which includes "the allocation of space among potential or existing uses and activities." 36 C.F.R. §251.56(a)(ii)(G).

26.     Special uses of forest lands are to be managed to protect the public interest which is defined to include the protection of resources and improvements on National Forest System Lands, the allocation of space among potential and existing uses and activities, and public health and safety. 40 C.F.R. § 251.56(a)(ii)(G). Within the context of special use authorizations, Forest Service regulations define the "public interest" to include "the allocation of space among potential or existing uses and activities" 36 C.F.R. §251.56(a)(ii)(G) and for recreation special uses the TLMP directs the Forest Service to administer special use authorizations to minimize "adverse impacts to popular or high-valued local areas." TLMP REC3(II)(3)(c)(ii)(c).

27.     The 2012 planning rule for National Forest System Land Management Planning (36 C.F.R. §219) requires responsible officials to use the best available scientific information to inform the assessment, development, and monitoring of plan components. It requires explanation of how the best available scientific information was used to inform how the responsible official arrives at a final decision. Documentation must

10

1   identify what information was determined to be the best available scientific information,

2   explain the basis for that determination, and explain how the information was applied to

3   the issued considered.

4   28.    The Forest Service Handbook Recreational Special Uses, Outfitting and Guiding

5   and Other Concession Services provides further guidance to the agency on the definition

6   of "resource capacity" and factors to be considered in needs analyses and capacity

7   analyses including: "applicable land management plan and other applicable

8   programmatic and project decisions, inventoried conditions, current visitor use and

9   visitor use trends (amount, type, length of stay, and group size), correlation of visitor use

10  to plan guidance and inventoried conditions, the results of management actions, such as

11  … findings from monitoring."

12          C.    **Tongass National Forest Land and Resource Management Plan**

13                **(TLMP)**

14  29.    In 2016, the Forest Service revised the Tongass National Forest Land and

15  Resource Management Plan (TLMP) which guides all natural resource management

16  activities and established the management direction for the Tongass National Forest. The

17  TLMP designates the Mendenhall Glacier Recreation area as a Special Interest Area and

18  sets the desired condition for this designation. The TLMP describes resource

19  management practices, levels of resource protection and management, and the availability

20  and suitability of lands for different kinds of resource management. The TLMP, inter

21  alia, establishes the desired conditions for Special Interest Areas, and sets forest-wise

11

1  standards and guidelines for recreational uses including commercial recreation and

2  outfitter/guide activities.

3      **D.**    **Mendenhall Glacier Recreation Area Management Plan (MGRA**

4             **Management Plan)**

5  30.    The Mendenhall Glacier Recreation Area Management Plan (MGRA Management

6  Plan) was developed to provide specific management direction for the MGRA. It

7  describes desired condition, management objectives, visitor capacities, and commercial

8  use (outfitters, guides, transporters and other service provides) allocations for the MGRA.

9  The 1996 MGRA Management Plan as amended in 2015 is the applicable plan to this

10  complaint.

11      **E.**    **Administrative Procedure Act**

12  31.    The Administrative Procedure Act (APA) confers a right of judicial review on any

13  person that is adversely affected by an agency action. 5 U.S.C. §702. Upon review the

14  court shall "hold unlawful and set aside agency actions…found to be arbitrary and

15  capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C

16  §702(2).

17                  **FACTUAL BACKGROUND**

18      **A.**    **Mendenhall Glacier Recreation Area (MGRA) Location and History**

19  32.    The MGRA is located at the northeast end of the Mendenhall Valley, a suburban

20  residential area approximately 12 miles from downtown Juneau, Alaska. It is accessed

21  from the south or west by the 2-lane Mendenhall Loop Road, and for the last 0.7 miles by

22  the 2-lane Glacier Spur Road. The south end of the Mendenhall Loop Road is the

12

primary commuter route into and out of the valley for residents. In 2020, the total population of Juneau, AK was 32,225 people. There are no roads into Juneau. It is a landlocked community accessible only by air or boat.

33.     The MGRA was established as a recreation area in 1947 and set aside for public recreation use. It encompasses 5,815 acres and includes parts of McGinnis Mountain, the terminus of the Mendenhall Glaciers, Bullard Mountain, Mendenhall Lake, Mendenhall River, and the uplands bordering the lake and Mendenhall River areas. Roughly 1/3 of the MGRA (which includes the lake surface) is easily available for public access, and the remainder is composed of the glacier, surrounding mountainous areas, and rivers. The first visitor center in the United States was built at the MGRA in 1962. The MGRA's Land Use Designation (LUD) under the (TLMP) is as a Special Interest Area (SIA) Recreation Area to "be managed principally for recreation use substantially in (its) natural condition (36 C.F.R. §294.1(a)). Under Desired Conditions, the TLMP states that "(a)ll Special Interest Areas on the Tongass National Forest are characterized by generally unmodified environments in which the natural features are preserved. They remain largely undisturbed by human uses or activities, except for localized interpretive purposes."

34.     Within a SIA, the TLMP directs that recreation use be regulated based "on studies reflecting the effect of recreation and tourism activities on the unique features for which the Special Interest Area is established." Within these more restrictive confines, recreation and tourism Forest-wide standards may be applied. With respect to authorizing recreational special uses, these standards include ensuring that adverse impacts to popular

13

or high-valued local areas are minimized and ensuring that operations can be carried out in a manner that is consistent with existing or expected use by the non-guided public. The TLMP recommends allocating no more than one-half the capacity of the LUD to recreation special uses (REC3 II.3.3.a), with party and group size limits that consider site capacities and impacts to other users and resource values (REC3 II.3.3.b.iii).

35.     Juneau residents have used the MGRA area as far back as 1920 for recreational purposes. Skater's cabin was used as both a wintertime recreation area as well as the first glacier observatory. Increasing visitor travel to Alaska in the late 1950s and early 1960s resulted in increased popularity of the area. The existing Visitor Center, a picnic area, and the campground were constructed in the early 1960s. Local resident and tourist visitor use of the area continued to increase as a result of increases in the Juneau population and the development of a cruise ship industry in Juneau.

**B.     MGRA Recreational users**

36.     Recreational users of the MGRA who arrive via commercial transporters primarily stay in the vicinity of the visitor center. Commercial use data from 2006 through 2019 shows that between 93% and 97% of these users do not leave the visitor center unit with only ~ 7% visiting any of the trails within that unit. Most of these visitors stay between 75 and 90 minutes at the MGRA leaving them little time to disperse to other areas. As a result, their primary interests are in facilities that allow them to see and photograph the glacier, and potentially purchase souvenirs and food items.

14

37. Visitors that frequent commercial trail outfitters and guides have more varied interests in the natural environment of the MGRA. Guided activities include hiking, biking, and river rafting.

38. Non-commercial visitors include Juneau residents and independent travelers. Independent travelers stay an average of 2 hours at the MGRA, while residents may spend substantially more time. Most Juneau residents and some other non-commercial visitors avoid the crowded visitor center during the cruise ship season, preferring an experience that is quieter and more natural with greater solitude.

39. There is conflict between the interests of the short stay commercial visitors and the locals/non-commercial visitors. Facilities and accommodations made for the former, and extreme levels of use and crowding, inextricably alter and degrade the natural environment and the resource value for the latter. National forests are to be managed in the public interest which is defined with respect to Special Uses to include "the allocation of space among potential or existing uses and activities." 40 C.F.R. §251.56.

### C. Federal Lands Recreation Enhancement Act (REA) - Impetus for Commercializing the MGRA

40. In 2004, Congress passed the REA authorizing federal collection of fees for recreational use of public lands. Prior to the REA, 85% of special use permit fees were deposited into the National Forest Fund with the remaining 15% deposited in the Recreation Fees for Collection Cost. Both funds were managed at the headquarters level of the Forest Service. In the 2005 REA Interim Implementation Guidelines, the Forest Service directed that "(a) minimum of 95% of recreation fee receipts are retained at each

15

1  forest/unit" to be used for a variety of purposes. The remaining 5% of the fees were for

2  use by the Regions. Following the passage of the REA, special permit revenue became a

3  primary source of funding directly to the MGRA and incentivized issuance of

4  commercial special use permits for revenue generation.

