# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

KATHARINE B. MILLER,

               Plaintiff,

    v.

U.S. FOREST SERVICE, *et al.*,

               Defendants.

Case No. 1:24-cv-00013-SLG

## ORDER ON MOTION FOR SUMMARY JUDGMENT

Before the Court at Docket 20 is self-represented Plaintiff Katharine B. Miller's Motion for Summary Judgment.[1] Defendants U.S. Forest Service and Francis Sherman, Forest Supervisor of the Tongass National Forest (collectively, the "Forest Service"), responded in opposition at Docket 22.[2] Plaintiff replied at Docket 28. Oral argument was held on May 23, 2025.[3] For the reasons set forth below, Plaintiff's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.

---

[1] Plaintiff's Opening Brief in Support of Motion for Summary Judgment is at Docket 21. Plaintiff later filed an Amended Motion for Summary Judgment at Docket 25-3. The Court cites to Plaintiff's Opening Brief at Docket 21 because Plaintiff's Amended Motion is substantially the same as her initial Opening Brief except in regard to standing, *see infra* n.74.

[2] On March 10, 2025, Federal Defendants filed a Notice of Errata "to correct certain citations to the administrative record" in its Response Brief. Docket 24 at 2; *see* Docket 24-1 (Corrected Defendants' Response Brief with changes in redline); Docket 24-2 (clean copy of Corrected Defendants' Response Brief). For ease of reference, this order cites to the clean copy of Corrected Defendants' Response Brief at Docket 24-2.

[3] Docket 33.

## BACKGROUND

This action concerns the December 2023 Record of Decision ("ROD") authorizing the Mendenhall Glacier Visitor Facility Improvements Project ("the Project").[4]

Mendenhall Glacier Recreation Area ("MGRA") is located about 12 miles north of downtown Juneau, Alaska.[5] The Mendenhall Glacier is located between Mount McGinnis and Mount Bullard, and it has carved out Mendenhall Valley, leaving behind a network of rivers and ponds.[6] The MGRA includes parts of Mount McGinnis, the terminus of the Mendenhall Glacier, Mount Bullard, Mendenhall Lake, Mendenhall River, and the uplands bordering the Mendenhall Lake and River.[7] The MGRA is a popular recreation destination, offering opportunities for hiking, biking, canoeing and kayaking, Nordic skiing, snowshoeing, wildlife viewing, and camping.[8] The area supports five species of salmon, brown and black bears, wolves, mountain goats, goshawk, shorebirds, and seabirds.[9] The Mendenhall Glacier Visitor Center is the most visited summer attraction in Alaska due to "the opportunity to see one of the nation's most accessible glaciers, the

---

[4] Docket 1 at ¶ 1.

[5] FS_020318.

[6] FS_020318.

[7] FS_018015-16.

[8] FS_020319.

[9] FS_020319.

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 2 of 49
Case 1:24-cv-00013-SLG    Document 37    Filed 09/30/25    Page 2 of 49

ability to safely interact in close proximity to Alaskan wildlife, and the accessibility of a variety of recreation activities."[10]

The Tongass National Forest, in which the MGRA is situated, was established in 1907.[11]  In 1935, the Forest Service designated the area as the "Mendenhall Lake Recreation Area."[12]  In 1947, the Forest Service reclassified it as the MGRA.[13]  In 1952, the Secretary of the Interior formally withdrew the "Mendenhall Scenic and Winter Sports Area" as a recreation area through Public Land Order 829.[14]  The Mendenhall Glacier Visitor Center was completed in 1962, and it was dedicated to furthering the "understanding and enjoyment o[f] glacial phenomena."[15]

The Multiple Use and Sustained Yield Act enacted in 1960 directs that the national forests, including the Tongass, be administered "for outdoor recreation, range, timber, watershed, and wildlife and fish purposes."[16]  The Forest Service's Tongass Land and Resource Management Plan classifies the MGRA as a "Special Interest Area," which is an area that is intended to "remain largely undisturbed by

---

[10] FS_000006.

[11] FS_020318.

[12] FS_020318.

[13] FS_018015.

[14] FS_018015-16; Public Land Order 829, 17 Fed. Reg. 4709, 4709-10 (May 22, 1952).

[15] FS_018015.

[16] 16 U.S.C. § 528.

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 3 of 49
Case 1:24-cv-00013-SLG    Document 37    Filed 09/30/25    Page 3 of 49

human uses or activities, except . . . in some cases, [for] recreation developments, and [to] provide quality opportunities for public study, use, and enjoyment."[17] Management direction for the MGRA is provided under 36 C.F.R. § 294.1(a), which classifies it as a special area that "[should] be managed principally for recreation use substantially in [its] natural condition."[18]

The Forest Service's "MGRA Management Plan was developed to provide specific management direction at the MGRA, including desired future conditions, management objectives, and implementation strategies. It also summarizes visitor capacities and sets commercial allocations for outfitters, guides, transporters, and other service providers . . . ."[19] The original MGRA Management Plan was developed in 1960; it has been revised in 1965, 1975, and 1996.[20] The Plan creates three management units in the MGRA—the Visitor Center Unit, the Dredge Lakes Unit, and the West Glacier Unit.[21]

The MGRA Management Plan was most recently updated in 2015, following a 2014 Environmental Assessment ("EA") and 2015 Finding of No Significant

---

[17] FS_000066; FS_000131; FS_000575.

[18] FS_018017.

[19] FS_016712.

[20] FS_018015; *see* FS_018015-FS_018032 (1996 MGRA Management Plan). The 1996 revision was initiated due to "changes in recreation use patterns, conflicts among user groups, resource damage concerns, and new project opportunities[]" since the 1975 Management Plan. FS_018001 (1996 Record of Decision).

[21] FS_016707; FS_016688.

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 4 of 49

Case 1:24-cv-00013-SLG    Document 37    Filed 09/30/25    Page 4 of 49

Impact ("FONSI") pursuant to the National Environmental Policy Act ("NEPA").[22] The impetus behind the 2015 Management Plan revision was to address the "increase in visitor demand for commercial uses, including transport, outfitting, and most specifically guide services"; the revised plan "increase[d] the commercial allocation on trails and Mendenhall Lake to meet the public demand."[23]

In 2019, the Forest Service made additional modifications to the commercial allocation for two of the three management units at the West Glacier Unit and Visitor Center Unit in the MGRA through the issuance of a Supplemental Information Report ("SIR").[24] The SIR increased the commercial allocation for the Visitor Center Unit by 12% to 517,650 people per year, and increased the commercial allocation for the West Glacier Unit by 10% to 55,000 people per year. The report also noted that "[w]ith the pending Mendenhall Glacier Visitor Facility Improvement Project there may be opportunity in future years to increase commercial use substantially as additional infrastructure improvements are made."[25]

As part of the 2015 FONSI, the Forest Service stated that it would implement the following mitigation measures "[t]o avoid and minimize potential environmental

---

[22] FS_018058-FS_018079 (2015 Decision and FONSI).

[23] FS_018060.

[24] FS_005301; FS_005304.

[25] FS_005304.

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 5 of 49

Case 1:24-cv-00013-SLG     Document 37     Filed 09/30/25     Page 5 of 49

impacts from the project":

- The Forest Service will implement a trail use monitoring plan to begin in May 2016 and continue for five years to provide information about encounters on trails in the MGRA. . . .

- The Forest Service will contact the Forestry Sciences Lab in Juneau to ascertain monitoring options (questions, design, and assessment tools) to better understand displacement of local residents who wish to recreate in the MGRA.[26]

In 2018, the Forest Service developed the Mendenhall Glacier Master Plan, which "represents a twenty-year development plan within a larger fifty-year vision."[27]  In that plan, the Forest Service stated that in the MGRA, "[d]emand exceeds capacity; congestion, long waits, under-capitalized opportunities, and inadequate visitor facilities result in a degraded visitor experience.  Visitation to Juneau is expected to grow 2-4% annually, with the potential for periods of much higher growth," which "continues to increase the pressure on facilities and further impacts the visitor experience."[28]  In addition, "[t]he Mendenhall Glacier is rapidly receding, and the terminus of the glacier is expected to recede from view (from the existing visitor center) by 2050."[29]

Pursuant to NEPA, on March 4, 2022, the Forest Service published a notice

---

[26] FS_018063-64.  These mitigation measures were also incorporated into the 2019 SIR.  *See* FS_005302 (letter enclosing the Supplemental Information Report stating that "[a]ll mitigation measures prescribed in the Decision Notice remain in effect").

[27] FS_000001; FS_000010.

[28] FS_000006.

[29] FS_000006.

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 6 of 49

Case 1:24-cv-00013-SLG     Document 37     Filed 09/30/25     Page 6 of 49

of availability of a draft environmental impact statement ("EIS") for the Mendenhall Glacier Visitor Facility Improvements Project.[30]   Following the public comment period and the publication of a supplemental draft EIS with additional alternatives, the Forest Service published its Final EIS ("the 2023 FEIS") for the Project in May 2023.[31]   In a section titled Purpose of and Need for Action, the 2023 FEIS states that "[t]he number of visitors to the MGRA is projected to increase at a rate of approximately 2 percent annually for the next 30 years as the cruise industry continues to grow in the region and the tourism season expands, with a projection of 1,000,000 visitors annually by 2050."[32]   The 2023 FEIS "Purpose and Need Statement" provides that:

> The purpose of the project is to update infrastructure and create recreation opportunities at the MGRA that can accommodate projected future visitor use while protecting the unique characteristics and outstanding beauty of the area. The project is needed to continue to provide quality opportunities for all visitors to enjoy the recreation area, to provide new recreation and interpretation experiences that emphasize the area's outstanding scenery and wildlife resources even as the glacier recedes out of view of the existing Visitor Center, to meet the demand of the visitor industry and support the economy of Southeast Alaska, and to protect the area from environmental impacts associated with increased visitation.[33]

 "Visitor capacity" of the MGRA's three units (the Visitor Center Unit, Dredge

---

[30] FS_016686.

