ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

ERIKA NORMAN (CA BAR NO. 268425)
Senior Trial Attorney
Natural Resources Section
150 M St., NE
Washington, DC 20002
Tel: (202) 305-0475
Erika.Norman@usdoj.gov

*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| KATHERINE B. MILLER,<br><br>Plaintiff,<br><br>v.<br><br>U.S. FOREST SERVICE and FRANCIS SHERMAN, Forest Supervisor, Tongass,<br><br>Defendants. | Case No. 1:24-cv-00013-SLG |

**DEFENDANTS' SUPPLEMENTAL BRIEF ON REMEDY**

## I. INTRODUCTION

On September 30, 2025, the Court granted in part and denied in part Plaintiffs'

Motion for Summary Judgment in this National Environmental Policy Act ("NEPA") case

challenging the U.S. Forest Service's Record of Decision and Final Environmental

Impact Statement ("EIS") for the Mendenhall Glacier Facility Improvements Project (the

1

"Project"). The Court determined the purpose and need for the Project was too narrow, and the range of alternatives considered too constrained to comply with NEPA. The Court, however, rejected Plaintiffs' remaining NEPA challenges.

The Court has allowed the parties to submit supplemental briefs on remedy. The Court should order a remand without vacatur in this case. First and foremost, there is a serious possibility the agency would reach the same decision on remand as to the long overdue facility and infrastructure improvement components of the Project—under the Supreme Court's recent *Seven County* decision that is enough to avoid vacatur. Second, vacatur would be unnecessarily disruptive and harmful to the agency and to the public *without* avoiding any harm to the Plaintiff herself, whose standing this Court found to be rooted in potential future increases in commercial visitors. The increased commercial permit allocation component of the Project is not authorized to occur for approximately two years, which is *after* the agency completes certain infrastructure components of the Project, and on an incremental basis. The agency anticipates it can correct the errors the Court identified within that period, meaning Plaintiff will not be harmed. Third, the agency will agree not to increase permits under this Project decision until it responds to the Court's ruling. There is thus no good reason to vacate the entire decision when the agency will not increase commercial use under this Project decision until it responds to the Court's ruling.

This Court found defendants' agreement to self-enjoin weighed in favor of a remand without vacatur in *Orutsararmuit Native Council v. U.S. Army Corps of*

*Engineers* and the Court should make the same finding here. No. 3:23-cv-00071-SLG, 2025 WL 1654878, *4 & n.27 (D. Alaska June 10, 2025).

## II. RELEVANT BACKGROUND

### a. The Challenged Forest Service Decision.

The Mendenhall Glacier Visitor Center is the most visited summer attraction in Alaska, and the entire Mendenhall Glacier Recreation Area is a popular recreation destination for both locals and tourists, offering opportunities for year-round outdoor activities. Order on Mot. for Summ. J. 2 ("Order"), Dkt. No. 37. The area also supports a wide variety of wildlife and other natural resources, *id.*, which the Forest Service has an obligation to protect while keeping the area open for the public to enjoy. *E.g.*, FS_16693. Completed in 1962 to accommodate only about 23,000 annual visitors, FS_16707, the Mendenhall Glacier Visitor Center is in desperate need of updates and improvements, from improvements downstairs that most visitors will never see, to additional indoor public spaces and bathrooms to reduce crowding and waiting times. *See* FS_20328-31. Current visitor capacity for just the Visitor Center Unit is managed at 544,890 service days across a 153-day primary use season. FS_16713, 16738.[1]

---

[1] The Order mistakenly noted that "*[r]ecently, due to the extended tourist season with early-season and late-season cruise ship arrivals*, 'current visitor capacity in the Visitor Center Unit is managed at 544,890 service days, which was established for a 153-day primary use season.'" Order at 8 (emphasis added). The decision at issue increases the primary use season to 214 days (up from 153 days) to reflect the extended tourist season; the current 153-day primary use season does not comport with the new reality of early and late season cruise ship arrivals. FS_20338. A portion of the potential increase in capacity represented by the Project is tied to the longer season.