5  **D.    History of Commercial Special Use Allocation Increases and Capacity**

6      **Determinations**

7          *a)    1996 Record of Decision (ROD) and Management Plan:*

8  41.    In response to public concerns about the impacts of increasing numbers of visitors

9  to the MGRA, to meet overall management objectives for the area, and to reduce

10  conflicts between non-tour and tour visitors, an EIS was initiated in 1995 to amend the

11  1975 MGRA Management Plan. A capacity analysis was developed for the Visitor

12  Center and for specific designated trails in the recreation area, the administrative units

13  were revised, and recreational capacity was established for those units and areas in which

14  commercial use would be allowed and where conflicts between competing recreational

15  uses were occurring or anticipated to occur.

16  42.    In selecting a management direction, the desired future condition of the MGRA

17  was to: "Remain relatively undeveloped, allowing for concentrated use at the Visitor

18  Center and Mendenhall Lake Campground, allowing for moderately concentrated use at

19  the West Glacier Trailhead, and on Mendenhall River, allowing for dispersed, low to

20  moderate use in the rest of the Recreation Area." The selected alternative which was

21  incorporated into the 1996 MGRA Management Plan was to provide for "managed

22  commercial growth in designated areas" with the objective of providing "an equitable

16

distribution between commercial and non-commercial uses." While recognizing the value provided by commercial tour operators, the selected alternative prioritized protection of the MGRA's natural setting and wild character, and allocated capacity between commercial and non-commercial users to ensure that "existing and future non-commercial public use is not "crowded out" of the Recreation Area." The selected alternative provided opportunities for commercial growth for 16-20+ years.

43.     In the 1996 MGRA Management Plan, commercial capacity for the Visitor Center, was set at 462,190 visitors per summer, with a limit of 896 people at one time ("PAOT"). This was stated as 65% of the total capacity for the Visitor Center Unit, which left 35% (248,871 visitors per summer) reserved for non-commercial public use with no PAOT restriction. Commercial capacities were also established for Mendenhall Lake (65% of the capacity, 2,980 visitors per summer, 2 groups per day ) and Mendenhall River (65% of the capacity, 38,190 visitors per summer, 4 groups per day), and on three specified trails (20% of the capacity for each): E Glacier Trail (5,950 visitors per summer, 4 groups per day), Nugget Creek Trail (2,980 visitors per summer, 2 groups per day), and W Glacier trail (4,220 visitors per summer, 4 groups per day). The Management Plan explicitly stated in Objective 14 that "(c)ommercial tour use is allowed in these designated areas only." The Management Plan contained stipulations required to be included in special use permits including: "maximum group sizes of twelve people, including guides for outfitter/guided hiking tours" and on Mendenhall Lake; and setting a maximum total number of groups allowed per day at each of the areas authorized for commercial use.

17

44.     The 1996 Record of Decision ("1996 ROD") included mitigation to monitor capacity levels and commercial special use permit allocations to determine if allocations cause unacceptable impacts to visitor experience or natural resources. Mitigation measures would include reevaluation of allocation levels depending on impacts. The 1996 ROD directed the MGRA staff to "monitor and evaluate data collected during the next 10 seasons (until 2006) of use for all commercial and non-commercial uses allowed in the Recreation Area," with the intent that the monitoring information would be used to either "verify that allocations meet the goals or give us information to adjust them either up or down." If monitoring indicated a continuation of conflict between commercial and non-commercial use "additional special use permit stipulations…may be considered."

45.     Total capacity for the MGRA was not established in the 1996 ROD because most trails were closed to commercial use. Total capacity for the Visitor Center was set at 711,062 people per year with commercial capacity at 65% (462,190 people per year). The 1996 Management Plan, as amended, is still the operating management plan and establishes the management direction for the MGRA.

*b)     Management Plan Changes outside of NEPA*

46.     Sometime around 2006, the Forest Service authorized commercial special use permit allocations for three trails that were closed to commercial use in the 1996 MGRA Management Plan: the Powerline Trail (5, 600 people); the Moraine Ecology Trail (13,000 people); and the Trail of Time (8,450 people). The Forest Service also nullified the 1996 MGRA Management Plan's Section 14 Direction requiring special use permit stipulations that set the maximum size of commercial tour groups (12 people including

18

1     guides), the maximum number of groups per day on trails and in units for which

2     commercial use was authorized, and the operating hours and days for commercial

3     activities. Forest Service regulations require a plan amendment for actions that "add,

4     modify, or remove one or more plan components, or to change how or where one or more

5     plan components apply to all or part of the area plan (36 C.F.R. 291.13(a))." Plan

6     amendments require NEPA review and opportunity for public participation. A Freedom

7     of Information Act ("FOIA") request submitted in 2024 for documentation regarding how

8     these changes were implemented, including any plan amendments, public notifications,

9     or public involvement occurring at the time of the changes, resulted in no responsive

10    records. Despite having records of reported commercial use for these trails starting in

11    2008, the Forest Service maintains that these changes were made during the 2015

12    Environmental Assessment Process. No records provided in response to the FOIA were

13    dated prior to 2011.

14    47.    In each year from 2012 through 2014, the Forest Service authorized an additional

15    15,400 short-term commercial service days for vendors already permitted to transport

16    tourists to the MGRA.

17                     c)     *2015 EA MGRA Management Plan Revision Commercial Guide,*

18                            *Outfitter, and Transport Services*

19    48.    By 2013, the Forest Service had issued special use permits such that the Visitor

20    Center Unit was nearing the commercial capacity cap established in the 1996

21    Management Plan. Claiming an "increased visitor demand for commercial guiding

22    services at the MGRA," the Forest Service initiated an EA in 2013 to evaluate the

19

1  commercial allocations for the MGRA Visitor Center and West Glacier Units and

2  facilities to determine whether those allocations should be changed. Data on visitor

3  demand was not included in the EA. The EA stated that "crowding in the Visitor Center

4  Unit has had adverse effects on visitor experiences" and proposed to address crowding by

5  reallocating capacity from the Visitor Center Unit to commercial special use permit

6  holders on trails and Mendenhall Lake.

7  49.    The Forest Service purported to analyze commercial visitation to the Visitor

8  Center unit, West Glacier unit, and trails using commercial visitor data reported by

9  special use permit holders. Although the 1996 Management Plan had directed the

10  collection of data of non-commercial use in the MGRA for a period of 10 years following

11  implementation, no data on non-commercial visitation levels were included in the EA.

12  Instead, the Forest Service relied on staff estimates to determine that non-commercial use

13  was less than 5% of the overall use of the Visitor Unit. The EA stated that the total

14  Visitor Center Capacity of 711,062 people per year from the 1996 Management Plan was

15  "unrealistic" and that the current level of visitation (~439,610 people in 2013 based on

16  commercial vendor reports) was "estimated to be within 5 percent of the area's true

17  maximum capacity."

18  50.    Therefore, the Forest Service decided to decrease the total capacity of the Visitor

19  Center Unit by reallocating the capacity that had been set aside for non-commercial use

20  to commercial uses elsewhere in the MGRA. In doing so, the Forest Service increased the

21  proportion of total capacity allocated to commercial users from 65% to 95% and

22  increased commercial capacity from 462,190 to 485,000 people per year. The non-

20

commercial capacity was allocated to commercial outfitter and guide use on trails. The EA erroneously described this as "reallocation of commercial service allocations from commercial transporter to guided use on trails and the lake surface" but it was in fact a removal of nearly all non-commercial allocation for the Visitor Center and a transfer of that non-commercial allocation to commercial use. Non-commercial capacity for the Visitor Center was reduced from 248,872 people to 24,250 people. The EA did not analyze how this change was consistent with the 1996 Management Plan's objective to provide an equitable distribution between commercial and non-commercial uses.