[31] FS_016683-FS_017085 (2023 FEIS Volume I); FS_017086-FS_017549 (2023 FEIS Volume II).

[32] FS_016712.

[33] FS_016713.

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 7 of 49

Case 1:24-cv-00013-SLG     Document 37     Filed 09/30/25     Page 7 of 49

Lakes Unit, and West Glacier Unit) reflects "the maximum amounts and types of visitor use that an area can accommodate while achieving and maintaining the desired resource conditions and visitor experiences that are consistent with the purposes for which the area was established."[34] Visitor capacity is "expressed as the number of individual visits to a unit over the days" of the primary use season— i.e., the tourist season.[35] "The Forest Service allocates a percentage of total [visitor] capacity in different areas of the MGRA for commercial use. For example, the Visitor Center Unit, which sees the greatest number of visitors, has a high percentage of total use allocated to commercial use."[36] The Forest Service does not limit entry into the MGRA for those entering without a commercial service provider.[37] "Every commercial client that visits the MGRA represents one service day for that commercial vendor."[38] Recently, due to the extended tourist season with early-season and late-season cruise ship arrivals, "current visitor capacity in the Visitor Center Unit is managed at 544,890 service days, which was established for a 153-day primary use season."[39]

In the 2023 FEIS, the Forest Service evaluated six action alternatives

---

[34] FS_016892.

[35] Docket 24-2 at 8; *see also* FS_017088.

[36] FS_016893.

[37] FS_016893.

[38] Docket 24-2 at 9; *see also* FS_16688.

[39] Docket 24-2 at 9; *see also* FS_17097.

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 8 of 49

Case 1:24-cv-00013-SLG    Document 37    Filed 09/30/25    Page 8 of 49

(Alternatives 2 through 7) for the Project and one no action alternative (Alternative 1).[40]  All six action alternatives provide for infrastructure improvements, including parking lots and access expansion, construction of a new welcome center, improvements to the historic Visitor Center, trail improvements, habitat restoration, and construction of public use cabins.[41]

Each of the action alternatives estimates future visitor capacity at the Visitor Center Unit "based on 2% [annual] growth in visitation over three different timeframes," which corresponds to the tourism growth projections for the City and Borough of Juneau.[42]  Current Visitor Center Unit capacity following the 2019 SIR was calculated to be 544,890 commercial service days.[43]  Alternatives 2, 5, and 7 are based on a 30-year 2% annual growth projection, Alternatives 3 and 6 are based on a 2% annual growth 20-year projection, and Alternative 4 is based on a 15-year 2% annual growth projection.[44]  The resultant 15-year, 20-year, and 30-year visitor capacities for the Visitor Center Unit are 752,000, 830,000, and 999,000 commercial use service days, respectively.[45]  These capacity estimates "were used to analyze future infrastructure needs, permitting needs, and impacts"

---

[40] FS_016689-90.

[41] FS_016728-39.

[42] FS_017088.

[43] FS_017088.

[44] FS_017088-89.

[45] FS_017088.

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 9 of 49

Case 1:24-cv-00013-SLG    Document 37    Filed 09/30/25    Page 9 of 49

for the Visitor Center Unit.[46]

In December 2023, the Forest Service issued its Final ROD ("the 2023 ROD").[47] The 2023 ROD "approve[d] new facilities and facility improvements, including parking lots and access expansion; construction of a new welcome center and visitor plazas; and improvements to the historic Visitor Center; Steep Creek habitat restoration; construction, improvement, or designation of the Lakeshore, Nugget Falls, Steep Creek, and West Glacier Spur trails and the Dredge Lake and West Glacier unit multi-use trails; construction of Glacier Spur Road trailheads; and construction of public use cabins" as well as "installation of culverts or other required drainage structures, grading, removal of outdated infrastructure and materials, vegetation management to preserve views, revegetation, and other maintenance of facilities and trails."[48]

The 2023 ROD also made changes to the 2015 MGRA Management Plan concerning visitor capacity and commercial use allocations.[49] The 2023 ROD states that "visitor capacity estimates and commercial use allocations will be updated to allow for increased visitation following facility improvements and management actions."[50] With respect to the Visitor Center Unit, the 2023 ROD set

---

[46] FS_017089.

[47] FS_020228-FS_020310 (Final 2023 ROD); FS_020311-FS_020393 (Final Signed 2023 ROD).

[48] FS_020322.

[49] FS_020322.

[50] FS_020255; *see also* FS_020338.

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 10 of 49

Case 1:24-cv-00013-SLG    Document 37    Filed 09/30/25    Page 10 of 49

visitor capacity at 999,000 visitors per year with designated commercial use at 87% of total capacity for the 30-year projections in Alternatives 2, 5, and 7.[51]   At full implementation, this allocates 869,130 service days per year to commercial use over the primary use season.[52]   With respect to the West Glacier Unit, the 2023 ROD set visitor capacity to 287,000 with 42% designated commercial use, allocating 120,170 service days to commercial use at full implementation.[53]   The 2023 ROD did not allocate any commercial use to the Dredge Lakes unit, which was not given a capacity estimate.[54]   The 2023 ROD provides that visitor capacity and commercial use allocations will be updated to allow for increased visitation only after facility improvements are complete, following a process outlined in an attached Adaptive Management Plan.[55]   The 2023 ROD also lengthened the primary use season from 153 days to 214 days each year, from April 1 through October 31.[56]

Capacities for each trail in the MGRA are based on the Recreation Opportunity Spectrum ("ROS") classification system.[57]   The ROS is a "Forest

---

[51] FS_020338.

[52] FS_020338.

[53] FS_020338.

[54] FS_020338.

[55] FS_020338.

[56] FS_020380.

[57] FS_017089.

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 11 of 49

Case 1:24-cv-00013-SLG     Document 37     Filed 09/30/25     Page 11 of 49

Service classification system that offers a framework for analyzing and providing a range of recreation experiences in different settings across the forest."[58]  There are seven ROS classes ranging from highly-trafficked to remote, and each ROS class "provides a different setting and features (e.g., scenic quality, ease of access, remoteness, visitor management, facilities, social encounters, visitor impacts)."[59] For each ROS designation, there is an expected number of social encounters.[60] Trail capacities for each trail are calculated based on the ROS class, the associated number of social encounters, and the group size.   For example, on a "rural" ROS trail, users may meet up to 30 parties of 12 people per day; therefore, the trail capacity would be 30 parties x 12 people x 214 days (season length) = 77,040 visitor trail capacity.[61]  In the 2023 FEIS, "[i]ncreases in visitor capacity between the no action and action alternatives for trails are due primarily to the increase in season length from 153 to 214 days; the change in ROS designation for the East Glacier, Powerline, Moraine Ecology, and Trail of Time trails; and the increase in estimate of people at one time . . .  for urban trails."[62]

In December 2023, the Forest Service published an errata to the 2023 FEIS

---

[58] FS_016893.

[59] FS_016893.

[60] FS_016894.

[61] FS_017090.

[62] FS_017089; *see also* FS_017091-92 (showing the trail capacities under each alternative).

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 12 of 49

Case 1:24-cv-00013-SLG     Document 37     Filed 09/30/25     Page 12 of 49

("the 2023 FEIS Errata").[63]  The 2023 FEIS Errata replaced the statement from its Recreation and Visitor Experience Assumptions that "[u]nguided recreation use is not expected to increase at rates higher than the general population growth" with the assumptions that "[l]ocal recreation use is not expected to increase at rates higher than the general population growth, since it is assumed to be closely related to resident population" but that "independent travellers [sic] are expected to increase over the life of the project."[64]

On July 30, 2024, Plaintiff initiated this action challenging the 2023 FEIS and the 2023 ROD and alleging violations of NEPA, 42 U.S.C. §§ 4321-47; NEPA implementing regulations, 40 C.F.R. §§ 1500-1508; the Administrative Procedure Act, 5 U.S.C. §§ 701-06 ("APA"); and the National Forest Management Act, 16 U.S.C §§ 1600-87 ("NFMA").[65]

On January 27, 2025, Plaintiff filed a Motion for Summary Judgment.[66]  On March 11, 2025, Plaintiff filed an Amended Motion for Summary Judgment, which included an affidavit on standing.[67]  Plaintiff first requests that the Court

---

[63] FS_020215-FS_020227.

[64] FS_020218; FS_016892; FS_016909.

[65] Docket 1.  Plaintiff did not brief the NFMA claim in Opening Brief in Support of Motion for Summary Judgment in this administrative appeal.  Thus, she has waived that claim.  *See Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) ("[W]e will not consider any claims that were not actually argued in appellant's opening brief.").

[66] Docket 20; Docket 21 (Plaintiff's Opening Brief in Support of Motion for Summary Judgment).

[67] Docket 25; Docket 25-1; Docket 25-3 (Plaintiff's Amended Opening Brief in Support of Motion for Summary Judgment).

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 13 of 49

Case 1:24-cv-00013-SLG     Document 37     Filed 09/30/25     Page 13 of 49

supplement the administrative record with three additional documents.[68]  Plaintiff then asks the Court to vacate the 2023 ROD and the 2023 FEIS for five reasons: First, she maintains that the Forest Service "unlawfully limited the Purpose and Need for the project and prejudged the outcome of the EIS by specifying a projected level of visitor increase" that could only be achieved by implementing the capacity increases included in the selected alternative in violation of NEPA (Claim 1).[69]  Second, she asserts that the Forest Service violated NEPA by failing to consider a reasonable range of alternatives in its 2023 FEIS (Claim 2).[70]  Third, she asserts that "[t]he Forest Service has violated 40 C.F.R. § 1502.22 regarding missing information essential to the EIS and failed to implement mitigation from the 2015 FONSI in violation of the APA" (Claim 3).[71]  Fourth, she maintains that the Forest Service's "[t]rail capacity analyses do not meet NEPA standards for scientific integrity" (Claim 4).[72]  Lastly, she maintains that the Forest Service violated NEPA's implementing regulations by failing "to consider the impacts of its decision to increase commercial visitor capacity at the MGRA on municipal waste

---

[68] Docket 21 at 7-9.  With respect to Plaintiff's third requested document—the Mendenhall Glacier Visitor Center Improvement Project Scoping Report—the Forest Service "agree[d] that the Scoping Report was excluded from the record in error" and promptly filed the Scoping Report as part of its Second Administrative Record Supplement on March 3, 2025.  *See* Docket 21 at 7; Docket 24-2 at 30; Docket 23-1.