3

The parties and the Court all seem to agree that the existing situation is mired by congestion, parking problems, long waits in the Visitor Center and for bathrooms, and a generally degraded visitor experience both indoors and outside during peak times. *See* Order at 6. Because demand for visiting the Mendenhall Glacier is already high and is likely to increase by at least some measure in the future these problems will only get worse. *See id.* The number of visitors to the MGRA climbed to about 6,000 some days during the 2025 season with over 1,900 people counted in the Visitor Center building on one day alone in August 2025. *See* Decl. of Monique Nelson ("Nelson Decl.") ¶¶ 23-24. The problems are not confined to the Visitor Center Unit. Local cars commonly line the two lane road on the West Glacier side even in the winter due to lack of available parking. *See id.* ¶ 8 & photos. The Project authorizes the construction of about fifty additional parking spaces to address this issue. *Id.*

In 2023, the Forest Service issued a Record of Decision for the Project supported by a Final Environmental Impact Statement. The decisions made by the agency fall into two primary categories. The first comprises:

> [N]ew facilities and facility improvements, including parking lots and access expansion; construction of a new welcome center and visitor plazas; and improvements to the historic Visitor Center; Steep Creek habitat restoration; construction, improvement, or designation of the Lakeshore, Nugget Falls, Steep Creek, and West Glacier Spur trails and the Dredge Lake and West Glacier unit multi-use trails; construction of Glacier Spur Road trailheads; and construction of public use cabins as well as installation of culverts or other required drainage structures, grading, removal of outdated infrastructure and materials, vegetation management to preserve views, revegetation, and other maintenance of facilities and trails.

4

Order at 10 (internal quotation marks omitted). These facility and infrastructure improvements are meant to alleviate *existing* crowding problems, improve *existing* visitor experience, protect natural resources conditions from *existing* visitor use—by reducing human-wildlife encounters for example—in addition to accommodating a broad range of potential future increases in visitorship following implementation of these improvements. *See* FS_16741-47; FS_20344-46.

The second part of the Project decision allows for increased commercial use allocations *after* the aforementioned infrastructure and facilities improvements are complete, following a process outlined in a separate Adaptive Management Plan. Order at 10-11. The decision also lengthens the primary use season to 214 days to reflect the reality that cruise ships arrive from April through October of each year. *Id.* at 11. A significant part of the potential increases in visitor capacity between the no action and action alternatives is due to this change in primary use season. FS_17089.

Plaintiff filed suit in July 2024 and raised several NEPA claims in her Motion for Summary Judgment. First, she challenged the purpose and need statement, because it "'prejudged the outcome of the EIS by specifying a projected level of visitor increase' that could only be achieved by implementing the capacity increases included in the selected alternative in violation of NEPA (Claim 1)." Order at 14. Second, she claimed the Forest Service failed to consider a reasonable range of alternatives (Claim 2). Third, she claimed the EIS was missing information and the agency had failed to implement mitigation from a 2015 decision (Claim 3). Fourth, she challenged the Forest Service's

trail capacity analyses in the EIS (Claim 4). Last, she claimed the Forest Service failed to adequately consider the impacts of the Project on municipal waste utilities (Claim 5).

   b. **This Court's Decision on the Merits.**

The Court found for Plaintiff on Claim 1 and 2 only. The error with the purpose and need statement, the Court determined, was that it incorporated the need to accommodate a 2% annual growth rate in visitation and anticipated 1 million visitors per year by 2050. Order at 28. The Court found this error consequently poisoned the action alternatives, because each alternative also incorporated the same 2% annual projected growth rate. *Id.* at 29.

The Court reasoned that the Forest Service's selection of a 2% annual growth rate for the Project area—which roughly matches the annual growth rate for the City of Juneau (a fact that does not appear to be contested)—equated to a decision that "all projected visitors to Juneau should have the opportunity to visit the MGRA, which can only occur as a consequence of increased special use authorizations to commercial operators." *Id.* at 29-30. "[A]ll six action alternatives assume that the growth will be tied to increased commercial use," although visitors coming without a commercial provider are also expected to increase with overall tourism growth in Juneau. *Id.* at 30; Nelson Decl. ¶ 34.