51.     The commercial capacities for trails and changes to the 1996 Management Plan that the Forest Service had made following passage of the REA were adopted as the existing conditions for the 2015 EA, although the Forest Service would claim in 2023 that these changes originated in the 2015 EA. By presenting these changes as the existing condition, there was no opportunity for public comment on them.

52.     The EA included a Capacity Analysis that evaluated actual commercial use in MGRA units and on trails against the Recreation Opportunity Spectrum (ROS) classifications for these areas. All trails and areas were found to be operating within their ROS classifications. Despite having actual trail use data, the Forest Service developed a new methodology for calculating capacities in the EA, but provided no references for it. Capacities were calculated based on daily social encounter criterion for the ROS (e.g., meets no more than 20 parties per day), an arbitrary 12 people defining a "party," and the total number of days in the (new) commercial use season (153 days). No actual trail use data was used in the analysis. This resulted in trails of varying length, like the East

21

1 Glacier Trail (3.5 miles) and the Trail of Time (0.5 miles), having identical capacities of

2 36,720 people per year. The total numbers from these capacity analyses are then allocated

3 to commercial vendors as a total number of people that can be guided or transported

4 during the entire season without consideration of group size or encounter rates.

5 53. The Selected Alternative increased commercial visitor capacities for most areas:

6 East Glacier Trail, 23% annual increase; West Glacier Trail, 74% annual increase;

7 Nugget Creek Trail, 23% annual increase; Moraine Ecology Trail, 41% increase;

8 Mendenhall Lake, 609% annual increase total, 445% increase commercial; Visitor Center

9 Unit, 35% increase commercial. The 2015 EA did not provide any analysis to explain

10 how capacity was increased in the absence of any changes or improvements to trails or

11 MGRA units. The sole criterion for determining capacity was the Forest Service's desire

12 to issue more commercial special use permits.

13 54. Juneau residents expressed concern throughout the EA process regarding

14 crowding from existing commercial use levels and proposals to increase commercial use

15 of trails. Two alternatives were considered but not carried forward in the analysis. One

16 would have lowered commercial allocation to "provide a less crowded experience for

17 locals and visitors." This alternative was rejected because it might "result in visitors using

18 other means to access the MGRA (public buses, private vehicles) or visitors not being

19 able to access the site." The second alternative would have reduced commercial

20 allocations on trails "providing more solitude and a higher quality recreation experience

21 for those using the trails." The Forest Service rejected this alternative because it would

22 limit the range of recreation opportunities and be inconsistent with the MGRA

1   Management plan, even though the Management Plan authorized commercial use on

2   fewer trails than in the EA.

3   55.     The EA acknowledged that there was displacement of some users as commercial

4   capacities were increased. Some locals avoided the MGRA during crowded periods.

5   However, the Forest Service cited the lack of complaints from the public to the Forest

6   Service District or the Tourism Management Board as evidence that changes to

7   commercial allocations on trails in 2008 and authorization of additional commercial use

8   days in 2012, 2013, and 2014 did not result in increased conflicts with or complaints

9   from local residents.

10  56.     The Forest Service received three objections to the EA. These objections

11  reasserted issues raised during EA comment periods concerning 1) the increases in

12  commercial capacity which are calculated based on daily encounters but are allocated in

13  special use permits as a total number of people that can be guided or transported during

14  the entire season; 2) the lack of any controls for preventing commercial users from using

15  their entire allocations during peak periods rather than spreading them out over the

16  season; 3) the failure to use, or make available for public review and comment, actual

17  trail monitoring data in capacity calculations; and 4) increasing capacities on trails for

18  which no monitoring of trail encounter data had been collected providing no baseline for

19  justifying an increase, and displacement of local users and visitors wanting a more natural

20  forest experience.

21  57.     To avoid and minimize potential impacts from the project and reach a Finding of

22  No Significant Impact, the Forest Service committed to mitigation measures that

23

| | |
|---|---|
| 1 | included: implementing a 5-year trail use monitoring plan to provide information about |
| 2 | encounters on trails in the MGRA; contacting the "Forest Sciences Lab in Juneau to |
| 3 | ascertain monitoring options (questions, design, and assessment tools) to better |
| 4 | understand displacement of local residents who wish to recreate in the MGRA"; |
| 5 | specifying a prohibition in the prospectus for commercial guides on using "shoulder |
| 6 | season" service days during the "peak season" until monitoring of use by the Forest |
| 7 | Service indicates that such service day shifts are appropriate. |
| 8 | 58.     The Forest Service never implemented the mitigation to analyze local resident |
| 9 | displacement or to develop a monitoring plan. Trails monitoring was conducted but at a |
| 10 | lower level than committed to. Records provided through a Freedom of Information Act |
| 11 | request in 2023 indicate the Forest Service contacted the Forestry Sciences Lab but chose |
| 12 | not to implement any of the recommendations provided for evaluating displacement, even |
| 13 | though determining displacement in the face of continual increases in commercialization |
| 14 | was the objective of the mitigation. The FOIA record shows that the Forest Service |
| 15 | abandoned the monitoring plan that it started to develop once it became clear that issuing |
| 16 | such a plan would call attention to the fact that the Forest Service had dropped the |
| 17 | commitment to evaluate displacement. The draft management plan had called for weekly |
| 18 | monitoring of the trails at random times and on random days with each trail "monitored |
| 19 | approximately three times per day" throughout the commercial operating season. Trail |
| 20 | monitoring reports from this period confirm that the monitoring was not based on random |
| 21 | sampling and there is only a single data entry for each trail for each day it was sampled. |

24

59. The combined Visitor Center and West Glacier unit capacity (total MGRA capacity not including trails) resulting from the 2015 EA was 635,525 people per year. Commercial allocation of visitor capacity was 95% for the Visitor Center Unit. The 2015 EA modified, but did not replace, the 1996 MGRA Management Plan.

<em>d)     2019 Supplemental Information Report (SIR)</em>

60. Despite having concluded that the MGRA was overcrowded during the 2015 EA process, "under-capitalized opportunities" created by the increased growth in the Juneau cruise ship industry, prompted the Forest Service to increase commercial allocations in 2019.

61. As justification for this action, the Forest Service cited Table 1 from 2015 EA, indicating that "capacity should be re-evaluated if infrastructure improvements are constructed." Minor changes to the interior of the Visitor Center, installation of a new restroom trailer, and improvements to the Nugget Falls Trail (in the Visitor Center Unit) were used to justify increases in commercial allocation for the Visitor Center Unit by 55,460 people (12% increase) to 517,650 people per year, and the West Glacier Unit by 5,000 people (10% increase) to 55,000 people per year. Although the purpose of SIR was solely to provide additional commercial use days, the increase for the Visitor Center Unit would have pushed the proportion of capacity allocated to commercial use over 100% by 32,650 people. As a result, the Forest Service adjusted the total capacity of both units to retain the appearance that the commercial capacity for the Visitor Center and West Glacier Units remained at 95% and 33%, respectively.

62.    Part of the 2019 SIR is titled Summary of Resource Effects and purports to evaluate social effects in two categories: (1) Visitor and (2) Local Recreation Opportunities and Experiences. For the latter category the effects on trails would be "minor to moderate and adverse." For the Visitor Center Unit, the overall effect "would continue to be negligible to minor and beneficial on local residents recreating in this area." No further information is provided. The memo from the District Ranger to the Acting Forest Supervisor states that "this modification to the commercial capacity allocation does not represent a substantive change to the Selected Alternative of the 2015 MGRA EIS."