[69] Docket 21 at 15-16.

[70] Docket 21 at 16-18.

[71] Docket 21 at 18.

[72] Docket 21 at 19.

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 14 of 49

utilities"(Claim 5).[73]

In its Response Brief, the Forest Service takes issue with each of Plaintiff's asserted claims and also asserts that Plaintiff "has not met her burden on standing."[74] Plaintiff replied on March 21, 2025.[75] Oral argument was held on the motion on May 23, 2025.[76]

---

[73] Docket 21 at 19.

[74] The Forest Service contended that "Plaintiff has submitted no affidavits or other evidence with her summary judgment motion to establish her standing." Docket 24-2 at 15. On March 11, 2025, Plaintiff filed a Motion for Leave to Amend Opening Brief in which she attached an Affidavit of Standing. Docket 25; Docket 25-1. At oral argument on May 23, 2025, the Forest Service confirmed that it no longer contests Plaintiff's standing. Docket 36 at 2.

The Court agrees that Plaintiff has met her burden to establish standing. Plaintiffs bear the burden of demonstrating standing, and they must show that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). On a summary judgment motion, the plaintiff "must 'set forth' by affidavit or other evidence 'specific facts'" to support standing, which will be taken as true for purposes of the motion. *Lujan*, 504 U.S. at 561 (quoting Fed. R. Civ. P. 56(e)). Here, Plaintiff's Affidavit of Standing sets forth evidence that she owns property adjacent to the road access to the MGRA and that she and her family "have used the MGRA extensively year around [sic] for hiking, skiing, and outdoor education." Docket 25-1 at 2. Plaintiff further alleges that "[t]he considerable increase in traffic (e.g., an estimated 40 buses per hour) . . . from the project's expansion of visitor capacity and commercial transporter allocations will substantially increase the level of bus and vehicle traffic congestion, noise, and safety concerns [and] . . . adversely affect property values in [her] neighborhood," and that an "increase[] in permitted visitors will adversely affect [her] enjoyment and use of the MGRA and will diminish [her] ability to use the area for seeking greater solitude for recreation, research, wildlife viewing, and spiritual and aesthetic enjoyment." Docket 25-1 at 2-3. Taking these allegations as true and construing them in the light most favorable to Plaintiff, she plausibly alleges a concrete and particularized injury, a causal connection between that injury and the Forest Service's decision to move forward with the Project, and a likelihood that a favorable decision will redress these injuries.

[75] Docket 28.

[76] Docket 33.

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 15 of 49

# LEGAL STANDARD

This action arises under the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.*, which provides for judicial review of final agency action. In reviewing an administrative agency's decision, the "function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."[77] "[S]ummary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did."[78]

Pursuant to Section 706 of the APA, a reviewing court shall set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[79]

> The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained. Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency. A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision.[80]

The APA requires courts to "exercise their independent judgment in deciding whether an agency has acted within its statutory authority . . . . [C]ourts need not

---

[77] *City & Cnty. of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997) (internal quotation marks omitted) (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985)).

[78] *Id.* (internal quotation marks omitted) (quoting *Occidental Eng'g Co.*, 753 F.2d at 770).

[79] 5 U.S.C. § 706(2)(A).

[80] *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 16 of 49

and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous."[81]

In *Seven County Infrastructure Coalition*, the Supreme Court recently held that "[a] course correction of sorts is appropriate to bring judicial review under NEPA back in line with the statutory text and common sense."[82] The Court emphasized that NEPA "is a purely procedural statute" that "imposes no substantive environmental obligations or restrictions."[83] "Rather, NEPA "simply prescribes the necessary process' for an agency's environmental review of a project. A reviewing court's only role "is to confirm that the agency has addressed environmental consequences and feasible alternatives as to the relevant project."[84] In undertaking that review, the Court stressed that "the central principle of judicial review in NEPA cases is deference."[85] And even if an environmental impact statement does "fall[] short in some respects, that deficiency may not necessarily require" vacatur of an agency's approval of a project, "absent reason to believe that the agency might disapprove the project if it added more to the" environmental impact statement.[86]

---

[81] *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412-13 (2024).

[82] *Seven Cnty. Infrastructure Coal. v. Eagle County*, 605 U.S. ___, 145 S. Ct. 1497, 1514 (2025).

[83] *Id.* at 1507 ("NEPA is a procedural cross-check, not a substantive roadblock.").

[84] *Id.* at 1504.

[85] *Id.* at 1511; *id.* at 1515 ("The bedrock principle of judicial review in NEPA cases can be stated in a word: Deference.").

[86] *Id.* at 1514.

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 17 of 49

Case 1:24-cv-00013-SLG    Document 37    Filed 09/30/25    Page 17 of 49

The APA provides that judicial review of agency action be based on "the whole record."[87]  The "whole record" comprises "everything that was before the agency pertaining to the merits of its decision,"[88] including all materials "directly or indirectly considered by agency decision-makers."[89]

## DISCUSSION

### I. The Court Denies Plaintiff's Request to Supplement the Administrative Record.

Plaintiff requests that the Court supplement the administrative record with two extra-record documents.[90]  The first document is "an April 2016 email from Linda Kruger, Forest Laboratory, to Brad Orr, Juneau District Ranger, transmitting a report on recommended options for investigating displacement of local users of the MGRA."[91]  Plaintiff cites to two places in the administrative record where the agency references this report from Ms. Kruger.[92]  The second document is a draft plan of the MGRA Trail Use Study with comments.[93]  According to Plaintiff, "this document provides evidence of the [Forest Service's] decision to not meet its

---

[87] 5 U.S.C. § 706.

[88] *Portland Audubon Soc. v. Endangered Species Comm.*, 984 F.2d 1534, 1548 (9th Cir. 1993).

[89] *Thompson v. U.S. Dep't of Lab.*, 885 F.2d 551, 555 (9th Cir. 1989) (emphasis and internal quotation marks omitted) (quoting *Exxon Corp. v. Dep't of Energy*, 91 F.R.D. 26, 33 (N.D. Tex. 1981)).

[90] Docket 21 at 7-8.  With respect to Plaintiff's third request, the Forest Service agreed to its supplementation and lodged it with the administrative record.  *See supra* n.68.

[91] Docket 21 at 8; *see* Docket 21-3.

[92] Docket 21 at 8 (first citing FS_014489; and then citing FS_019313-86).

[93] Docket 21 at 8 (citation omitted); *see* Docket 21-4.

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 18 of 49

Case 1:24-cv-00013-SLG    Document 37    Filed 09/30/25    Page 18 of 49

commitment to study displacement of local recreational users made in the 2015 [FONSI]." [94] Plaintiff asserts both documents are relevant to Claim 3.[95]

The Forest Service opposes supplementation, asserting that Plaintiff "presents no evidence of bad faith or improper behavior" and that "[w]ithout such a showing, internal deliberative emails and drafts such these [sic] are not part of the administrative record."[96]

In addition to the administrative record, a court may consider extra-record evidence in the following four circumstances, each of which is to be narrowly construed:

> (1) admission of extra-record evidence is necessary to ascertain whether the agency considered all relevant factors and explained its decision; (2) the agency relied on documents not in the record; (3) clarification of technical matter is needed; or (4) the agency acted in bad faith.[97]

The Court finds that neither the 2016 email from Ms. Kruger—in which Ms. Kruger "recommend[s] commissioning a baseline study of use of the area that goes beyond encounters to explore overall experience quality"[98]—nor the draft plan of the MGRA Trail Use Study—which includes a comment stating that the author

---

[94] Docket 21 at 8; *see also* Docket 28 at 17.

[95] *See* discussion *infra* Section 0.

[96] *Safari Club Int'l v. Haaland,* 31 F.4th 1157, 1177 (9th Cir. 2022) (citing *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005)).

[97] *Id.* (citing *Lands Council*, 395 F.3d at 1030).

[98] Docket 21-3 at 2.

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 19 of 49

Case 1:24-cv-00013-SLG    Document 37    Filed 09/30/25    Page 19 of 49

"thought [the agency] concluded that [they] don't have the resources to study the various aspects of displacement [and] that this monitoring will focus on encounters"[99]—show bad faith on the part of the agency.[100] Nor would either document, even if considered, alter the Court's conclusions with respect to Claim 3. As discussed below, the Forest Service adequately complied with its commitment under the 2015 FONSI to undertake trail monitoring and to "contact the Forestry Sciences Lab in Juneau to ascertain monitoring options (questions, design, and assessment tools) to better understand displacement of local residents who wish to recreate in the MGRA."[101]

## II. The Court Finds that the 2023 FEIS Purpose and Need Statement Unreasonably Narrows the Forest Service's Consideration of Alternatives (Claims 1 and 2).

In her Opening Brief, Plaintiff first contends that the 2023 FEIS "unlawfully limited the Purpose and Need for the project and prejudged the outcome of the EIS by specifying a projected level of visitor increase to the MGRA that is a consequence of the selected alternative."[102] Plaintiff cites to *Alaska Survival v.*

---

[99] Docket 21-4 at 5.

[100] *See Safari Club*, 31 F.4th at 1177 (holding that a court may consider extra-record evidence where "the agency acted in bad faith"). This is particularly pertinent with respect to the draft plan of the MGRA Trail Use Study, which is a deliberative document "prepared to aid the decision-maker in arriving at a decision" that is "generally not part of the [administrative record] absent impropriety or bad faith by the agency." *Blue Mountains Biodiversity Project v. Jeffries*, 99 F.4th 438, 444-45 (9th Cir. 2024).