In short, the Court found the purpose and need statement to be "unreasonably narrow, in so far as it identified the need to fully accommodate at the MGRA the expected projected growth of tourism to Juneau through 2050." Order at 33. And because every alternative likewise "assumes an annual 2% growth rate of visitors to the MGRA,"

6

the range of alternatives also violates NEPA. *Id.* All the errors with the purpose and need statement and alternatives therefore relate to the 2% annual growth rate and projected increases in visitor capacity. The Court found no errors with the other components of the purpose and need statement or alternatives that do not relate to the projected 2% annual growth rate.

The Court denied Plaintiff's Motion for Summary Judgment as to her remaining claims. Specifically, the Court found that the Forest Service had complied with its earlier mitigation obligations from a 2015 decision (Order at 34-41), that the Forest Service's trail capacity analyses in the EIS were reasonable (Order at 41-45), and that the Forest Service's analysis of impacts of the Project on municipal waste utilities was adequate (Order at 45-48).

### III. LEGAL STANDARDS

The Supreme Court recently announced a major "course correction" when it comes to the standards of judicial review under NEPA, which Plaintiff fails to acknowledge in discussing the appropriate remedy. *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.,* 605 U.S. 168, 184 (2025). *Seven County* abrogated lower-court decisions that had "assumed an aggressive role in policing agency compliance with NEPA," "slowed down or blocked many projects and, in turn, caused litigation-averse agencies to take ever more time and to prepare ever longer EISs." *Id*. at 169, 183. Those project delays have come at least in part from lower courts reflexively vacating the underlying agency decision rather than remanding the matter to the agency to fix procedural NEPA
7

errors in the supporting environmental documents without vacating the underlying agency decision.

*Seven County* also sought to right the ship at the remedy stage, making clear that "courts not only must defer to the agency's reasonable choices regarding the scope and contents of the EIS, but also must keep in mind that review of an agency's EIS is not the same thing as review of the agency's final decision concerning the project." *Seven Cnty.*, 605 U.S. at 184. Thus, "[e]ven if an EIS falls short in some respects, that deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to the EIS." *Id.* at 185. Rather than automatically vacating an agency action supported by a successfully challenged EIS, courts must "consider whether 'on remand, a different result may be reached.'" *Montana Wildlife Fed'n* v. *Haaland*, 127 F.4th 1, 51 (9th Cir. 2025) (citation omitted).

Even before *Seven County*, Ninth Circuit case law directed courts reviewing agency action under the Administrative Procedure Act to look to the two factors set forth in *California Communities Against Toxics v. EPA* and did not mandate vacatur. 688 F.3d 989, 992 (9th Cir. 2012). Instead, applicable case law requires an equitable balancing of factors rather than a presumption of vacatur. M*onsanto Co. Geertson Seed Farms*, 561 U.S. 139, 157 (2010) ("No such thumb on the scales is warranted."). Finally, a "remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Gill v. Whitford*, 585 U.S. 48, 50 (2018) (citation omitted). *Gill* is particularly apt here where Plaintiff's injury derives from potential second-order

8

decisions about commercial use that *might* be made years from now, *after* a suite of infrastructure and facilities projects that are also authorized by the decision are implemented.

## IV. ARGUMENT

In *Orutsararmuit Native Council v. United States Army Corps of Engineers*, this Court agreed with the Government that vacatur was not warranted where the Final EIS failed to consider a tailings spill greater than 0.5% of the tailings volume even though correcting that error could cause the agency to modify or even rescind the Section 404 permit that had been issued for the project. 2025 WL 1654878. The Court rested its decision on the possibility that the agencies "could adopt the same rule [or decision]," the fact that the flaw in the Final EIS was not "fundamental," the anticipated disruption to the mining company and to residents from vacatur, and the fact that remand without vacatur would not cause environmental harm to the Plaintiff. *Id.* at *3-4 (alteration in original) (citation omitted). The Court was also persuaded that the mining company had voluntarily agreed to self-enjoin during the remand. *Id.* at *4-5 & n.27.

These same considerations militate against vacatur here.