63.    As a result of the SIR, the combined Visitor Center and West Glacier unit capacity (total MGRA capacity not including trails) was 711,550 people per year of which 80% was allocated to commercial use.

    e)    *MGRA Master Plan*

64.    The Forest Service began a master planning process to guide development of the MGRA for the next 20 years and create a vision for the next 50 years. The Mendenhall Glacier is receding and expected to no longer be visible from the Visitor Center within the next few decades. Since the glacier is the primary attraction for visitors from outside Alaska, the Forest Service is concerned about maintaining relevance of, and tourist generated income from, the MGRA as the glacier recedes. The master plan proceeds from the assumption that the numerical visitor capacity of the MGRA must be substantially increased to capitalize on otherwise under-capitalized opportunities for revenue generation from commercial special use permits. Capacity increases would be

26

1 accomplished by substantially increasing the size and number of constructed facilities,

2 parking areas, trails, concessions, and other features such as bridges, walkways, docks,

3 and boats. ROS classification for most trails and units would be changed to the Urban,

4 unregulated, classification. It would also be accomplished by abandoning the current

5 management direction for the area to "be managed principally for recreation use

6 substantially in the area's natural condition," although how that change would be affected

7 is unclear.

8 65.    The purpose of the master plan was to increase visitor capacity within the MGRA

9 beyond that established in the 1996 Management Plan EIS and subsequent documents

10 and actions. The master plan established a rate of 2% per year for 30 years for increases

11 in the MGRA's visitor capacity. This mirrors the projected rate of increase in total cruise

12 ship visitation to Juneau over the same period. The combined capacity for the Visitor

13 Center and West Glacier units would increase from 711,550 to 1,286,000 people per year.

14 The Forest Service's preferred method for cruise ship passengers to visit the MGRA is

15 via commercial visitor transporter services and commercial special use permits, therefore

16 the master plan assumes that the Forest Service will choose to maintain the existing

17 proportional allocations of capacity between commercial and independent/local visitors

18 as visitor numbers increase. The master plan outlines infrastructure and facilities to

19 accommodate this high level of visitation by bus transport.

20 66.    During the master plan development process, numerous questions raised during

21 public meetings and in writing regarding capacity limits or carrying capacity of the area

22 were not addressed. Because the focus of the planning process was primarily on

27

accommodating more cruise ship tourists, the focus of public involvement in the planning

was on facilities and modifications that would meet that goal. The public involvement

objectives for the master plan included ensuring stakeholders were integrated into the

process, creating open communication for stakeholders, and ensuring stakeholder were

well informed about the process and project. "Stakeholders" were defined as a "collective

group of people with similar interests" and the list of key stakeholders included cruise

ship and tour operators, Juneau city agencies, Juneau development groups, Juneau

businesses, Alaska Native Corporations and groups, and a select group of environmental

and outreach organizations. Local residents and non-commercial recreational users of the

MGRA were not listed as stakeholders.

67.     The Preferred Alternative for the 2020 EIS was developed based on the master

plan. The master plan is referenced in section 1.8.2 of the MGRA EIS but is not

incorporated by reference elsewhere in the document.

### E.     2020 MGRA Facilities Improvement EIS (The Project)

68.     The Project EIS was initiated in February 2020. The need for the action as stated

in the scoping notice of intent was to address visitation levels that "far exceed" the

MGRA capacity and result in congestion, "under-capitalized opportunities," and

inadequate facilities. The level of commercial permitted visitation was approaching the

cap set in the 1996 Management plan, as amended by the 2015 EA and additional

increases from the 2019 SIR. Without the Project, commercial capacity and visitation to

the MGRA could not increase, and independent and local visitation, which the Forest

Service estimated would grow at the rate of the Juneau population (0.3%), would result in

28

a very small projected increase in MGRA visitation overall. The Decision Framework for the EIS included deciding on whether to change existing total capacities and commercial allocations of that capacity for the MGRA, but the EIS proceeds from the assumption that capacities will be increased. Options to retain or decrease existing capacity levels were not considered. The EIS states that alternatives were evaluated by how they respond to the TLMP direction for management of SIAs. The EIS claims to be consistent with the 1996 MGRA Management Plan which established the management direction for the MGRA and the commercial capacity caps.

69.     All the action alternatives in the EIS are based on the same proposed rate of tourism growth (2% per year), and the same actions. They are distinguished only by the planning period of the EIS (30, 20 or 15 years). Over the same period of time, all of the alternatives would increase visitor capacities for most MGRA units and trails by 221% over the levels set in the 2019 SIR. Exceptions to this level of increase would occur in the Visitor Center Unit (206%) and the Trail of Time (460%). The alternatives remove a section of the Dredge Lakes Unit along the lakeshore to the Visitor Center Unit, continuing a reduction in this unit that was started in the 2015 EA. All alternatives propose similar and substantial increases in constructed visitor facilities, parking areas, paved trails, boat docks, a remote visitor center at the head of the glacier, and cabins for overnight use.

70.     The EIS acknowledges that proposed increases in capacities throughout the MGRA, urbanization of the Visitor Center Unit, and an expansion of the built environment at the cost of natural areas are likely to displace local and independent users

29

of the MGRA and result in user conflicts. The selected alternative will spread the distribution of visitors into traditionally low or local-use areas, and the EIS acknowledges that the anticipated increase in crowding will impact the experience that visitors, particularly local users, would like to have when they visit the MGRA.

a) The Purpose and Need statement.

71. In the MGRA EIS, the three primary stated purposes and needs for the project are: (1) to create infrastructure and recreation opportunities to accommodate "projected future visitor use," which is defined as a 2 percent annual growth rate reaching 999,000 commercial visitors; (2) to meet the demand of the visitor industry; and (3) to support the economy of Southeast Alaska. Each of these purposes prejudges the outcome of the NEPA process as explained below.

i. Projected Future Visitor Use and capacity increases:

72. Projected visitor use is addressed in Section 1.2 Purpose of and Need for Action of the final EIS: "The number of visitors to the MGRA is projected to increase at a rate of approximately 2 percent annually for the next 30 years as the cruise industry continues to grow . . . with a projection of 1,000,000 (commercial) visitors annually by 2050."

73. The No Action alternative describes the visitor situation at the MGRA in the absence of the EIS. Visitor capacity would remain at the levels established in the 1996 Management plan, as amended, and the proportion of the capacity allocated to commercial use (via service days) would also remain at the current level. Section 3.7.5.3 of the EIS identifies the assumptions on which the EIS analysis is based with regard to recreational uses. This section states that unguided recreation use is stable and "not

30

1  expected to increase at rates higher than the general population growth (~0.3%)". Given

2  the cap on commercial capacity, and the estimated low level of unguided recreation

3  growth, it is not possible for the number of visitors to the MGRA to increase at a rate of 2

4  percent per year under existing conditions. Therefore, it is not possible for this level of

5  increase to be the need for the action.

6  74.  The selected alternative in the Record of Decision would change the existing

7  capacity limits to increase visitation to the MGRA by 2 percent per year reaching a total

8  commercial capacity of 990,000 visitors by year 30. This alternative is identical to the

9  projected growth and visitor capacity stated in Purpose and Need, but it will only occur

10  by implementing the capacity increases in selected alternative. EIS Section 2.3.3.15,

11  Visitor Capacity and Commercial Use, addresses the changes to the 1996 Management

12  Plan capacities under the preferred alternative. This section explicitly states that the

13  alternative would increase visitor capacity for the Visitor Center unit from 544,890 to an

14  estimated 999,000 annual visitors (which was arrived at by selecting a 2 percent annual

15  growth rate). The projected growth in the Purpose and Need statement is the result of the

16  selected alternative, not the need that drives the project. By drafting the purpose and need

17  to include not just a desire for increasing capacity but specific numeric capacity and

18  growth levels that can only be achieved by implementing the selected alternative the

19  Forest Service has prejudged the outcome of the NEPA process. The only alternative that

20  had a chance of being selected was the one that completely met the purpose and need.