[101] FS_018063-64. *See* discussion *infra* Section 0.

[102] Docket 21 at 19-20.

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 20 of 49

Case 1:24-cv-00013-SLG    Document 37    Filed 09/30/25    Page 20 of 49

*Surface Transportation Board*, a Ninth Circuit case that held that "a purpose and need statement will fail if it unreasonably narrows the agency's consideration of alternatives so that the outcome of the NEPA process is preordained."[103]

According to Plaintiff, "[t]he purpose and need is to accommodate future visitor use resulting from a projected 2% increase in the number of visitors over the next 30 years with a projection of 1 million visitors by 2050."[104]  Plaintiff maintains that "[p]remising the EIS on the specific need to accommodate a 2% annual growth in visitors and an anticipated 1 million visitors per year by 2050 is a *de facto* decision by the [Forest Service], prior to initiating the Project EIS, to issue special use authorizations at a level that would make the projected growth a reality."[105]  Plaintiff posits that "[i]t is well established that the decision to authorize commercial special use permits is a major federal action within the meaning of NEPA and must be proceeded [sic] by the preparation of an EIS."[106]  And because the Forest Service "is not under any mandate or direction to increase visitor capacity or special use authorization at the MGRA," Plaintiff maintains that the decision to do so must comply with NEPA requirements.[107]  Plaintiff also maintains

---

[103] Docket 21 at 19 (citing *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1084 (9th Cir. 2013) (citing *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1076 (9th Cir. 2011))).

[104] Docket 21 at 20.

[105] Docket 21 at 20-21.

[106] Docket 21 at 21 (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 336 (1989)).

[107] Docket 21 at 21 (citing *City of Los Angeles v. Fed. Aviation Admin.*, 63 F.4th 835, 844 (9th

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 21 of 49

that the Purpose and Need Statement's objective to "meet the demand of the visitor industry" biases the 2023 FEIS in favor of the tourism industry, which she maintains is unlawful, given that the Forest Service's "regulations, directives, and mandates compel the [Forest Service] to manage for multiple use and to balance and reduce conflicts between competing uses."[108]

Relatedly, Plaintiff contends that "[t]he FEIS failed to consider a reasonable range of alternatives."[109] According to Plaintiff, "[t]he biases in the purpose and need statement . . . foreclose consideration of viable, reasonable alternatives to the proposed action. Each of the Action Alternatives in the EIS are based on the projected 2% growth rate. The total visitor levels for these alternatives vary only by the time over which that growth would occur: 15, 20, or 30 years."[110]

In its opposition, the Forest Service maintains that "[t]he Purpose and Need Statement is [r]easonable."[111] The Forest Service cites Ninth Circuit caselaw for the proposition that courts review the purpose and need statement under a "reasonableness standard," and that agencies have considerable discretion in drafting it.[112] The Forest Service contends that the Purpose and Need Statement

---

Cir. 2023)).

[108] Docket 21 at 21 (first citing *Meister v. U.S. Dep't of Agric.*, 623 F.3d 363, 379 (6th Cir. 2010); and then citing *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 746 F. Supp. 2d 1055, 1089 (N.D. Cal. 2009)).

[109] Docket 21 at 22.

[110] Docket 21 at 23.

[111] Docket 24-2 at 16.

[112] Docket 24-2 at 16 (first citing *League of Wilderness Defs.-Blue Mountains Biodiversity*

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 22 of 49

Case 1:24-cv-00013-SLG     Document 37     Filed 09/30/25     Page 22 of 49

of the Project—"to update infrastructure and create recreation opportunities at the MGRA that can accommodate projected future visitor use while protecting the unique characteristics and outstanding beauty of the area"—is "consistent with the historical use of the MGRA as a recreation area, Forest Service regulations directing the agency to manage the area 'principally for recreation,' and the agency's obligations under the Multiple Use and Sustained Yield Act to manage the Tongass National Forest in which the MGRA sits for 'outdoor recreation.'"[113] The Forest Service cites *League of Wilderness Defenders v. U.S. Forest Service*, in which the Ninth Circuit held that a purpose and need statement, which the plaintiffs had argued was "improperly limited . . . to a specific research study[,]" "was reasonable considering the agency's broad statutory direction and the project's consistency with that direction."[114]

The Forest Service further contends that its Purpose and Need Statement responds to the realities of overcrowding and long wait lines, with increasing numbers of tourists visiting Juneau, most of whom "would prefer to visit the MGRA by commercial means."[115] The Forest Service maintains that its Purpose and Need

---

*Project v. U.S. Forest Serv.*, 689 F.3d 1060, 1069 (9th Cir. 2012)); and then citing *Fed. Aviation Admin.*, 63 F.4th at 843).

[113] Docket 24-2 at 16-17 (first quoting FS_016688-89; then citing FS_016711; then citing 36 C.F.R. § 294.1(a); and then citing 16 U.S.C. § 528).

[114] Docket 24-2 at 17 (citing *League of Wilderness Defs.-Blue Mountains Biodiversity Project*, 689 F.3d at 1067-71).

[115] Docket 24-2 at 17-18.

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 23 of 49

Case 1:24-cv-00013-SLG    Document 37    Filed 09/30/25    Page 23 of 49

Statement "is broad enough that the Forest Service was able to consider various measures to address the stated purpose and need over different timeframes."[116] The Forest Service compares its Purpose and Need Statement to the one upheld by the Ninth Circuit in *City of Los Angeles v. Federal Aviation Administration*, which included "meet[ing] . . . passenger demand" and "improv[ing] utilization and operational efficiency of the passenger terminal building."[117]

The Forest Service takes issue with Plaintiff's assertion that "the 2% annual growth rate and an anticipated 1 million visitors per year by 2050 are *a part of* the purpose and need[,]" stating that "[t]he purpose and need statement contains no such directives."[118] The Forest Service further asserts that Plaintiff's "related argument that the Forest Service predetermined the outcome of the EIS fares no better," because "[t]he standard for 'predetermination' is high and requires an 'irreversible and irretrievable commitment of resources' by the agency before finishing its review, which is not alleged to have happened here."[119]

---

[116] Docket 24-2 at 18 (citing *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 866-68 (9th Cir. 2004) ("[N]othing about the language of the Statement of Purpose and Need limits consideration of [various] measures." (alterations in original))).

[117] Docket 24-2 at 18 (alterations in original) (internal quotes omitted) (quoting 63 F.4th 835, 844 (9th Cir. 2023)). In her Reply, Plaintiff distinguishes this situation from the one in *City of Los Angeles v. Federal Aviation Administration* on the basis that "[t]he FAA's purpose did not single out passengers from specific airlines, or a particular class of passenger, e.g., first class, differentiating that situation from the present case where a specific user group is favored." Docket 28 at 10.

[118] Docket 24-2 at 18 (emphasis in original) (citing FS_016713).

[119] Docket 24-2 at 19 n.6 (quoting *Metcalf v. Daley*, 214 F.3d 1135, 1142-43 (9th Cir. 2000)). This "irreversible and irretrievable commitment" standard is related to the timing of the preparation of NEPA documents, which is not at issue here, and the Court therefore does not address this

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 24 of 49

Case 1:24-cv-00013-SLG     Document 37     Filed 09/30/25     Page 24 of 49

The Forest Service also maintains that the Purpose and Need Statement does not bias the EIS in favor of the tourism industry. "Although the purpose and need here includes meeting demand and supporting the economy of Southeast Alaska, those goals are tied directly to the overall purpose of the Project to provide more and better recreation opportunities for more people at the MGRA."[120] The Forest Service distinguishes this situation from the one in *National Parks & Conservation Association v. Bureau of Land Management*, where the Ninth Circuit held that the Bureau improperly included the private interests of a mine developer in its purpose and need statement.[121] Here, by contrast, the Forest Service maintains that it "did not reject any alternatives that met the unquestionably valid purpose and need of accommodating projected visitor use, simply because they failed to provide sufficient income or economic opportunity to a third party."[122]

Turning to the alternatives, the Forest Service maintains that its examination of seven alternatives, including the no action alternative, satisfies NEPA's requirements.[123] The fact that the action alternatives "all assume a 2% annual visitor growth rate" does not render the alternatives too similar, according to the

---

argument. *See id.*

[120] Docket 24-2 at 20.

[121] Docket 24-2 at 19-20 (citing *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1071 (9th Cir. 2010)).

[122] Docket 24-2 at 20.

[123] Docket 24-2 at 20-21.

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 25 of 49

Forest Service, because the "2% annual visitor growth rate is not policy choice the Forest Service is carrying out, but a fact the Forest Service estimated based on available data."[124] "And the Forest Service reasonably used the same percentage capacity allocation for commercial use within the Visitor Center Unit (87%) across all action alternatives because that unit is the most heavily trafficked by cruise ship passengers and a clear need for the Project is to have infrastructure that can meet demand during peak times."[125] The Forest Service further contends that "[l]imiting the number of visitors in the face of increasing demand . . . 'would not meet the purpose and need for the project to accommodate increasing visitation and to provide quality opportunities for all visitors to enjoy the recreation area.'"[126]

In her , Plaintiff first takes issue with the Forest Service's claim that the 2% annual growth rate and an anticipated 1 million visitors per year by 2050 are not "*a part of*" the Purpose and Need Statement.[127] Plaintiff maintains that the term "projected future visitor use" used in Section 1.2.1 of the Purpose and Need Statement is a reference to the projected increase (2% growth rate, anticipated 1

---

[124] Docket 24-2 at 21. The Forest Service also cites *Pacific Coast Federation of Fishermen's Associations v. Blank* for the proposition that applying the 2% projected growth rate to different time frames allowed the agency to "thoroughly study the potential consequences of its action." 693 F.3d 1084, 1101 (9th Cir. 2012). In her Reply, Plaintiff maintains that this citation is inapposite because that case "involved alternatives NMFS evaluated for allocating resources (catch) among fishery sectors where the quantity being allocated was determined by regulation (total allowable catch). In this case, the [Forest Service] is not operating under regulations or mandates that specify a required level of commercial access to the MGRA." Docket 28 at 13.