### a. The Errors Are Not so Fundamental that the Agency Could Not Reach the Same Decision Following Remand.

As this Court acknowledged, NEPA deficiencies may not require vacatur "absent reason to believe that the agency might disapprove the project if it added more to the environmental impact statement." Order at 17 (cleaned up). Here, there is "reason to believe" that the agency could reach the same decision following remand. *Seven Cnty.*,

9

605 U.S. at 185; *see also Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*, 988 F.2d 146, 151 (D.C. Cir. 1993) (framing the inquiry as to whether there was a "serious possibility").

First and foremost, although the errors the Court found derive from one specific aspect of the purpose and need statement (the 2% annual growth rate), they are not so fundamental to the Project overall that the agency could not reach the same decision following remand. One way in which the Forest Service could rectify the error would be to clarify the purpose and need statement such as by editing it to read:

> The purpose of the project is to update infrastructure and create recreation opportunities at the MGRA that can better meet existing conditions and visitorship to the MGRA and consider if and how increasing visitors to the Juneau area might be accommodated at the MGRA while protecting the unique characteristics and outstanding beauty of the area.

Whereas the action alternatives currently all assume a 2% annual increase in visitation implemented over different time horizons (15 and 30 years), they could reasonably be revised to instead consider a range of increased visitorship (including but not limited to 2%) over an identical time horizon (e.g., 30 years). *See* Nelson Decl. ¶ 37. This would result in an apples-to-apples comparison between alternatives because all alternatives would have the same time horizon.

In addition, both the Court and Plaintiff appeared to acknowledge that the 2% figure was not a creation of the Forest Service but an estimate of increase in overall visitorship to Juneau. The Court noted that visitors coming without a commercial provider are also expected to increase though the Forest Service does not estimate by

what amount. Order at 30. This is a point that the Forest Service could clarify on remand and potentially support with additional data that overall numbers of visitors to the MGRA are expected to increase regardless of an increase in commercial permits. *See* Nelson Decl. ¶ 38. The Forest Service could also clarify the limits of its ability to physically exclude visitors—*i.e.*, prevent increases in visitors beyond actions related to commercial permits—from the MGRA. *See id.* ¶ 36.

Second, any change to the range of annual increase percentages is unlikely to alter the infrastructure and facilities components of the Project between alternatives—with which the Court found no error. Ultimately, the Forest Service *could* still select ostensibly the same alternative that allows the agency under the Adaptive Management Plan to increase commercial use permits by 2% annually over a set time horizon. A serious *possibility* that the Forest Service could arrive in the same place is all that is required to support a remand without vacatur. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 97 (D.D.C. 2017).

The facilities and infrastructure improvements are needed even in the absence of a single additional commercial use permit, meaning the Forest Service's decision to authorize them was reasonable to begin with, not completely dependent on the annual growth rate, and there is at least a serious possibility that the agency would make these same decisions again. Bus congestion (and the attendant noise and exhaust), inadequate parking, crowding, long lines, undesired wildlife encounters, and a generally degraded visitor experience in the Visitor Center Unit during peak times are all existing problems

11

that the Project would address. *See* Nelson Decl. ¶¶ 21-26. The work in the downstairs of the Visitor Center has nothing to do with the numbers of visitors. *Id.* ¶ 31.

As for the outdoor restoration and improvement of Steep Creek, Nugget Falls, West Glacier Spur, and the West Glacier unit multi-use trails, the Forest Service decided to do this work not only to potentially allow more people to enjoy these trails, but to alleviate existing trail congestion, address existing ecological impacts like erosion and trail damage, and reduce unintended encounters with wildlife that are happening *now*, by re-routing one of the trails to photo point, for example, to avoid a well-traveled bear crossing. *Id.* ¶¶ 26-28. Trail congestion, erosion and damaged trails, and close encounters with bears are existing issues, *id.*, and thus there is a serious possibility the Forest Service will still decide to undertake this work following remand.

All the components of the Project directed at improving areas used exclusively (or almost exclusively) by locals—for example, the public use cabins and activities in the Dredge Lakes area—are also unlikely to change following remand. *See id.* ¶¶ 8-9. The decision to add additional parking on the west side (an area mostly used by locals) is driven by a safety issue caused by cars being forced to park along the road to access the Glacier Spur road trailheads. *See id.* ¶ 29.