21  75.  The EIS proceeds from an assumption that visitor capacity will increase despite

22  the fact that the December 2020 Notice of Intent and the EIS itself indicate that the

31

1    decision to be made through the NEPA process is "whether to increase visitor capacity

2    including the level of commercial use of the entire MGRA and/or specific management

3    zones." 85 Fed. Reg. 81,444. Visitor capacities for all action alternatives use a 2 percent

4    per year increase in visitation, and as this level of growth is the stated need for the action

5    it precludes consideration of reasonable alternatives that do not include this level of

6    growth. An alternative for commercial capacity to remain at current levels was dismissed

7    from detailed consideration for not meeting the stated Purpose and Need for the project to

8    accommodate increasing visitation. Alternatives suggested during scoping that would roll

9    back increases to commercial capacity that the Forest Service has made over the years,

10   and which are the primary source of overcrowding, also were not considered as they were

11   also incompatible with the purpose and need.

12   76.    The 2 percent growth rate and final capacity numbers are explicitly acknowledged

13   in the discussion of the preferred alternative as choices the Forest Service has made, yet

14   the Forest Service addressed the multitude of comments questioning the rate of selected

15   rate of growth and carrying capacity for MGRA units and trails, including comments and

16   objections raised by Plaintiff, by repeating the fallacy that visitor use is projected to

17   increase in the absence of this Project and in spite of the existing cap. Because both

18   statements cannot be true, the language in the EIS is deceptive and precludes meaningful

19   public involvement in the decision-making process. On the one hand, the public is told

20   that the decision to be made is whether to increase visitor capacity including commercial

21   capacity; on the other, it is told that "the number of visitors to the MGRA is expected to

22   increase" by a specific rate and the Forest Service is merely responding to that increase.

32

77. The Forest Service's choices regarding visitor growth and future commercial capacity are discretionary federal actions that are (1) within the control of the agency to implement, and (2) major federal actions within the meaning of 40 C.F.R. § 1501.1. As such, they are required to be evaluated under NEPA and Forest Service regulations. There is no question that decisions affecting MGRA capacities are major federal actions. The Notice of Intent (NOI) identified "increased visitation, particularly in areas that have lower use currently "that would "negatively impact user experience through increased encounters and larger group sizes" as a preliminary issue raised during scoping that the EIS would address. 85 Fed. Reg. 81,444. There is also no question that the Forest Service's choice to increase commercial capacity is discretionary. A capacity limit was established in the 1996 Management Plan, as amended, and the Forest Service is under no obligation or mandate to change it.

78. The Forest Service's decision to increase capacity is not evaluated in the MGRA EIS or any other environmental analysis. The existing capacity and commercial allocations for the MGRA were established in 1996 under a public process that sought to balance competing resources uses

                ii.    Meeting the demand of the visitor industry

79. The TLMP directs the Forest Service to administer special use authorizations to minimize "adverse impacts to popular or high-valued local areas," and to identify recreation uses that may be in conflict and to reduce conflicts and polarization. TLMP standards for outfitters recommend allocating not more than 50% of an area to commercial use.

33

80.     The Purpose and Need statement in the EIS states that the project is needed to "meet the demand of the visitor industry." This statement prejudges the outcome of the NEPA process by explicitly prioritizing the interests of one recreational user group over all others. The decision to prioritize the interests of the visitor industry violates NFMA, the recreational standards in the 2016 TLMP, and the TLMP regulations for Special Interest Areas. It is not possible to balance competing recreational uses when the needs of one user group are paramount to those of others, nor is it possible to adequately address conflicts between this group and other users with such an uneven playing field.

81.     The Forest Service's original action alternatives (Alternatives 2, 3 and 4) of the EIS were aimed at maximizing the number of commercial visitors, maximizing benefits for the commercial tourism sector, and expanding commercial use into areas where management direction had traditionally prohibited commercial visitation "to create a quiet and peaceful space."  An alternative that considered the interests of non-commercial recreational users (Alternative 6) was only included in the EIS in response to comments on the draft EIS from local users and people desiring a less commercial experience. Alternative 6 was included to concentrate commercial use in existing commercial areas. The total capacity and commercial allocation under this proposal were based on 15-year implementation period and would be "less likely to disperse visitors to existing quiet areas valued by locals" and independent travelers resulting in a minor effect on social encounters (compared to moderate for the selected alternative). However, with the bias in the purpose and need to meet the demands of the visitor industry, this alternative had no

34

1 chance of being selected since it met the purpose and need "to a lesser degree than other

2 action alternatives."

3 82.     By placing this decision in the Purpose and Need for the EIS, the Forest Service

4 has set it outside the analytical and public involvement environment of the EIS, and also

5 outside of NEPA review. During the EIS process, the Forest Service received 4,500

6 discrete public comments. Numerous additional public comments were received on the

7 Master Plan that preceded the EIS. The vast majority of these comments questioned the

8 deference given to cruise ship passengers, the cruise industry, and commercial visitors to

9 the MGRA in future planning. The Forest Service responded to these comments alleging

10 bias by ironically claiming that the Forest Service "knows that national forests are for the

11 enjoyment of all residents and visitors to America" while still maintaining a bias toward

12 the needs of the visitor industry.

13 83.     "Visitor industry" is not defined in the EIS, but the language in the document

14 indicates that this term is meant to apply only to those commercial transporters and

15 outfitters that obtain special use permits from the Forest Service. The Forest Service'

16 preferred method for visitors to access the MGRA is through permitted transporters and

17 guides. In evaluating the No Action alternative, the Forest Service states that a negative

18 result of not increasing commercial capacity is that tourists might look to other

19 transportation providers (taxis, ride share options) or city buses to access the MGRA.

20 Visitors that arrive at the MGRA in this manner are considered independent travelers, but

21 the conveyances they use may also be part of the visitor industry. Not only has the Forest

22 Service biased the NEPA process in favor of a specific recreational user sector, but it has

35

1   also chosen to favor the subset of that sector that provides the greatest economic benefit

2   to the Forest Service itself.

3   84.     The decision to prioritize the interests of the visitor industry above other users is a

4   discretionary federal action within the meaning of 40 C.F.R. § 1501.1 and therefore

5   requires NEPA review. The timing of that review needed to occur before the Forest

6   Service committed to the Project. Including the decision to favor visitor industry needs in

7   the Purpose and Need forecloses consideration of reasonable alternatives. One alternative

8   considered but eliminated from detailed study would have limited new facilities and

9   capacity increases to the Visitor Unit only. This alternative would have met some of the

10  needs of non-commercial visitors wanting less crowded hiking areas. This alternative was

11  rejected as not meeting the purpose and need for the project because even with added

12  facilities, crowding is expected to increase in the Visitor Unit. The experience of "all"

13  users would be impacted "if visitors cannot disperse over the MGRA." It defies reason

14  that the experience of visitors wanting a less crowded location for hiking would be

15  adversely affected by limiting the number of commercial visitors to those areas. By "all

16  visitors," the Forest Service apparently meant only the commercial visitors whose needs

17  are explicitly favored in the Purpose and Need.

18                          iii.     Support the economy of Southeast Alaska

19  85.     The third criterion that alternatives must meet to satisfy the purpose and need is to

20  meet the Forest Service' definition of an action that supports the economy of Southeast

21  Alaska. Section 3.12.4.2 of the EIS describes the regional and local economy. Most of

22  this section discusses tourism in general with a brief statement that the MGRA supports

36

the tourism and recreation industry in Southeast Alaska through the issuance of special

use permits to 24 companies. The EIS does not evaluate the value of the MGRA to the

Juneau economy within the context of other available tourism venues, nor does it

specifically evaluate the incremental benefit to the economy from increasing commercial

use of the MGRA. The EIS contains only conclusory statements that increasing

commercial visitation to the MGRA would have a beneficial economic impact to Juneau

without any analysis to support these statements.