[125] Docket 24-2 at 21.

[126] Docket 24-2 at 22-23 (quoting FS_016817).

[127] Docket 28 at 6; Docket 24-2 at 18 (emphasis in original).

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 26 of 49

million visitors) as described in Section 1.2, Purpose of and Need for Action.[128]

In response to the Forest Service's assertion that the alternatives it considered are reasonable because the underlying 2% growth rate is a "fact" rather than a "policy choice,"[129] Plaintiff maintains that "[t]he issuance of [special use permits] is clearly a policy decision and a federal action requiring NEPA review."[130] Because "the EIS allocates 87% of the future Visitor Center capacity to commercial use, the Defendants clearly anticipate that future growth will be the result of [special use permits] issued to commercial visitors."[131]

An EIS must include a purpose and need statement that "briefly specif[ies] the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action."[132] Because "[t]he range of alternatives that an agency must consider . . . is based on the purpose and need of the proposed agency action," a court begins "by determining whether or not the

---

[128] Docket 28 at 6 (citing FS_016712-13). Plaintiff also cites to § 2.3.3.15 "Visitor Capacity and Commercial Use (Alternative 2)" of the EIS, which provides in relevant part: "To respond to the project's purpose and need, the proposed infrastructure improvements would increase the overall visitor capacity for the Visitor Center Unit from 544,890 to an estimated 999,000 annual visitors to meet expected demand over the next 30 years .... Therefore, capacity for the Visitor Center Unit is based on a projected 2 percent annual growth in visitation over 30 years." Docket 28 at 7.

[129] Docket 24-2 at 21.

[130] Docket 28 at 11.

[131] Docket 28 at 12.

[132] *Fed. Aviation Admin.*, 63 F.4th at 843 (internal quotation marks omitted) (quoting 40 C.F.R. § 1502.13).

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 27 of 49

purpose and need statement was reasonable."[133]  "Agencies have discretion in drafting the purpose and need statement, but the statement must not 'unreasonably narrow[] the agency's consideration of alternatives so that the outcome is preordained.'"[134]  "In assessing the reasonableness of a purpose and need specified in an EIS, [a court] must consider the statutory context of the federal action."[135]

The Court rejects the Forest Service's contention in its Response Brief that that "the 2% annual growth rate and an anticipated 1 million visitors per year by 2050 are [not] *a part of* the purpose and need."[136]  In the 2023 FEIS, the Section 1.2.1 "Purpose and Need Statement" describes one purpose as being to "accommodate projected future visitor use."[137]  Above this, under the Section 1.2 "Purpose of and Need for Action" heading, the 2023 FEIS provides that "[t]he number of visitors to the MGRA is projected to increase at a rate of approximately 2 percent annually for the next 30 years . . . with a projection of 1,000,000 visitors annually by 2050."[138]  The "projected future visitor use" in the Purpose and Need

---

[133] *Id.* (alterations in original) (internal quotation marks omitted) (quoting *Audubon Soc'y of Portland*, 40 F.4th at 981).

[134] *Id.* (alteration in original) (first citing *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 876 (9th Cir. 2022); and then quoting *Alaska Survival*, 705 F.3d at 1084).

[135] *League of Wilderness Defs.-Blue Mountains Biodiversity Project*, 689 F.3d at 1070.

[136] Docket 24-2 at 18 (emphasis in original).

[137] FS_016713.

[138] FS_016712.

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 28 of 49

Case 1:24-cv-00013-SLG    Document 37    Filed 09/30/25    Page 28 of 49

Statement appears to be a reference to this 2% growth and 1 million visitors estimate. At oral argument, the Forest Service acknowledged that the Purpose and Need Statement incorporates the estimated projected growth in tourism in Juneau.[139]

The 2023 FEIS Purpose and Need Statement includes the need to accommodate an anticipated 2% annual growth rate with a projected 1 million visitors per year by 2050.[140] Because the Forest Service incorporates this growth into its Purpose and Need Statement, all of the action alternatives are estimated based on a 2% annual projected growth rate in the Visitor Center Unit.[141] The Court finds that this renders the Purpose and Need Statement unreasonable because it unreasonably narrows the agency's consideration of alternatives and results in a visitor capacity that is "preordained."[142]

Clearly, and despite the Forest Service's contentions to the contrary,[143] the estimated 2% annual growth rate to 1 million visitors by 2050 is necessarily a policy choice because it is based on a determination that all projected visitors to Juneau should have the opportunity to visit the MGRA, which can only occur as a

---

[139] Docket 36 at 2-3 (Forest Service attorney agreeing that the reference to "projected future visitor use" "is ostensibly referring to the 2%").

[140] *Contra* Docket 24-2 at 18.

[141] *See* FS_017088; FS_016738; Docket 24-2 at 21.

[142] *Fed. Aviation Admin.*, 63 F.4th at 843.

[143] *See* Docket 24-2 at 21 ("The 2% annual visitor growth rate is not policy choice the Forest Service is carrying out, but a fact the Forest Service estimated based on available data . . . .").

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 29 of 49

Case 1:24-cv-00013-SLG     Document 37     Filed 09/30/25     Page 29 of 49

consequence of increased special use authorizations to commercial operators. The Forest Service does not appear to seriously dispute the fact that a growth rate leading to 1 million visitors per year by 2050 cannot occur except as a result of additional commercial visitors. While the Forest Service does maintain that "the record shows visitors unable to use a commercial provider can and do visit independently" and that independent visitor use is expected to increase,[144] the Forest Service does not provide any data to show that an increase in independent visitor use alone could lead to the projected 1 million visitors by 2050.[145] To the contrary, all six action alternatives assume that the growth will be tied to increased commercial use by allocating 87% of the increased capacity of the Visitor Center Unit to commercial use.[146] In short, in its Purpose and Need Statement, the Forest Service decided that it should develop an improvement plan for the MGRA in which virtually all cruise ship passengers that arrived in Juneau would be able to visit the

---

[144] Docket 24-2 at 18-19 (first citing Docket 24-2 at 10; then citing FS_16909; and then citing FS_020218); *see* Docket 24-2 at 10 (citing FS_020345). The Forest Service relies on the 2023 FEIS Errata for its assertion about the increase in independent recreation use. Docket 24-2 at 19 (citing FS_020218). Because the Court ultimately does not deem this assertion to be significant, the Court does not address Plaintiff's challenge of the Forest Service's reliance on the 2023 FEIS Errata. *See* Docket 28 at 8-9.

[145] *See* Docket 24-2. Even assuming that independent visitor demand rose significantly, actual visitation by independent visitors would likely remain far below the projected levels. The 2023 FEIS recognized certain limitations to independent visitation, including that taxis, ride share options, and city buses "are not likely to meet the visitor demand. The walking distance from the nearest city bus stop to the Visitor Center (approximately 1.5 miles) would be a deterrent for those with time constraints, such as cruise ship passengers, or mobility constraints." FS_016912.

[146] *See* FS_017096.

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 30 of 49

Case 1:24-cv-00013-SLG    Document 37    Filed 09/30/25    Page 30 of 49

MGRA through a commercial provider if they chose to do so.[147]

The Court next considers the statutory and regulatory context of the Forest Service's action and finds that this context does not render the Purpose and Need Statement reasonable.[148] Here, the relevant statutes, regulations, and orders designate the MGRA as being a "recreation" area. The Multiple Use and Sustained Yield Act directs the Forest Service to manage the Tongass National Forest in which the MGRA sits for "outdoor recreation."[149] Public Land Order 829 created the Mendenhall Scenic and Winter Sports Area as a recreation area.[150] And 36 C.F.R. § 294.1(a) classifies the MGRA as a special area that "should be managed principally for recreation use substantially in [its] natural condition."[151] The Court does not agree with the Forest Service that a directive to manage the MGRA for "recreation" is necessarily a directive to enable as many visitors as possible to come to the MGRA.[152] Rather, the Court envisions that fulfilling the directive to

---

[147] *See e.g.*, FS_020348 ("Need: To meet the demand of the visitor industry and support the economy of Southeast Alaska.").

[148] *See League of Wilderness Defs.-Blue Mountains Biodiversity Project*, 689 F.3d at 1070 ("In assessing the reasonableness of a purpose and need specified in an EIS, we must consider the statutory context of the federal action.").

[149] 16 U.S.C. § 528.

[150] FS_018015-16; Public Land Order 829, 17 Fed. Reg. at 4709-10.

[151] FS_018017. At oral argument, in response to the Court's question about support for the Forest Service's assertions about the animating policy and regulatory context, the Forest Service directed the Court to the discussion of the MGRA history from its Response Brief, *see* Docket 36 at 3-4, indicating that it represents a complete summary of the relevant directives according to the Forest Service.

[152] *But see* Docket 36 at 3-4 (Forest Service asserting that implicit in the purpose of recreation is the policy objective to enable as many people as want to come the ability to do so).

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 31 of 49

Case 1:24-cv-00013-SLG     Document 37     Filed 09/30/25     Page 31 of 49

manage the MGRA "principally for recreation use substantially in [its] natural condition" might also include, for example, an alternative that restricted the number of visitors to the MGRA in order to enhance the visitor experience.[153]

The Court also does not agree with the Forest Service that the Purpose and Need Statement here is like the one the Ninth Circuit upheld in *City of Los Angeles v. Federal Aviation Administration*.[154] The Federal Aviation Administration's purpose in that case was to "meet . . . passenger demand[]" at an airport terminal.[155] This was consistent with the FAA's statutory mandate that artificial restrictions on airport capacity are not in the public interest.[156] That is unlike the Purpose and Need Statement here, because accommodating all persons who might wish to visit the MGRA is not an express statutory directive. The Purpose and Need Statement here is also unlike the "unquestionably" valid purpose to "meet long-term landfill demand" recognized in *National Parks & Conservation Ass'n v. Bureau of Land Management*, where, in any event, the purpose and need

---

[153] *Cf. Fed. Aviation Admin.*, 63 F.4th at 844 (holding that the Federal Aviation Administration's purpose and need "to provide a passenger terminal building that meets current FAA Airport Design Standards, passenger demand, and building requirements as well as improve utilization and operational efficiency of the passenger terminal building" and "to ensure that the Airport operates in a safe manner [as required by statute]" were reasonable because the relevant statute "directs FAA to promote airport safety and efficiency, and the purpose and need statement incorporated those goals"); *see also* 49 U.S.C. § 47101(a)(1); *Blue Mountains Biodiversity Project*, 689 F.3d at 1070 (holding the purpose and need statement to be reasonable where it "comes directly from . . . statutory authorities").