Finally, there is at least a serious possibility that the extension of the primary use season from 153 days to 214 days (and attendant increase in potential visitor capacity) would remain unchanged in any remand scenario, both because the season-length extension was not challenged and because it is due to the uncontested fact that cruise ships are arriving both earlier and later in the year.

12

In sum, even if the Forest Service ultimately ended up creating and selecting an alternative that incorporated smaller visitor growth estimates, the infrastructure components of that alternative would likely be substantially the same as the current Project to better accommodate existing use and the longer season, address existing ecological issues and things in need of repair, and also increases in non-commercial (independent) use that the Forest Service has limited practical ability to control.

### b. Vacatur Would Be Unnecessarily Disruptive and Harmful.

Vacatur would be unnecessarily disruptive and harmful to the Forest Service and to the public, including local users and visitors to Juneau. Vacatur would be disruptive to the Forest Service employees and partners that would be deprived of much-needed improvements to the Visitor Center that will reconfigure non-public areas to make them more comfortable and productive. Nelson Decl. ¶ 31. Vacatur could also have significant "economic consequences" on the agency by increasing project costs and threatening the project's viability. *See Cook Inletkeeper v. Raimondo*, 541 F. Supp. 3d 987, 993 (D. Alaska 2021). Specifically, the Forest has currently secured about $25 million dollars for the initial phase of the Project, which may be reallocated by the agency to other projects and activities should the Project be halted, even temporarily. *See* Nelson Decl. ¶¶ 19-20, 30. In addition, the Forest Service has thus far spent about $ 3 million on architecture and engineers and design work, which cannot be recovered if the work does not go forward. *Id.* ¶ 18.

Finally, vacatur would be disruptive and harmful to the public, because all of the problems that exist today will remain unabated for potentially years—the Visitor Center

13

will continue to be overcrowded and have long lines; the vehicle congestion and lack of parking both in the Visitor Center Unit and elsewhere will persist; the damage and erosion to trails will get worse; there will be more unwanted interactions with bears; and local residents will continue park along the road instead of in a safer location. Because the Forest Service cannot practically reduce the number of people who enter the MGRA, these problems can and will only improve through infrastructure improvements like the ones included in the Project.

By contrast, remand without vacatur is unlikely to cause harm to Plaintiff's concrete interests, because the Forest Service will not implement any increase to permitted commercial service days under this Project decision during the remand period. Nelson Decl. ¶¶ 40-42. It is the potential increase in visitors and commercial use that is the source of Plaintiff's alleged injuries and standing. *See* Order 15 n. 74 (finding Plaintiff has plausibly alleged the elements of standing due to "the project's expansion of visitor capacity and commercial transporter allocations" and "increase[] in permitted visitors" (alteration in original)).

It is axiomatic that the "remedy must be tailored to redress [their] particular injury," *Gill*, 585 U.S. at 73 (citation omitted). That means that "the scope of remedy must be no broader and no narrower than necessary to redress the injury shown by the plaintiffs." *Cascadia Wildlands v. Warnack*, 570 F.Supp.3d 983, 992 (D. Or. 2021) (cleaned up). Here, tailoring the scope of the remedy to the alleged injuries this Court found to be the basis of Plaintiff's standing means leaving alone all those aspects of the Project that do not touch the Forest Service's decision to *potentially* allow for future

14

increases in commercial use permits—namely, the facilities and infrastructure improvements within the Visitor Center Unit, trail restoration and improvement projects, and all those activities within areas that see mostly local use. There is no basis to vacate those latter aspects of the Project, which without the attendant increase in commercial use do not plausibly harm the Plaintiff.

## V. Conclusion

For all the reasons set forth above, the Court should remand the matter without vacatur to address the issues identified in the Order. Until it responds to the Court's ruling, the Forest Service agrees not to increase commercial use permits under the Project decision.

DATED: December 12, 2025

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

*/s/ Erika Norman*
ERIKA NORMAN
Senior Trial Attorney, Natural Resources Section
150 M. Street, NE
Washington, DC 20002
202-305-0475
Erika.norman@usdoj.gov

*Counsel for Defendants*

Of Counsel:

JENNIFER MCVEY THOMAS
Attorney Advisor
U.S. Department of Agriculture