86.     Cruise ships that come to Juneau stop at several locations in Alaska. Although the

MGRA is a popular attraction, it is not the reason that the ships come to Juneau and the

Forest Service is unable to claim that a decision to not increase commercial transporter or

outfitter capacity at the MGRA would have any impact on the number or size of cruise

ships visiting Juneau. Commercial vendors at the MGRA have an assured number of

tourists that they can transport or guide. Tourist that are unable to secure a paid tour to

the MGRA have the option to select a variety of other activities, or to find a non-

commercial means of getting to the MGRA. Of the 54 tourist activities listed in the

MGRA Market Demand and Economic analysis (incorporated by references in the EIS),

fewer than 10 involved the MGRA and this list does not present all tourist options that

are available. Most commercial operators that deliver tourist to the MGRA or provide

outfitter/guide services also take people to other tourist attractions and offer

outfitter/guide services to other trails and locations around Juneau. If the cap on

commercial special use permits is not increased, the tourism industry, including the

37

1  portion that delivers tourists to the MGRA, will still have opportunities to make money

2  off the tourists in town until their ship leaves.

3  87.     The Forest Service reached this same conclusion prior to the MGRA EIS. In 2021

4  the Forest Service changed its directive regarding point-to-point commercial transporters

5  to exclude taxis and other gig operators from driving tourists to the MGRA without a

6  commercial special use permit. Since all commercial special use permits had already

7  been allocated, the effect of this change was to prevent taxis and other gig operators from

8  accessing the MGRA at all. The Forest Service's economic analysis of this action

9  concluded that it would not have a significant economic impact on these small entities

10  because 1.16 million cruise ship visitors to Juneau engaged in activities other than

11  visiting the MGRA. Small entities excluded from the MGRA could provide services to

12  these visitors and thus "not doing business in the Visitor Center subunit does not equate

13  to not doing business in Juneau." Obviously, there would be substantial opportunity for

14  all types of tourist ventures to do business in Juneau if the number of tourists to Juneau

15  increases as anticipated but commercial capacity for the MGRA does not.

16  88.     The obvious economic benefit of increasing MGRA commercial capacity accrues

17  to the Forest Service itself through revenue from the sale of commercial special use

18  permits.  It is clear from the language and arguments in the EIS that the Forest Service's

19  definition of benefit to the economy of Southeast Alaska is growth in commercial service

20  providers to the MGRA.  The analyses in the MGRA EIS concludes that the potential for

21  economic growth under the No Action Alternative would be limited to "existing service

22  days available to each commercial provider (to the MGRA)" with local use providing "a

38

1    small measure of economic support through day-use fee collection." MGRA EIS

2    3.12.6.1. Economic growth for the Forest Service might well be limited by these factors,

3    but the MGRA vendors are not the Juneau visitor industry and economic benefit to the

4    MGRA is not equivalent to economic benefit to the economy of Southeast Alaska.

5    89.    The Forest Service's analysis of economic benefits lacks a clear methodology. It is

6    biased by the Forest Service's desired to increase revenue by maximizing the number of

7    visitors that access the MGRA through commercial transporters operating under

8    commercial special use permits. Including this specific definition of "Southeast Alaska

9    economy" in the purpose and need prejudges the outcome of the NEPA process toward

10   the alternative that maximizes commercial capacity at the MGRA.

11                    b)    Alternatives Selection and Analysis:

12   90.    The EIS evaluated three Action Alternatives and a No Action Alternative. The

13   capacity levels in the Action Alternatives were all based on the Forest Service' selected 2

14   percent per year growth rate. The total visitor levels for these alternatives vary only by

15   the time over which that growth would occur: 15, 20, or 30 years. They are in effect

16   simply shorter or longer versions of the same action not discrete alternatives as required

17   by NEPA. Three additional alternatives were added to the SDEIS. These alternatives

18   differ primarily in the location of various facilities, and they all still have the same 2

19   percent growth over the same three time periods. The EIS does not evaluate any

20   alternatives for different growth rates, or alternatives for decreasing capacity to address

21   overcrowding.

39

91.     All six action alternatives also contain several similar components, including: Parking lot expansion; New Welcome Center; Glacier spur road trailheads; a Lakeshore trail; Public use cabins; Nugget Falls trail expansion; Steep Creek modification; West glacier trails; Changes to the management unit boundaries (moving a portion of the Dredge Lake Unit into the Visitor Center Unit); the same increases to trail capacities and allocation.

92.     Comments on the limited range of alternatives were raised during public comments and the objection period, but they were ignored by the Forest Service. As an excuse for limiting the alternatives, the ROD states that a team of architects, landscape architects, engineers and natural resource specialists determined that facilities needed to be designed for peak hours and days and as a result the "infrastructure required to accommodate the 15-, 20-, and 30- year projections was largely similar." There is no discussion of this determination in the EIS. Each alternative simply identifies the components of the preferred alternative (Alternative 2) that would be matched. The public use cabins, Glacier Spur Road trailheads and dredge lake multiuse trails, which are included in all alternatives, are not used by cruise ship visitors and are therefore not subject to visitor peaks. There is no reason why there could not have been one or more alternatives that did not have these components. Changes to trail ROS levels and capacities are also the same between the alternatives, even though the total capacity of the alternatives can vary by 250,000 people. The Forest Service apparently picked the highest level and applied it regardless of the number of visitors. A reasonable alternative might have included capacities based on actual projected use. In the FEIS, only one

40

1 action alternative did not include boats, docks, a remote visitors center at the glacier face,

2 and other support facilities. Since this component of was removed from the selected

3 alternative in the ROD, its necessity to accommodating peak visitation is questionable.

4 93.     The EIS proposes to further expand the Visitor Center Unit at the expense of the

5 Dredge Lakes Unit and concludes that Alternatives 2,3,5,6, and 7 would involve

6 displacement of non-commercial visitors from the Visitor Center Unit and trails due to

7 large crowds, noise, and increased social encounters. The analysis of these alternatives

8 states that "user conflicts inevitably arise on multi-use trails between different recreation

9 types" and anticipates that "as capacity and commercial use allocations increase, more

10 social encounters and user conflicts would be expected." NEPA regulations direct federal

11 agencies to "study, develop and describe appropriate alternatives to recommended

12 courses of action in any proposal which involves unresolved conflicts concerning

13 alternative uses of available resources (42 U.S.C §4332)." The Record of Decision for the

14 EIS offers no alternatives for, or mitigation of, the user conflicts resulting from the

15 selected alternative.

16                     c)     Incomplete data on non-commercial visitor use and

17                             displacement.

18 94.     Section 3.2.2 of the EIS identifies information that was incomplete or unavailable

19 at the time of publication. This data included knowledge of visitor usage beyond counts

20 of people arriving via a special use permit leading to "uncertainty about displacement of

21 local users and how they may actually use the MGRA if crowded conditions did not exist

22 in the primary use season." The project involves reasonably foreseeable significant

41

adverse impacts on non-commercial uses of the MGRA. Information on displacement of these users and how they may use the MGRA if crowded conditions did not exist is essential to a reasoned choice among alternatives.

95.    In response to objections made to the 2015 EA, the Forest Service committed to mitigation that included, inter alia, "a trail use monitoring plan to begin in May 2016 and continuing for five years in the MGRA" and contacting "the Forestry Sciences Lab in Juneau to ascertain years to provide information about encounters on trails monitoring options (questions, design, and assessment tools) to better understand displacement of local residents who wish to recreate in the MGRA." This mitigation allowed the Forest Service to reach a Finding of No Significant Impact (FONSI) in the 2015 EA. Therefore, information on displacement should already exist for use in the MGRA EIS.

100.    Documents obtained through a FOIA request in 2021 indicate that in May 2016 the Forest Service decided against funding a displacement study as recommended by the forest laboratory and the mitigation was not implemented. The Council on Environmental Quality issued guidance on the appropriate use of mitigated FONSIs in 2011. This guidance asserts that agencies that do not disclose in the EA possible lack of funding for mitigation should not move forward with the action until funding becomes available or should prepare supplemental analyses in accordance with 40 C.F.R. § 1502.9(c) to address the effects of mitigation failure. At the very least, the MGRA EIS should not be completed before the requirements of both 40 C.F.R. §1502.22 and 40 C.F.R. 1502.9(c) have been addressed with respect to obtaining information on displacement of non-commercial recreational users of the MGRA.