[154] *See* Docket 24-2 at 18 (citing 63 F.4th at 844).

[155] *Fed. Aviation Admin.*, 63 F.4th at 844.

[156] 49 U.S.C. § 47101(a)(10).

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 32 of 49

statement was invalidated because it not only included the need to meet long-term landfill demand, but "also set[] out three private objectives as defining characteristics of the proposed project"[157]  Nor is the situation here similar to the one in *Blue Mountains Diversity Project v. United States Forest Service.*[158]  There, the plaintiff argued that because of "the narrowness of the stated purpose and need, only a single alternative—the Study Plan—could satisfy" it.[159]  The Ninth Circuit held that, when read in context, the purpose and need statement did not require rigid implementation of the Study Plan, and that some of the action alternatives in fact deviated from the Plan.[160]  This is in contrast to the situation here, where the narrowness of the Purpose and Need Statement is reflected in the lack of variation in the action alternatives.

For the foregoing reasons, the Court concludes that the Forest Service's Purpose and Need Statement in the 2023 FEIS is unreasonably narrow, in so far as it identified the need to fully accommodate at the MGRA the expected projected growth of tourism to Juneau through 2050.  As a result, the range of alternatives evaluated in the 2023 FEIS, each of which assumes an annual 2% growth rate of visitors to the MGRA, violates NEPA.

---

[157] *National Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1071-72 (9th Cir. 2010).

[158] *League of Wilderness Defs.-Blue Mountains Biodiversity Project*, 689 F.3d at 1067-71.

[159] *Id.* at 1070.

[160] *Id.*

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 33 of 49

The Court finds for the Plaintiff is entitled to judgment on Claims 1 and 2.

### III. The Court Finds that the Forest Service Complied with its Mitigation Obligations Under the 2015 FONSI and 40 C.F.R. § 1502.22 (Claim 3).

Plaintiff next asserts that "[t]he Forest Service has violated 40 C.F.R. § 1502.22 regarding missing information essential to the EIS and failed to implement mitigation from the 2015 FONSI in violation of the APA."[161] Specifically, she contends that the Forest Service failed to consider sufficient information about the displacement of local visitors in the EIS.[162] Plaintiff points to Section 3.2.2 of the 2023 FEIS, which states that there is "[i]ncomplete knowledge of exact visitor usage of the MGRA beyond counts of people arriving via a special use permit," but that "the basic data and relationships are sufficiently well-established to analyze and disclose possible adverse effects and for the responsible official to make a choice between alternatives."[163] Plaintiff contends that "this section does not

---

[161] Docket 21 at 25. The Court notes that the 2019 version of 40 C.F.R. § 1502.22 is related to "incomplete or unavailable information." The 2019 version of 40 C.F.R. § 1502.22 can be accessed at the National Archives eCFR website. National Archives, *Code of Federal Regulations*, https://www.ecfr.gov/on/2019-07-24/title-40/chapter-V/part-1502/section-1502.22 (last visited Aug. 28, 2025). However, in 2020, the relevant "incomplete or unavailable information" section was relocated to 40 C.F.R. § 1502.21, and the Court therefore refers to this section for the remainder of this order because it "look[s] to the regulations in place at the time of the challenged decision." *Env't Def. Ctr.*, 36 F.4th at 879 n.5. This 2020 version can be accessed at the National Archives eCFR website. National Archives, *Code of Federal Regulations*, https://www.ecfr.gov/on/2020-09-14/title-40/chapter-V/subchapter-A/part-1502/section-1502.21 (last visited Aug. 28, 2025). All CFR regulations were subsequently removed by an interim final rule in February 2025. Removal of National Environmental Policy Act Implementing Regulations, 90 Fed. Reg. 10610-01 (Feb. 25, 2025).

[162] Docket 21 at 8-9.

[163] Docket 21 at 26; FS_016842.

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 34 of 49

Case 1:24-cv-00013-SLG    Document 37    Filed 09/30/25    Page 34 of 49

address the fact that the [Forest Service] should already possess this information as a result of its mitigation obligation to understand displacement made [in the] 2015 FONSI."[164]   Plaintiff contends that the Court should compel the Forest Service to implement these mitigation measures pursuant to 5 U.S.C § 706(1).[165]

The Forest Service first contends that "Plaintiff did not raise a failure to act claim in her complaint and has therefore waived the argument."[166]  In any event, the Forest Service maintains, in the 2015 FONSI, the Forest Service stated that it would "implement a trail use monitoring plan" and "contact the Forestry Sciences Lab in Juneau to ascertain monitoring options . . . to better understand displacement of local residents who wish to recreate in the MGRA."[167]  In accordance with these commitments, the Forest Service states that it did implement a trail use monitoring program in May 2017.[168]  And, "[w]hile the Forest Service engaged the Forestry Sciences Laboratory to determine monitoring options, the Forest Service did not have to adopt all the Lab's recommendations and chose not to do so."[169]  The Forest Service also maintains that the 2015 FONSI

---

[164] Docket 21 at 26.

[165] Docket 21 at 27.

[166] Docket 24-2 at 23 (citing *Brass v. County of Los Angeles*, 328 F.3d 1192, 1197-98 (9th Cir. 2003)).

[167] Docket 24-2 at 23 (internal quotation marks omitted) (quoting FS_018064).

[168] Docket 24-2 at 23 (citing FS_016903).

[169] Docket 24-2 at 23 (first citing FS_014489; and then citing FS_016842).  In her reply, Plaintiff contends that "Defendants conflate implementation of the trail monitoring study with mitigation on displacement, but these were separate mitigation elements."  Docket 28 at 14.  The Court, however, understands the Forest Service's response to address both its trail use monitoring

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 35 of 49

Case 1:24-cv-00013-SLG     Document 37     Filed 09/30/25     Page 35 of 49

"is *not* a so-called 'mitigated FONSI'" because "the monitoring commitments Plaintiff cites were not mitigation measures at all, and the agency made no determination of significant environmental effects in the absence of those commitments."[170]

The Forest Service also maintains that Plaintiff did "not raise Claim 3, that the Forest Service did not consider sufficient information on displacement of local users, in her opening brief," and that "[s]he has therefore waived that claim."[171]  In any event, the Forest Service maintains that it "analyzed potential effects on local users in the EIS" by reviewing the data collected by the monitoring program from 2017 to 2020, and that it "discussed potential displacement of 'resident users' for each Alternative" in the 2023 FEIS.[172]

In her Reply, Plaintiff maintains that she raised a failure to act claim in her Complaint, and that she raised her claim that the Forest Service failed to consider information on displacement of non-commercial recreational users of the MGRA in her Opening Brief, and that she therefore did not waive either argument.[173]  And she contends that the 2015 FONSI was a "mitigated FONSI" because it states that

_____

commitment as well as its commitment to determine monitoring options to better understand displacement.

[170] Docket 24-2 at 24 n.8 (emphasis in original) (citing *Klamath Forest All. v. U.S. Forest Serv.*, 746 F. Supp. 3d 761, 779 (N.D. Cal. 2024)).

[171] Docket 24-2 at 24 (citing *Grenier v. Cyanamid Plastics*, 70 F.3d 667, 678 (1st Cir. 1995) ("[A]n issue raised in the complaint but ignored at summary judgment may be deemed waived.")).

[172] Docket 24-2 at 24 (citing FS_016903-04, 20, 25, 30, 33-34).

[173] Docket 28 at 13-15.

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 36 of 49

Case 1:24-cv-00013-SLG    Document 37    Filed 09/30/25    Page 36 of 49

the "mitigation measures will be implemented" "[t]o avoid and minimize potential environmental impacts from the project."[174]

As a threshold matter, the Court finds that Plaintiff's failure to act claim was adequately pled in her Complaint, and that it is therefore properly before the Court. Claim 3 of Plaintiff's Complaint alleges that:

> By failing to consider information on displacement of non-guided users which is essential to a reasoned choice among alternatives and which the Forest Service committed to studying as mitigation for the 2015 EA and FONSI and should already possess, the Forest Service's EIS, ROD and Final Rule violate NEPA 42 U.S.C §§ 4321-4347, its implementing regulations 40 C.F.R. parts 1500-1508, and the APA 5 U.S.C § 706(2).[175]

It is clear from Plaintiff's Complaint that she takes issue with the Forest Service's mitigation efforts following the 2015 FONSI.[176]  The Court further finds that Plaintiff did not waive her claim that the Forest Service did not consider sufficient information on displacement of local users in the 2023 FEIS because Plaintiff did

---

[174] Docket 28 at 14 (citing FS_018063).

[175] Docket 1 at ¶ 119.

[176] The Court finds that Plaintiff's citation in her Complaint to 5 U.S.C § 706(2)—which directs courts to "hold unlawful and set aside agency action"—rather than to § 706(1)—which directs courts to "compel agency action unlawfully withheld or unreasonably delayed"—does not result in a waiver of her failure to act claim.  The Forest Service's citation to *Brass v. County of Los Angeles* is not persuasive, given that there, the Ninth Circuit held that the district court did not abuse its discretion in refusing to allow the plaintiff "to broaden his case" where "[n]othing in Counts I–III of the amended complaint even suggest[ed] that Brass was raising those issues." 328 F.3d at 1197.  Here, by contrast, it is clear from Plaintiff's Complaint that she took issue with the Forest Service's alleged failure to study mitigation pursuant to its obligations under the 2015 FONSI, and that she simply cited the wrong subsection of the APA in bringing her claim.  *See also Eldridge v. Block*, 832 F.2d 1132, 1137 (9th Cir. 1987) (holding that trial courts must liberally construe the pleadings of self-represented litigants).