42

d)      Capacity Selection and Analysis:

96.    The capacity analysis in the EIS is deeply flawed and adversely affects accurate evaluation of the environmental consequences of the action alternatives. The EIS contains two hypothesized visitor growth rates: one at 2% per annum for commercial visitors, and one at 0.3% per annum for non-commercial visitors. These assumed growth rates were used in developing and analyzing the action alternatives in the EIS (Section 3.7.5.3).

102.    Yet in the capacity analysis (Appendix A) the Forest Service applies the 2% growth rate to the 2019 total capacity of each management unit without regard for proportions of commercial and independent use. For the Visitor Center Unit, this results in a total capacity of 999,000 visitors of which the Forest Service claims to allocate 87% (869,130) to commercial users and 15% (149,840) to non-commercial users. However, if this capacity was calculated by applying a 2% growth rate to the 2019 actual commercial visitation and 0.3% to the remaining 2019 visitation, the total capacity for the Visitor Center Unit would be 967,499 people and the true commercial proportion would be 97% (937,643) of the total.  Thus, the Forest Service's analysis overestimates the non-commercial capacity by 134%.

97.    This is not just a mathematical exercise. This mathematical sleight of hand misrepresents the impact of the proposed changes on non-commercial users and calls into question the Forest Service' assertions regarding balancing commercial and non-commercial use. It deceives the public by downplaying the magnitude of the actual commercial allocation and creates an unrealistic "slush fund" of non-commercial capacity

43

1   that the Forest Service can reallocate to commercial use in the future, as was done in the

2   2015 EA when non-commercial capacity was reduced by over 90%.

3   98.    Although this issue was not addressed in the response to objections, it clearly

4   resonated with the Forest Service which sought to change the assumptions on which the

5   FEIS analysis was based after the EIS process was complete. Errata published with the

6   ROD changes FEIS Section 3.7.5.3 to claim unguided recreation will actually increase

7   faster than the local population rate. This change uses a 2023 report on post-COVID

8   increases in air travel originating from outside Southeast Alaska as evidence of an

9   increase in independent travelers, even though the data do not differentiate between

10  returning residents and visitors. Even if the data showed what the Forest Service claims,

11  it is impossible to change the assumptions on which an analysis is based after the analysis

12  is complete. This portion of the errata violates 40 C.F.R. §1503.4(c) which limits the use

13  of errata to minor changes between the draft and final environmental impact statement

14  not the objection period post-final.

15  99.    The trail capacities derived from the Forest Service capacity analysis are so

16  implausible that they cannot be the result of a reasonable scientific process. A mitigation

17  commitment made in the 2015 EA Decision Memo required the Forest Service to

18  implement a trail use monitoring plan starting in 2016 and continuing to 2021. None of

19  the monitoring data were included in the EIS, but a section summarizing Trail Monitoring

20  Surveys from 2017 through 2019 was added to the EIS Section 3.7.4.3 in response to

21  comments and FOIA request regarding the status of the mitigation. None of the data

22  summarized in this section was used in determining proposed trail capacity increases or

44

1    for analyzing action alternatives. In addition to data from the required mitigation, the

2    Forest Service has actual commercial trail use data going back to 2012. These data also

3    were not used in developing proposed trail capacity increases.

4    100.    The Forest Service has failed to identify the methodology used to develop trail

5    capacities making "explicit reference . . . to the scientific and other sources relied upon

6    for conclusions." 40 C.F.R. §1502.24. Instead of basing its analysis on actual trail use

7    data, the Forest Service chose to base its trail capacity analysis on an arbitrary group size

8    of 12 people for determining social interactions. This is the only capacity analysis for any

9    area of the Tongass, or any other national forest where a capacity analysis has been

10    published, that uses an arbitrary group size instead of actual use data. This includes the

11    Shoreline II Capacity Analysis on which the Juneau Ranger District is a signatory. This is

12    also the only capacity analysis for which the only criteria for determining capacity are the

13    recreational opportunity spectrum designation, the arbitrary group size, and the number

14    of days in the commercial use season. As a result, the total capacity for 3.5-mile East

15    Glacier Trail and the 0.5-mile Trail of Time are identical at an unbelievable 77,040

16    people per year, or one person every 5 feet every day of the 153-day commercial season

17    for the Trail of Time.

18    101.    These trail capacities are beyond what is reasonable or even possible to achieve,

19    tens of thousands of people above actual or projected trail use, and so implausible that

20    they cannot be the result of a reasonable scientific process. The Forest Service allocates a

21    relatively small proportion of these unrealistic capacities to commercial use (between

22    10% and 30%) to maintain a fallacy that actual commercial allocation is below the 50%

1  level specified in the TLMP.  However, the remaining non-commercial capacity (70% to

2  90%) for each trail is several times larger than the entire Juneau population and the

3  relatively small number of independent travelers.  In the response to comments the Forest

4  Service claims these capacities are an upper limit and do not represent actual use, but

5  these capacities are being used to allocate commercial service days and to imply that

6  commercial allocation for trails is lower than it actually is.  The only real number in this

7  analysis is the number of service days the Forest Service will give to each vendor.

8  102.    The capacity analysis is further flawed because the standard for setting the

9  capacity is based on controlling the number of group encounters as specified for the ROS

10  designation, but the Forest Service does not manage trail use in this way.  Vendors are

11  simply allocated a total number of people they can guide in a year and as a result the

12  Forest Service cannot ensure that the vendor doesn't guide many more groups than the

13  analysis anticipates.  If a vendor distributes its allocation across smaller sized groups, the

14  result would be more encounters than allowed under the ROS criteria.  For example, for a

15  given allocation a vendor could have twice as many groups comprised of 6 people than of

16  12 people.  The analysis also assumes that encounters will be evenly spread across all

17  days in the tourist season, despite the EIS acknowledging that peak tourism periods

18  occur.  Applying an allocation to anything other an even by number of groups per day

19  will also lead to higher encounters than allowed under the ROS.  The method for

20  determining capacity and the way that capacity is implemented are completely unrelated

21  with no rational connection or justification for the disconnect between them.

22                              e)        Direct and Indirect Effects

46

103.    The selected alternative will increase the capacity of the entire MGRA to 1,286,000 visitors.  Facilities will be constructed to accommodate this level of visitation, and new services including food services will be offered.  The facilities and services will generate solid waste (food and other solid wastes) and sewage.  Under NEPA, direct actions are those which are caused by the action and occur at the same place and time." The sewage and solid waste generated from the action is a reasonably foreseeable direct impact of the Forest Service's decision to increase the MGRA capacity.  The project does not provide for onsite treatment of waste, yet the EIS contains no discussion of impacts from the action on waste infrastructure in Juneau.

104.    The Mendenhall Wastewater Treatment Facility is designed to service a population of less than 30,000 people.  Adding the sewage of more than 1 million people to the waste stream to be processed by that facility is clearly a major federal action under the meaning of 40 C.F.R. §1508.18.  Concern about the lack of consideration for waste treatment was raised by the plaintiff and the Forest Service response was: "All connections to the public water and wastewater utility would need to be permitted by the City and Borough of Juneau, who would consider potential impacts to public utilities." Responsibility for evaluating the impacts of the Project rests with the Forest Service.  It cannot shift this responsibility and any potential costs to the local government and its taxpayer base.  Wastewater permitting is not discussed in EIS Section 1.9 Applicable permits, nor is there any evidence that the scale of wastewater needs for the Project were discussed with the City and Borough of Juneau (section 1.7.3).