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 37 of 49
Case 1:24-cv-00013-SLG    Document 37    Filed 09/30/25    Page 37 of 49

indeed raise this issue in her Opening Brief.[177]

However, the Court finds that the Forest Service adequately complied with its commitments under the 2015 FONSI. In the 2015 FONSI, the Forest Service stated that:

> To avoid and minimize potential environmental impacts from the project, the following mitigation measures will be implemented . . . [t]he Forest Service will contact the Forestry Sciences Lab in Juneau to ascertain monitoring options (questions, design, and assessment tools) to better understand displacement of local residents who wish to recreate in the MGRA.[178]

Pursuant to this commitment, the Forest Service consulted with the Forestry Sciences Lab Director on the topic of monitoring options to better understand local displacement.[179] As the Forest Service states, the 2015 FONSI language is clear that the Forest Service made a commitment to consult with the lab on monitoring options, but did not commit to implementing any monitoring option recommendations that the lab made.[180]

The trail monitoring plan also complied with the 2015 FONSI. The Forest Service analyzed potential displacement of local trail users under "a monitoring

---

[177] *See* Docket 21 at 25-27 (claiming that the Forest Service violated NEPA regulations "regarding missing information essential to the EIS" by failing to include information on displacement of local users).

[178] FS_018063-64.

[179] FS_014489.

[180] The Court notes that because the finding of no significant impact in the 2015 FONSI does not appear to have been "based on" the stated mitigation measures, this would appear to lessen the Forest Service's enforceable obligations with respect to the mitigation measures in the 2015 FONSI. *See Klamath Forest All.*, 746 F. Supp. 3d at 779; FS_018058-FS_018079.

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 38 of 49

Case 1:24-cv-00013-SLG     Document 37     Filed 09/30/25     Page 38 of 49

plan during the primary use season . . . from 2017 to 2020" where "[f]our trails were monitored by Forest Service staff on varying days and times."[181]  For three years, the Forest Service's trail monitoring plan collected data of the use by Juneau residents and non-residents on the Steep Creek Trail, Trail of Time, East Glacier Trail, and West Glacier Trail.[182]  Furthermore, from 2017 to 2020, the monitored trails were placed into ROS classifications based on the percent of monitored days with more than 20 social encounters, indicating the Forest Service's implementation of a detailed and thorough monitoring plan.[183]

Nor did the Forest Service violate 40 C.F.R. § 1502.21 with respect to the missing information.[184]  That regulation provides, in relevant part, that:

> (c) If the information relevant to reasonably foreseeable significant effects cannot be obtained because the overall costs of obtaining it are unreasonable or the means to obtain it are not known, the agency shall include within the environmental impact statement:
>
> > (1) A statement that such information is incomplete or unavailable;
> >
> > (2) A statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant effects on the human environment;
> >
> > (3) A summary of existing credible scientific evidence that is relevant to evaluating the reasonably foreseeable significant effects on the human environment; and

---

[181] FS_016903.

[182] FS_016903.

[183] FS_016904.

[184] The Court cites 40 C.F.R. § 1502.21 per its discussion *supra* n.161.

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 39 of 49

Case 1:24-cv-00013-SLG     Document 37     Filed 09/30/25     Page 39 of 49

> (4) The agency's evaluation of such effects based upon theoretical approaches or research methods generally accepted in the scientific community.[185]

The Forest Service complied with these directives. The 2023 FEIS includes a statement disclosing "incomplete knowledge about the exact visitor usage of the MGRA beyond counts of people arriving via a special use permit."[186] The Forest Service explained that the data was incomplete due to the costs and difficulty of obtaining data as to the displacement of local users.[187] The 2023 FEIS explained that "more comprehensive data collection would require Forest Service personnel posts at multiple entry points or expansion of the fee collection area. There are no barriers to entry, and many local users arrive on foot or by bike. This leads to uncertainty about displacement of local users...."[188] The Court defers to the Forest Service's conclusion that "the 2017 MGRA visitor survey, questions added to local city-wide surveys, and public comments received during the master planning and draft and supplemental draft environmental impact statement (EIS) efforts captured a good estimate of this population's use and the dynamics present between the different user groups," and that "[t]he basic data and relationships are sufficiently well-established to analyze and disclose possible adverse effects and

---

[185] National Archives, *Code of Federal Regulations*, https://www.ecfr.gov/on/2020-09-14/title-40/chapter-V/subchapter-A/part-1502/section-1502.21 (last visited Aug. 28, 2025).

[186] FS_016842.

[187] FS_016842.

[188] FS_016842.

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 40 of 49

Case 1:24-cv-00013-SLG    Document 37    Filed 09/30/25    Page 40 of 49

for the responsible official to make a choice between alternatives."[189]  In addition, in the discussion on direct and indirect effects in the 2023 FEIS, the Forest Service discussed displacement of local users for each of the various alternatives.[190]

For the foregoing reasons, the Court finds that the Forest Service complied with its mitigation obligations under the 2015 FONSI and 40 C.F.R. § 1502.22 and denies Plaintiff relief on Claim 3.

## IV.    The Court Finds that the Forest Service's Trail Capacity Analyses are Reasonable (Claim 4).

Plaintiff next contends that the "[t]rail capacity analyses [in the 2023 FEIS do not meet NEPA standards for scientific integrity [and] are so implausible that they cannot be ascribed to a product of agency expertise."[191]  First, Plaintiff contends that the 2023 FEIS "increases visitor capacities on MGRA trails between 72% and 109% despite the MGRA Master Plan concluding that 'trails are generally well below their capacities . . . and are expected to remain so for the periods being examined by this project.'"[192]  According to Plaintiff, the trail capacity methodology

---

[189] FS_016842; *see N. Plains Res. Council, Inc.*, 668 F.3d at 1075 ("A court generally must be 'at its most deferential' when reviewing scientific judgments and technical analyses within the agency's expertise." (quoting *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983)); *Seven Cnty. Infrastructure Coal.*, 145 S. Ct. at 1513 ("[A]n agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its [NEPA] inquiry—and also about the length, content, and level of detail of the resulting EIS. Courts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness.").

[190] *See* FS_016920, FS_016925-26, FS_016930-31, FS_016933-34.

[191] Docket 21 at 28.

[192] Docket 21 at 29 (first citing Docket 21 at 14; and then citing FS_016877).  The Court notes that FS_016877 does not offer support for the contention that "trails are generally well below their capacities . . . and are expected to remain so for the periods being examined by this

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 41 of 49

Case 1:24-cv-00013-SLG    Document 37    Filed 09/30/25    Page 41 of 49

results in "extraordinary capacity levels. For example, the East Glacier Trail total capacity under the selected alternative is 77,040 people with 20% of this capacity (15,400) allocated to commercial use." And yet, "the total number of actual guided (commercial) visitors on this trail in 2019 was 416 people."[193] Second, Plaintiff asserts that "[t]he method for calculating trail capacities in the EIS makes no allowance for trail length such that the total capacity for [the] 3.5-mile long East Glacier Trail and the 0.5-mile long Trail of Time are identical."[194] And third, Plaintiff contends that the Forest Service's selection of a 12-person group size "has no relationship" to actual groups or groups sizes.[195]

The Forest Service responds that its trail capacity analyses are reasonable and based on the ROS, which it explains "reflects the desired condition for each trail."[196] First, the Forest Service does not agree with Plaintiff that trail capacity increases from 72% and 109%, contending that "the lowest capacity increase is in fact 40%, which is wholly attributable to the longer use season (a 40% longer

---

project," and the Court is unable to find this quote in the administrative record.

[193] Docket 21 at 29 (first citing FS_017099; and then citing FS_004574). Plaintiff's assertion that there were 416 commercial visitors on East Glacier Trail in 2019 is inaccurate. The document Plaintiff cites for this proposition is from a monitoring plan that monitored the trail "on varying days of the week and times of the day." FS_004569. In particular, the 516 commercial visitors to the East Glacier Trail were from only 18 days across the season in 2019 and is therefore far below the number of total guided visitors for that season. *See* FS_004574.

[194] Docket 21 at 29 (citation omitted).

[195] Docket 21 at 30.

[196] Docket 24-2 at 28.

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 42 of 49

season of 214 days instead of 153 days)."[197]  Second, in its brief, the Forest

Service explains that "[a] trail's length correlates directly to the time it takes for an

individual or group to hike that trail, so it is not necessary to include trail length in

the capacity calculation."[198]  And third, the Forest Service states that the "[g]roup

size is not arbitrary," but is rather based on "trail monitoring data collected from

2016 to 2020," which "shows that the use of 12-person group size is appropriate

with average group sizes from that dataset ranging from 2 to 18."[199]

In her Reply, Plaintiff asserts that methodology used for the Forest Service's

trail capacity analyses was only set out in its brief to this Court.[200]  And Plaintiff

notes that the EIS states trail capacities had been calculated "based solely on the

social encounter criterion for the trail's ROS category, e.g., that a person meets

---

[197] Docket 24-2 at 30 (citing FS_017087, 91).

[198] Docket 24-2 at 28-29 (citing *Lands Council v. McNair*, 537 F.3d 981, 1003 (9th Cir. 2008) (en banc) ("[The agency] must explain the methodology it used for its . . . analysis, . . . [but] NEPA does not require [this Court] to decide whether an [EIS] is based on the best scientific methodology available" (alterations in original) (citation omitted))).  In its brief to this Court, the Forest Service provides the following example of the East Glacier Trail (3.5 miles) and Trail of Time (.5 miles): "The estimated 77,040 capacity (measured in terms of individual visits) over a 214-day season equals 360 visits per day. If 360 people hike each trail in one 10-hour day, it would take each person about 10 minutes to hike the Trail of Time, for a total of 60 trips per day, or 6 people on the .5-mile trail at once. On the other hand, it would take each person about 70 minutes to hike the East Glacier Trail, for a total of around 8.5 trips per day, or 42 people on the 3.5-mile trail (or three groups of 12 and one of six) at once. Six people on a .5-mile trail is proportional to 42 people on a 3.5-mile trail."  Docket 24-2 at 28-29.