47

105.    The proposed alternative includes the sale of food and drink which heretofore has not been allowed. Sale of food and drink will generate waste that must be dealt with either through onsite management or disposal into the municipal landfill.  The Forest Service does not estimate the anticipated type or level of waste that would be generated by over 1 million tourists, nor does it discuss potential mitigation measures such as requiring the use of compostable materials in all food service items.  According to the Juneau Public Works Division, the Juneau landfill has approximately 20-years of remaining life at current Juneau waste production levels.  Waste contributed as a result of the project may substantially shorten this lifespan.  Since Juneau is a landlocked community, alternatives to the landfill are likely to be expensive and paid for using municipal resources collected from property taxes.  NEPA requires the Forest Service to evaluate the impacts of this aspect of the project.

## CLAIMS FOR RELIEF

**Claim 1 – Violations of NEPA, NFMA, and the APA – Purpose and Need.**

106.    All allegations set forth above are incorporated here by reference.

107.    By predicating its NEPA analysis on a manufactured purpose and need that specified a rate and level of projected visitor increase that could only be achieved by implementing capacity increases included in the selected alternative, the Forest Service prejudged the outcome of the EIS in violation of NEPA, 42 U.S.C. §§4321-4347, its implementing regulations, 40 C.F.R. parts 1500-1508, the APA, 5 U.S.C §706(2), and NFMA 16 U.S.C §1600-1687.

48

108.    By deciding that the commercial capacity cap at the MGRA would be increased by a specified rate prior to initiating the MGRA EIS for which determining whether to increase capacity is part of the decision framework, and for doing so without any other NEPA review for this decision to increase capacity which is a clearly an independent, discretionary federal action significantly affecting the quality of the human environment, the Forest Service has violated NEPA 42 U.S.C §§4321-4347, its implementing regulations 40 C.F.R. parts 1500-1508, and the APA 5 U.S.C §706(2).

109.    By using language in the text of the EIS and in responses to public comments that claims that the projected increase in commercial visitation to the MGRA is something to which the Forest Service is responding rather than creating by removing capacity limits, the Forest Service has violated NEPA, 42 U.S.C. §§ 4321-4347, its implementing regulations 40 C.F.R. parts 1500-1508, and NFMA, 16 U.S.C §1600-1687, and acted arbitrarily and capriciously in violation of the APA, 5 U.S.C §706(2).

110.    By predicating its NEPA analysis on a purpose and need that prioritizes the interests of one recreational user group over others, the Forest Service prejudged the outcome of the EIS and violated the NFMA 16 U.S.C §1600-1687 and the TLMP Recreation and Tourism Forest-wide Standards and Guidelines.

111.    By predetermining that the needs of the visitor industry would be considered paramount to those of other conflicting uses, and for doing so without any other NEPA review for this decision which is a clearly a discretionary federal action significantly affecting the quality of the human environment, the Forest Service has violated NEPA 42

49

1  U.S.C §§4321-4347, its implementing regulations 40 C.F.R. parts 1500-1508, and the

2  APA 5 U.S.C §706(2)

3  112.   By conflating the economy of southeast Alaska with benefits accruing to the

4  Forest Service from the issuance of commercial special use permits and conducting a

5  flawed analysis that lacks any clear, quantifiable methodology and fails to evaluate the

6  economic value of increasing commercial capacity at the MGRA in the context of

7  alternative tourist activities, the Forest Service prejudged the outcome of the EIS in favor

8  of maximizing commercial capacity increases and special use authorizations that provide

9  the greatest revenue to the Forest Service in violation of NEPA, 42 U.S.C §§4321-4347,

10  its implementing regulations 40 C.F.R. parts 1500-1508, and the APA 5 U.S.C §706(2).

11  113.   The Forest Service's prejudgment of the outcome of the NEPA process through

12  construction of a Purpose and Need so narrow as to define competing, reasonable

13  alternatives out of existence is arbitrary and capricious, an abuse of discretion or

14  otherwise not in accordance with law 5 U.S.C §706(2).

### Claim 2 – Violations NEPA and APA – Alternatives

16  114.   All allegations set forth above are incorporated here by reference.

17  115.   By including in the analysis only alternatives that utilize the Forest Service's

18  chosen rate of visitor growth, failing to consider reasonable alternatives to that rate, and

19  failing to honestly respond to petitioner's and others comments requesting justification of

20  that rate by implying that the projected growth was beyond the Forest Service's control

21  the Forest Service's EIS, ROD and Final Rule violate NEPA, 42 U.S.C §§4321-4347, its

22  implementing regulations 40 C.F.R. parts 1500-1508, and the APA 5 U.S.C §706(2).

50

116. By including several facility and structural project components in all of the action alternatives and disingenuously claiming in the response to objections and as a post hoc rationalization that does not occur anywhere within the EIS that these facilities were required to address peak visitation even when they are not subject to visitation peaks, the Forest Service prejudged the outcome of the EIS with regard to these components such that the Forest Service's EIS, ROD and Final Rule violate NEPA 42 U.S.C §§4321-4347, its implementing regulations 40 C.F.R. parts 1500-1508, and the APA 5 U.S.C §706(2).

117. By acknowledging the displacement of local and non-guided users from the MGRA but failing to develop alternatives with a lower level of tourism growth than Forest Service's chosen rate, the Forest Service failed to comply with the NEPA directive to "study, develop and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources (42 U.S.C §4332)."

## Claim 3 – Violations NEPA and APA – Incomplete Data

118. All allegations set forth above are incorporated here by reference.

119. By failing to consider information on displacement of non-guided users which is essential to a reasoned choice among alternatives and which the Forest Service committed to studying as mitigation for the 2015 EA and FONSI and should already possess, the Forest Service's EIS, ROD and Final Rule violate NEPA 42 U.S.C §§4321-4347, its implementing regulations 40 C.F.R. parts 1500-1508, and the APA 5 U.S.C §706(2).

## Claim 4 – Violations NEPA – Capacity Analysis

51

120.    All allegations set forth above are incorporated here by reference.

121.    By developing a capacity analysis that ignores the levels of both the presumed commercial and non-commercial visitor increases stated in the EIS itself, fails to apply basic mathematical principles, has no credible scientific basis, and attempts to post hoc revise the visitation assumptions on which the alternative development and analysis in FEIS was based through the inappropriate use of errata, the Forest Service violated 40 C.F.R. §1502.24 regarding both scientific and professional integrity and 40 C.F.R. §1503.4(c) regarding the appropriate use of errata.

122.    By developing trail capacities that are beyond what is reasonable or even possible to achieve, tens of thousands of people above actual or projected trail use, and so implausible that they cannot be ascribed to a difference of view or a product of agency expertise, the capacity analysis underlying the development and analysis of alternatives is arbitrary and capricious in violation of APA 5 U.S.C §706(2).

### Claim 5 – Direct and Indirect Effects

123.    All allegations set forth above are incorporated here by reference.

124.    By failing to consider the impacts on solid and wastewater infrastructure from the Forest Service' choice to increase the commercial visitation level for the MGRA to over 1 million people and allow food and drink consumption and associated waste the Forest Service's EIS, ROD and Final Rule fail to take a "hard look" at an important aspect of the Project, in violation of NEPA 42 U.S.C §§4321-4347, and its implementing regulations 40 C.F.R. parts 1500-1508, and the APA 5 U.S.C §706(2).

### **PRAYER FOR RELIEF**

52

Plaintiff respectfully requests the Court enter a judgement in her favor and against the Defendants and provide the following relief:

(1)    Declare that the Forest Service's EIS and ROD violate NEPA, the NFMA, the TLMP and the APA;

(2)    Declare unlawful and issue an injunction setting aside the Defendant's decisions to increase visitor capacity at the MGRA and develop associated infrastructure.

(3)    Set aside the Forest Service's EIS and ROD for the Project

(4)    Enjoin the Forest Service from taking any action to implement the Project;

(5)    Provide any other relief the Court deems just and/or proper.

DATED July 29, 2024.

By: /s/ *Katharine Miller*
Katharine B. Miller
8302 Gladstone Street
Juneau, AK 99801
(907) 523-8991
Dio36dio@gmail.com

*Plaintiff (Pro Se)*

53