[199] Docket 24-2 at 29-30 (first citing FS_001497; then citing FS_016096-16098 (2016 Trail Monitoring Summary); then citing FS_018675-18680 (2016 Trail Monitoring Data); then citing FS_004541-4555 (2017 Trail Monitoring Report); then citing FS_004556-4568 (2018 Trail Monitoring Report); then citing FS_004569-4581 (2019 Trail Monitoring Report); then citing FS_09309-9318 (2020 Trail Monitoring Report)).

[200] Docket 28 at 16.

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 43 of 49

fewer than 20 other parties during at least 80% of the primary use season multiplied by an arbitrary group size (12 people) multiplied by the days in the season."[201]  Plaintiff characterizes the explanation in the Forest Service's brief to this Court as "another example of fitting the analysis to the desired result that the [Forest Service] used in the EIS."[202]

The Court finds that the Forest Service's trail capacity analyses are not arbitrary.  First, the Court agrees that trail capacity increases between 40% and 109% is reasonable, given that the 40% increase in capacity is fully attributable to the increase in season length from 153 to 214 days.[203]  The 109% increase is for two trails that have an ROS designation of "urban" for which significant improvements are proposed.[204]  Second, the Court finds that the Forest Service's methodology is adequately explained in the EIS.[205]  NEPA does not require an agency to use the "best scientific methodology available."[206]  The Forest Service explains that the MGRA's trail capacity "is managed to offer different visitor

---

[201] Docket 28 at 16-17 (citing FS_17090).

[202] Docket 28 at 17.

[203] This is because the increase from 153 days to 214 days is an increase of 40%.  *See* FS_017087, FS_017091.

[204] Docket 24-2 at 30.  Urban trails have an estimated people at one time ("PAOT") ranging from 100 to 150 per hour.  FS_017089.

[205] *See e.g.*, FS_017089-90 (assumptions the Forest Service used when estimating visitor capacity for trails); FS_017098-113 (summary tables with various calculations for service days for trail use); and FS_016893 (referring the reader to the MGRA Forest Plan, Appendix I).

[206] *Lands Council*, 537 F.3d at 1003 (citing *Friends of Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 986 (9th Cir. 1985)).

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 44 of 49

Case 1:24-cv-00013-SLG    Document 37    Filed 09/30/25    Page 44 of 49

experiences on different types of trails" where the "[v]isitor experience is described in the ROS as the expected scenic quality, ease of access, sense of remoteness, level of visitor management, scale of recreation developments, expected number of social encounters, and amount of visitor impacts."[207]   The visitor capacities for trails that have commercial use rely on the ROS designation for the trail, number of social encounters, and group size, and then, account for the increase in season length from 153 to 214 days.[208]   Lastly, the Court finds that the 12-person group size is not arbitrary, rather, it is rationally based on data gathered from several years of monitoring.[209]

For the foregoing reasons, the Court finds that the Forest Service's trail capacity analyses are reasonable and denies Plaintiff relief on Claim 4.

## V.   The Court Finds that the 2023 FEIS's Evaluation of Impacts on Municipal Waste Utilities is Sufficient (Claim 5).

Plaintiff contends that "[t]he Forest Service failed to consider the impacts of

---

[207] FS_17089 (citing USDA Forest Service 2016, Appendix I).

[208] FS_17089.

[209] See e.g., FS_016096-16097 (2016 Trail Monitoring Summary, noting that "[t]ypical size of a guided group [on East Glacier Trail] was 10-15 people and "[g]roup sizes [on West Glacier Trail] would be anywhere from one to six"); FS_004541-4555 (2017 Trail Monitoring Report, stating that average group size for guided tours of West Glacier Trail was 10 per group, Glacier Trail Spur was eight per group, East Glacier Trail was eight per group, Trail of Time was four per group); FS_004556-4568 (2018 Trail Monitoring Report, stating that average group size for guided tours of West Glacier Trail was seven per group, West Glacier Trail Spur was five per group, East Glacier Trail was 12 per group, Trail of Time was 11 per group, Steep Creek was nine per group); FS_004569-4581 (2019 Trail Monitoring Report stating that average group size for guided tours of West Glacier Trail was seven per group, West Glacier Trail Spur was nine per group, East Glacier Trail was 12 per group).

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 45 of 49

Case 1:24-cv-00013-SLG    Document 37    Filed 09/30/25    Page 45 of 49

its decision to increase commercial visitor capacity at the MGRA on municipal waste utilities as required under 40 C.F.R § 1508.8(g)(1)."[210]  According to Plaintiff, "[t]he EIS contains no discussion or analysis of impacts to public water and wastewater infrastructure, or municipal solid waste disposal facilities, from the introduction of 1 million people to the MGRA." Plaintiff maintains that this violates "NEPA's requirement for agencies [to] consider foreseeable direct, indirect and cumulative environmental impacts."[211]  Plaintiff maintains that the fact that the utilities "would need to be permitted by the City and Borough of Juneau" does not relieve the Forest Service of its duties to consider its impacts.[212]  And in her Reply, Plaintiff asserts that "[t]he amount of wastewater generated at the Visitor Center will be the same amount that is delivered to the municipal sewer system rendering the impacts of that transfer neither remote nor highly speculative."[213]

The Forest Service responds that it is not required to evaluate impacts to public water, sewage infrastructure, or municipal solid waste disposal facilities because NEPA "applies only to reasonably foreseeable impacts that are proximately caused by the agency action at issue."[214]  The Forest Service contends

---

[210] Docket 21 at 28.

[211] Docket 21 at 28.

[212] Docket 21 at 28 (citing *Friends of the Floridas v. U.S. Bureau of Land Mgmt.*, 746 F. Supp. 3d 1039 (D.N.M. 2024)).

[213] Docket 28 at 16.

[214] Docket 24-2 at 26 (citing *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004)).

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 46 of 49

Case 1:24-cv-00013-SLG    Document 37    Filed 09/30/25    Page 46 of 49

that "[v]isitors to Juneau are expected to increase in the future and neither the Forest Service nor the Project is the proximate cause of those additional visitors arriving in the City and potentially impacting Juneau City and Borough wastewater facilities and operations."[215] And in any event, the Forest Service maintains that "[t]he EIS does analyze potential effects related to waste management within the MGRA itself."[216]

The Court finds that the 2023 FEIS's evaluation of impacts on municipal waste utilities is sufficient. The Court agrees with the Forest Service that there is not a "reasonably close causal relationship" between the Project and impacts on the municipal waste utilities of Juneau from increased visitation, given that the Project does not appear to be the proximate cause of increased visitation to Juneau.[217] And, as indicated in its 2023 FEIS, ROD, and response to public comments, the Forest Service did analyze potential effects related to waste management within the MGRA itself and considered different options for the proposed Welcome Center's wastewater system.[218]

---

[215] Docket 24-2 at 26-27 (citing FS_20515-20558).

[216] Docket 24-2 at 27 (first citing FS_016723; then citing FS_005252-53; and then citing FS_017277).

[217] *See Seven Cnty. Infrastructure Coal.*, 145 S. Ct. at 1517 ("[A] court may not invoke but-for causation or mere foreseeability to order agency analysis of the effects of every project that might somehow or someday follow from the current project."); FS_020518 (McDowell Group October 2017 Travel Juneau Tourism Study finding that "[t]he bulk of [a recent] increase [in visitor volume] is attributable to the cruise market").

[218] *See e.g.*, FS_016749 (2023 FEIS indicating that the Forest Service contemplated different sanitary sewer options for the wastewater system in the Visitor Center); FS_020330 (ROD describing the "[t]wo options . . . under consideration for sewer service for the proposed

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 47 of 49

Case 1:24-cv-00013-SLG    Document 37    Filed 09/30/25    Page 47 of 49

For the foregoing reasons, the Court finds that the 2023 FEIS's evaluation of impacts on municipal waste utilities is sufficient and denies Plaintiff relief on Claim 5.

## VI.    Determining the Remedy

Plaintiff seeks vacatur of the December 2023 EIS and the ROD because "[t]he flaws are foundational affecting the analyses on which the decision is based."[219]  The Forest Service responds by stating that "[i]f the Court finds any legal error, the Government requests additional briefing to address the appropriate remedy… which would be informed by the Court's specific findings."[220]  Plaintiff does not respond to this request in her Reply.

Because it appears that no activity is being currently planned or undertaken to implement the 2023 ROD for the Mendenhall Glacier Visitor Facility Improvements Project, the Court grants the Forest Service's request.

Each party may file a supplemental brief addressing the appropriate remedy in this case within **30 days of the date of this Order**.

## CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Summary Judgment at Docket 20 is **GRANTED IN PART and DENIED IN PART**.  The Court finds for

---

Welcome Center"); FS_017277 (response to public comment indicating that "design team considered the potential impacts of increased commercial capacity and allocation at the MGRA on wastewater and solid waste facilities").

[219] Docket 21 at 30.

[220] Docket 24-2 at 31 (citing *Allied-Signal v. U.S. NRC*, 988 F.2d 146 (D.C. Cir. 1993)).

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 48 of 49

Plaintiff on Claims 1 and 2, and the Court finds for the Forest Service on Claims 3, 4, and 5.  The Court DENIES Plaintiff's request to supplement the administrative record.

Within 30 days of the date of this order each party may file and serve a supplemental brief on the appropriate remedy in this case.

IT IS SO ORDERED.

DATED this 30th day of September, 2025, at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Motion for Summary Judgment
Page 49 of 49

Case 1:24-cv-00013-SLG     Document 37     Filed 09/30/25     Page 49 of 49