# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

KATHARINE B. MILLER,

                Plaintiff,

      v.

U.S. FOREST SERVICE, *et al.*,

                Defendants.

Case No. 1:24-cv-00013-SLG

## ORDER ON REMEDY

Before the Court at Docket 41 is self-represented Plaintiff Katharine B. Miller's Briefing Regarding Remedy. Defendants U.S. Forest Service and Francis Sherman, Forest Supervisor of the Tongass National Forest (collectively, the "Forest Service") filed a Supplemental Brief on Remedy at Docket 42. Oral argument was not requested and was not necessary to the Court's determination.

## BACKGROUND

This action concerns the December 2023 Record of Decision ("the 2023 ROD") authorizing the Mendenhall Glacier Visitor Facility Improvements Project ("the Project"),[1] located in the Mendenhall Glacier Recreation Area ("MGRA"), about 12 miles north of downtown Juneau, Alaska.[2]

Pursuant to the National Environmental Policy Act ("NEPA"), the Forest

---

[1] Docket 1 at ¶ 1.

[2] FS_020318.

Service published its Final EIS ("the 2023 FEIS") for the Project in May 2023.[3] In a section titled Purpose of and Need for Action, the 2023 FEIS states that "[t]he number of visitors to the MGRA is projected to increase at a rate of approximately 2 percent annually for the next 30 years as the cruise industry continues to grow in the region and the tourism season expands, with a projection of 1,000,000 visitors annually by 2050."[4]

In the 2023 FEIS, the Forest Service evaluated six action alternatives (Alternatives 2 through 7 for the Project) and one no action alternative (Alternative 1).[5] Each of the action alternatives estimates future visitor capacity at the Visitor Center Unit "based on 2% [annual] growth in visitation over three different timeframes," which corresponds to the tourism growth projections for the City and Borough of Juneau.[6]

---

[3] FS_016683-FS_017085 (2023 FEIS Volume I); FS_017086-FS_017549 (2023 FEIS Volume II).

[4] FS_016712. The 2023 FEIS "Purpose and Need Statement" provides that:

> The purpose of the project is to update infrastructure and create recreation opportunities at the MGRA that can accommodate projected future visitor use while protecting the unique characteristics and outstanding beauty of the area. The project is needed to continue to provide quality opportunities for all visitors to enjoy the recreation area, to provide new recreation and interpretation experiences that emphasize the area's outstanding scenery and wildlife resources even as the glacier recedes out of view of the existing Visitor Center, to meet the demand of the visitor industry and support the economy of Southeast Alaska, and to protect the area from environmental impacts associated with increased visitation.

FS_016713.

[5] FS_016689-90.

[6] FS_017088.

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Remedy
Page 2 of 22

In December 2023, the Forest Service issued its Final ROD.[7] The 2023 ROD provides that visitor capacity and commercial use allocations will be updated to allow for increased visitation only after facility improvements are complete, following a process outlined in an attached Adaptive Management Plan.[8] The 2023 ROD also lengthened the primary use season from 153 days to 214 days each year, from April 1 through October 31.[9]

On July 30, 2024, Plaintiff initiated this action challenging the 2023 FEIS and the 2023 ROD under NEPA and the Administrative Procedure Act ("APA").[10]

On September 30, 2025, this Court granted in part and denied in part Plaintiff's motion for summary judgment.[11] The Court found that the 2023 FEIS Purpose and Need Statement, which was made at the beginning of the EIS process, included the need to accommodate an anticipated 2% annual visitor growth rate.[12] "Because the Forest Service incorporates this growth into its Purpose and Need Statement, all of the action alternatives are estimated based on a 2% annual projected growth rate in the Visitor Center Unit."[13] The Court

---

[7] FS_020228-FS_020310 (Final 2023 ROD); FS_020311-FS_020393 (Final Signed 2023 ROD).

[8] FS_020338.

[9] FS_020380.

[10] Docket 1 at 1, 48-52.

[11] Docket 37.

[12] Docket 37 at 29; *see also* Docket 36 at 2-3.

[13] Docket 37 at 29 (first citing FS_017088; then citing FS_016738; and then citing Docket 24-2 at 21).

concluded that this rendered "the Purpose and Need Statement unreasonable because it unreasonably narrows the agency's consideration of alternatives and results in a visitor capacity that is 'preordained.'"[14]

The Court found for Plaintiff as to Claims 1 and 2 as follows: (1) that the Forest Service "unlawfully limited the Purpose and Need for the project and prejudged the outcome of the EIS by specifying a projected level of visitor increase" that could only be achieved by implementing the capacity increases included in the selected alternative in violation of NEPA (Claim 1);[15] and (2) that the Forest Service violated NEPA by failing to consider a reasonable range of alternatives in its 2023 FEIS (Claim 2).[16] The Court found for Defendants as to Plaintiff's other three claims.[17]

In its order, the Court asked each party to file a supplemental brief addressing the appropriate remedy with respect to Plaintiff's two remaining

---

[14] Docket 37 at 29 (citing *City of Los Angeles v. Fed. Aviation Admin.*, 63 F.4th 835, 843 (9th Cir. 2023)).

[15] Docket 37 at 20-34 (quoting Docket 21 at 15-16).

[16] Docket 37 at 20-34 (citing Docket 21 at 16-18).

[17] The Court found that the Forest Service complied with its mitigation obligations under the 2015 FONSI and did not violate 40 C.F.R. § 1502.22 regarding missing information essential to the FEIS and thus denied Plaintiff relief on Claim 3. Docket 37 at 40-41.

The Court then found that the Forest Service's trail capacity analyses in the 2023 FEIS met NEPA standards for scientific integrity and were reasonable and thus denied Plaintiff relief on Claim 4. Docket 37 at 43-45.

Lastly, the Court found that the 2023 FEIS's evaluation of impacts of the increase in commercial visitor capacity on municipal waste utilities was sufficient and thus denied Plaintiff relief on Claim 5. Docket 37 at 47-48.

claims.[18]  Plaintiff filed her Briefing Regarding Remedy at Docket 41 and the Forest Service filed a Supplemental Brief on Remedy at Docket 42.  The issue of the appropriate remedy is now ripe for the Court's decision.

## LEGAL STANDARD

"Where a court holds an agency action unlawful, vacatur and remand is the default remedy under the APA, but the court retains equitable discretion in 'limited circumstances' to remand a decision without vacatur while the agency corrects its errors."[19]  "Whether agency action should be vacated depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'"[20]  In evaluating "the seriousness of the error," a court may "consider whether 'on remand, a different result may be reached.' The court may 'look[] at whether the agency would likely be able to offer better reasoning or whether by complying with procedural rules, it could adopt the same rule [or decision] on remand,'" "or whether such fundamental flaws in the agency's decision make it unlikely that the same rule would be adopted on remand."[21]  "Even

---

[18] Docket 37 at 48.

[19] *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 50 (9th Cir. 2025) (quoting *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015)); *see also* 5 U.S.C. § 706(2)(A) (directing reviewing courts to "set aside" unlawful agency action).

[20] *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)).

[21] *Mont. Wildlife Fed'n*, 127 F.4th at 50-51 (alterations in original) (quoting *Pollinator Stewardship Council*, 806 F.3d at 532); *Pollinator Stewardship Council*, 806 F.3d at 532; *see Allied-Signal*, 988 F.2d at 151 (declining to vacate because there was "at least a serious possibility that the [agency would] be able to substantiate its decision on remand").

if an EIS falls short in some respects, that deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to the EIS."[22]

## DISCUSSION

Plaintiff asks the Court to set aside the 2023 ROD and vacate the 2023 FEIS for several reasons.[23] First, she maintains that "vacatur is the presumptive and appropriate remedy" for violations under the APA and the present case is not one of the "rare circumstances" where remand without vacatur is necessary.[24] Second, she asserts that the Forest Service's legal errors are serious and "permeate every aspect of the EIS"[25] And third, she maintains that the disruptive consequences of vacatur do not outweigh the seriousness of the Forest Service's errors.[26]

Defendants ask the Court to order a remand without vacatur. They maintain: (1) "there is a serious possibility the agency would reach the same decision on remand as to the long overdue facility and infrastructure improvement components of the Project," which under *Seven County* "is enough to avoid vacatur"; (2) "vacatur would be unnecessarily disruptive and harmful to the agency and to the

---

[22] *Seven Cnty. Infrastructure Coal. v. Eagle County*, 605 U.S. 168, 185 (2025).

[23] Docket 41 at 3.

[24] Docket 41 at 3-4.

[25] Docket 41 at 4-9.

[26] Docket 41 at 11.

public" and without avoiding harm to Plaintiff herself; and (3) "the agency will agree not to increase permits under this Project decision until it responds to the Court's ruling."[27]

## I.      Severity of the Agency's Error

"The first *Allied-Signal* factor—the seriousness of the error—requires the Court to consider whether 'on remand, a different result may be reached.'"[28]  A court "look[s] at whether the agency would likely be able to offer better reasoning or whether by complying with procedural rules, it could adopt the same rule [or decision] on remand."[29]

Plaintiff asserts that the Forest Service's use of the 2% annual growth rate for every alternative section in the FEIS is a serious error that goes to "'the heart' of the EIS."[30]  Plaintiff cites *Citizens for a Better Henderson v. Hodel* for the proposition that "[t]he existence of a viable but unexamined alternative renders an environmental impact statement inadequate."[31]  Furthermore, Plaintiff maintains that *Seven County* deference is unwarranted because "Defendants unreasonably narrowed the purpose and need, which strongly indicates any comparable narrowing on remand would be similarly unlawful and violate NEPA in the same

---

[27] Docket 42 at 2 (citing *Seven County*, 605 U.S. 168).

[28] *Mont. Wildlife Fed'n*, 127 F.4th at 50-51 (quoting *Pollinator Stewardship Council*, 806 F.3d at 532).

[29] *Pollinator Stewardship Council*, 806 F.3d at 532.

[30] Docket 41 at 5 (citing 40 C.F.R. § 1502.14).

[31] Docket 41 at 5 (citing 768 F.2d 1051, 1057 (9th Cir. 1985)).

core ways as the original decision."[32] Plaintiff also asserts that the Forest Service did not adequately consider public comments questioning why increased visitation was the only option, which in Plaintiff's view, "strongly suggest[s] that the Forest Service would be unable to reach the same decision on remand."[33] Lastly, Plaintiff distinguishes this case from this Court's prior decisions concerning remedy in *Cook Inletkeeper v. Raimondo* and *Orutsararmuit Native Council v. United States Army Corps of Engineers*.[34] Unlike those cases, Plaintiff maintains that here, "serious legal errors permeate the EIS and go well beyond mere technical or procedural formalities that can be easily cured on remand."[35]

In their supplemental brief, Defendants disagree and contend that the Forest Service could reach the same decision following remand for three reasons.[36] First, they maintain that the use of the 2% annual growth rate error for all alternatives is "not so fundamental to the Project overall that the agency could not reach the same

---

[32] Docket 41 at 6 (citing Docket 37 at 21); *see also* Docket 41 at 6 ("The Forest Service has no remaining arguments to justify a purpose and need statement that artificially constrains the alternatives analysis except deference, and even here an overly simplistic 'deference' argument must be rejected.").

[33] Docket 41 at 8-9 (citing *Nat. Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 812 (9th Cir. 2005)); *see also* Docket 41 at 8 ("The Forest Service's actions are also serious for their impact on subverting the public process. Nearly 20% of the 556 comments on the EIS directly questioned why increased visitation was the only option considered in the EIS or why a permit system limiting access could not be implemented." (citing FS_17180-17440)).

[34] Docket 41 at 9 (first citing 541 F. Supp. 3d 987 (D. Alaska 2021) [hereinafter *Cook Inletkeeper*]; and then citing Case No. 3:23-cv-00071-SLG, 2025 WL 1654878 (D. Alaska June 10, 2025) [hereinafter *Orutsararmuit*]).

[35] Docket 41 at 3.

[36] Docket 42 at 9-12.

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Remedy
Page 8 of 22
Case 1:24-cv-00013-SLG   Document 43   Filed 05/08/26   Page 8 of 22

decision following remand."[37]  Second, Defendants assert that "any change to the range of annual increase percentages is unlikely to alter the infrastructure and facilities components of the Project between alternatives—with which the Court found no error."[38]  According to Defendants, because "facilities and infrastructure improvements are needed even in the absence of a single additional commercial use permit," "the Forest Service's decision to authorize them was reasonable to begin with, not completely dependent on the annual growth rate, and there is at least a serious possibility that the agency would make these same decisions again."[39]  Lastly, Defendants maintain that the extension of the primary use season from 153 days to 214 days "would remain unchanged in any remand scenario, both because the season-length extension was not challenged and because it is due to the uncontested fact that cruise ships are arriving both earlier and later in the year."[40]

The Court agrees with Defendants that "there is 'reason to believe' that the agency could reach the same decision following remand."[41]  Clearly, there is a need for infrastructure improvements at the MGRA.[42]  That the Forest Service only

---

[37] Docket 42 at 9-10 (citing *Seven County*, 605 U.S. at 185).

[38] Docket 42 at 11.

[39] Docket 42 at 11.

[40] Docket 42 at 12.

[41] Docket 42 at 9-10 (quoting *Seven County*, 605 U.S. at 185).

[42] *See* Docket 42-1 at ¶¶ 21-29 (Decl. of Monique Nelson).

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Remedy
Page 9 of 22
Case 1:24-cv-00013-SLG    Document 43    Filed 05/08/26    Page 9 of 22

considered a projected 2% annual increase in visitors in its environmental analysis is not an error of such magnitude so as to go to "the heart of the [EIS]."[43]  And while the Court determined that the Purpose and Need Statement for the Project was too narrow and the range of alternatives considered was too constrained to comply with NEPA, the Court rejected Plaintiffs' three other NEPA challenges to the 2023 FEIS.[44]

In *Orutsararmiut,* the Court found that the agency violated NEPA and § 810 of the Alaska National Interest Lands Conservation Act ("ANILCA") "by failing to consider a tailings spill larger than 0.5% of the [tailings storage facility's] total volume and by declining to assess a catastrophic tailings spill based solely on its low probability of occurrence" in the FEIS.[45]  Similar to the error this Court found here with the agency's analysis of only a 2% projected annual visitor growth for all alternatives, in *Orutsararmiut,* the Court found that "[t]he issue on remand is narrow and a matter of degree, as the agencies already modeled and considered a tailings spill, albeit only a spill of 0.5% of the total tailings volume."[46]  The Court was further persuaded that significant disruption would occur to Intervenor-Defendants Donlin

---

[43] 40 C.F.R. § 1502.14 (2024).  All CFR regulations were subsequently removed by an interim final rule in February 2025. Removal of National Environmental Policy Act Implementing Regulations, 90 Fed. Reg. 10610-01 (Feb. 25, 2025).  The Court refers to the regulation in effect at the time of the Forest Service's action.

[44] *See supra* note 17.

[45] 2025 WL 1654878, at *1 (citation omitted).

[46] *Id.* at *4.

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Remedy
Page 10 of 22
Case 1:24-cv-00013-SLG     Document 43     Filed 05/08/26     Page 10 of 22

Gold, LLC and Calista Corporation, as well as to the local residents of the Yukon-Kuskokwim region, in the event of vacatur, and that remand without vacatur would not cause environmental harm particularly because the Court adopted Intervenor-Defendant Donlin Gold's proposed self-injunction.[47]

In *Cook Inletkeeper*, this Court found that the agency had "failed to provide a reasoned explanation or identify adequate support in the record for its determination that tug noise from [Intervenor-Defendant] Hilcorp's activities would not take beluga whales."[48] The Court had ruled that the agency's "failure to consider the noise from [Intervenor-Defendant] Hilcorp's tug boats in issuing the [Incidental Take Regulation] [was] a serious error that [was] particularly troublesome because Cook Inlet beluga whales [had been] listed as an endangered species and [had] a declining population despite ongoing efforts."[49] However, the Court determined that the nature of the agency's violations did not warrant the complete vacatur of the Incidental Take Regulations, Biological Opinion, and Environmental Assessment/Finding of No Significant Impact, because the agency's errors "affect[ed] only a discrete set of tug operations" and that on remand, "further analysis of the effects of Hilcorp's tug operations may

---

[47] *Id.* In its order, the Court further noted that remanding without vacatur helped to ensure that the remand would be focused on the additional tailings analysis and would not unnecessarily expand beyond the Court's order. *Id.*

[48] 541 F. Supp. 3d at 990–91 (citation omitted).

[49] *Id.* at 991 (citation omitted).

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Remedy
Page 11 of 22
Case 1:24-cv-00013-SLG    Document 43    Filed 05/08/26    Page 11 of 22

affect NMFS's evaluation of the aggregate effects of Hilcorp's activities as a whole and whether those activities as a whole will have a negligible impact."[50]

Much like the range of alternatives evaluated in the 2023 FEIS Purpose and Need Statement in this case that all assumed an annual 2% growth rate, in *Cook Inletkeeper*, the Court found that "while [the agency's] error permeated each of the challenged documents, it pertained only to a limited set of activities authorized in the [Incidental Take Regulations]" pursuant to the Endangered Species Act.[51] While the violations in *Cook Inletkeeper* and the instant case are both serious, both errors "are also limited in scope."[52]

In her brief, Plaintiff cites to the Concurrence in Part in *Center for Biological Diversity v. United States Bureau of Land Management* as supporting authority for her assertion that the severity of the FEIS's error "weighs strongly in favor of vacatur."[53]  The Concurrence in Part "[could not] join the majority's adoption of an

---

[50] *Id.* at 992. Specifically, the Court found that the Incidental Take Regulations, Biological Opinion, and Environmental Assessment/Finding of No Significant Impact be (1) vacated as to Intervenor-Defendant's use of tugs towing the drill rig in connection with exploratory well drilling; (2) remanded without vacatur as to production drilling at the Tyonek Platform; (3) vacated as to Intervenor-Defendant's use of tugs towing the drill rig in connection with all other production well drilling; and (4) remanded without vacatur as to all other activities governed by the Incidental Take Regulations. *Id.* at 996.

[51] *Id.* at 992.

[52] *Id.*

[53] Docket 41 at 10 (citing 141 F.4th 976, 1028-29 (9th Cir. 2025) (Sanchez, J., concurring in part)).

In a footnote, Plaintiff includes the following parenthetical: "finding that vacatur was warranted where BLM's decision to rely on a full field development standard lacking 'any basis in law [. . .] at the outset of its supplemental analysis infected each determination that the agency subsequently made.'" Docket 41 at 10, n.15 (citing *Ctr. for Biological Diversity*, 141 F.4th at

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Remedy
Page 12 of 22
Case 1:24-cv-00013-SLG     Document 43     Filed 05/08/26     Page 12 of 22

improper remedy—remand without vacatur—under the circumstances of this appeal."[54] However, a Concurrence in Part is not binding authority.[55] Thus, *Center for Biological Diversity* actually supports Defendants' position, rather than Plaintiff's position, as the majority held that "vacatur is unwarranted because the procedural error is minor and the on-the-ground consequences of vacatur would be severe."[56]

Although this Court did find that the 2023 FEIS Purpose and Need Statement unreasonably narrowed the Forest Service's consideration of alternatives in violation of NEPA,[57] this error is one that can be appropriately addressed on remand. Given the need for visitor improvements at the MGRA, the Court finds no reason to believe that the agency would adopt the No Action Alternative and disapprove the Project after it considers a range of visitor growth projections.[58]

---

1028-29).

[54] *Ctr. for Biological Diversity*, 141 F.4th at 1020 (Sanchez, J., concurring in part); *see also id.* at 1029 ("Given the extent of agency error, I see no reason to deviate from the typical remedy our cases and the APA have required under such circumstances.").

[55] *Maryland v. Wilson*, 519 U.S. 408, 412-13 (1997) ("We agree with respondent that the former statement was dictum, and the latter was contained in a concurrence, so that neither constitutes binding precedent.").

[56] *Ctr. for Biological Diversity*, 141 F.4th at 1015-16.

[57] Docket 37 at 20.

[58] *Seven County*, 605 U.S. at 185 ("Even if an EIS falls short in some respects, that deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to the EIS.").

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Remedy
Page 13 of 22

With their Supplemental Brief on Remedy, Defendants filed the Declaration of Monique Nelson, Forest Supervisor for the Tongass National Forest.[59] Forest Supervisor Nelson explained that on remand, the agency can explore "several possible solutions that would not fundamentally alter the construction components of the Project."[60] She explained:

> For example, the current alternatives vary the amount of visitor capacity based on a fixed percentage growth, but over different time horizons. The Forest could instead vary the percentage growth, but over a fixed time horizon, or provide a range of visitation from which to design facilities without relying on general tourism growth estimates for Juneau overall.[61]

On remand, the agency "would also carefully consider how to clarify current conditions and the impacts of the No Action Alternative" or "add documentation for more alternatives considered but eliminated from detailed study" as approaches to address errors.[62]

Defendants maintain that "facilities and infrastructure improvements are needed even in the absence of a single additional commercial use permit," or any increase in growth rates.[63] Indeed, Plaintiff does not appear to dispute that some degree of infrastructure and facility improvements are needed at the Visitor Center

---

[59] Docket 42-1.

[60] Docket 42-1 at ¶ 37.

[61] Docket 42-1 at ¶ 37.

[62] Docket 42-1 at ¶ 38.

[63] Docket 42 at 11.

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Remedy
Page 14 of 22
Case 1:24-cv-00013-SLG   Document 43   Filed 05/08/26   Page 14 of 22

Unit, trails, and/or parking facilities.[64]

The Court found that the 2023 FEIS Purpose and Need Statement failed to adequately consider alternatives apart from those based on the 2% annual growth rate assumption.  This issue on remand is relatively narrow.  In addition, the Forest Service has demonstrated that it is likely that the agency may be able to address the error that the Court has noted with minimal delay and disruption to the Project.  As such, the Court finds that on remand, "there is at least a serious possibility" the agency "could adopt the same rule [or decision]."[65]

## II.    Disruptive Effect of Vacatur

"The second *Allied-Signal* prong requires the court to consider the disruptive effect of vacatur."[66]

Plaintiff first asserts that the current overcrowding at the MGRA is due to the Forest Service's own actions, namely, increasing the commercial visitor allocation in 2015 and 2019 through the issuance of additional Special Use Permits.[67]

---

[64] Although Plaintiff asserts that "the present level of overcrowding [is] a direct consequence of [the issuance of Special Use Permits," she appears to acknowledge that the MGRA presently experiences overcrowding. *See* Docket 41 at 11-12.

[65] *Mont. Wildlife Fed'n*, 127 F.4th at 51 (alteration in original) (quoting *Pollinator Stewardship Council*, 806 F.3d at 532); *see also Pollinator Stewardship Council*, 806 F.3d at 532 (declining to vacate because there was "at least a serious possibility that the [agency would] be able to substantiate its decision on remand") (quoting *Allied-Signal, Inc.*, 988 F.2d at 151).

[66] *Mont. Wildlife Fed'n*, 127 F.4th at 51.

[67] Docket 41 at 11 ("Not only is the present level of overcrowding a direct consequence of these actions, but because the majority of visitors are arriving under special use permits that the Forest Service issues, the Forest Service has direct control over how many people to let in and could reduce the number of visitors at any time.").

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Remedy
Page 15 of 22
Case 1:24-cv-00013-SLG    Document 43    Filed 05/08/26    Page 15 of 22

Plaintiff maintains that "[v]acatur would merely maintain the status quo, leaving the Forest Service with significant discretion to determine how many special use permits to allow to address overcrowding."[68]  Plaintiff also observes that vacatur would cause limited disruption because the City and Borough of Juneau have entered into voluntary agreements with the cruise lines to limit cruise ship traffic in 2025 and 2026.[69]  Thus, according to Plaintiff, because "the growth rate anticipated in the EIS is unlikely to occur in the near future, vacatur of the EIS and ROD would be minimally disruptive, if at all."[70]

Plaintiff also requests that the Court "consider the changes in the federal landscape that have occurred since the ROD was signed, which call into question whether the project could proceed even if the Defendants had prevailed in court."[71] Plaintiff points out that staffing levels at the MGRA decreased in 2025 amid nationwide federal downsizing, a planned reorganization of the Forest Service in 2026 is expected to further reduce the employee presence in the Alaska Regional Office in Juneau, and proposed budget cuts in the President's Fiscal Year 2026 Budget Request for the Forest Service, if implemented, would significantly cut salaries and expenses.[72]  She also states that funding sources that the Forest

---

[68] Docket 41 at 12.

[69] Docket 41 at 12 ("A five-ship daily limit is already in effect, and starting in 2026, there will be a daily cap of 16,000 cruise passengers, with a 12,000 limit on Saturdays." (citation omitted).

[70] Docket 41 at 12.

[71] Docket 41 at 13.

[72] Docket 41 at 13 (first citing Yvonne Krumrey, *Mendenhall Glacier Visitor Center Plans for*

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Remedy
Page 16 of 22
Case 1:24-cv-00013-SLG     Document 43     Filed 05/08/26     Page 16 of 22

Service relies on from the Great American Outdoors Act ended in 2025 and funding from the Infrastructure Investment and Jobs Act has since been rescinded by the Trump Administration.[73]

Finally, Plaintiff highlights that because construction has not yet begun, "there is no argument for remand without vacatur based on disruption to activities underway."[74] According to Plaintiff, because "federal courts have been reluctant to give economic considerations the same weight as environmental ones," the Court should not give significant weight to Defendants' argument that the potential loss of funding for the Project justifies remand without vacatur.[75]

In their supplemental brief, Defendants assert that "vacatur would be disruptive and harmful to the public, because all of the problems that exist today," such as the congestion in indoor public spaces and bathrooms, and a generally degraded visitor experience, "will remain unabated for potentially years."[76] They also assert that vacatur would be disruptive to Forest Service employees and

---

*Limited Staffing for First Cruise Ship on Monday*, KTOO (Apr. 10, 2025), https://www.ktoo.org/2025/04/10/mendenhall-glacier-visitor-center-plans-for-limited-staffing-for-first-cruise-ship-on-monday/; then citing U.S. Dep't of Agric., Sec'y Memorandum SM 1078-015 (July 24, 2025), https://www.usda.gov/sites/default/files/documents/sm-1078-015.pdf; and then citing *A Review of the President's Fiscal Year 2026 Budget Request for the United States Forest Service*, Hill Heat (June 11, 2025), https://hillheat.com/events/2025/06/11/a-review-of-the-president-s-fiscal-year-2026-budget-request-for-the-united-states-forest-service).

[73] Docket 41 at 13 (first citing Great American Outdoors Act, Pub. L. No. 116-152, 134 Stat. 682 (2020); and then citing Exec. Order No. 14,052, 86 Fed. Reg. 64335 (Nov. 15, 2021)).

[74] Docket 41 at 12 (citations omitted).

[75] Docket 41 at 14.

[76] Docket 42 at 13.

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Remedy
Page 17 of 22
Case 1:24-cv-00013-SLG    Document 43    Filed 05/08/26    Page 17 of 22

volunteers who "would be deprived of much-needed improvements to the Visitor Center that will reconfigure non-public areas to make them more comfortable and productive."[77] In addition, Defendants assert that vacatur could also have significant "economic consequences" by increasing project costs that threaten the Project's viability.[78] Defendants express concern that in particular, a vacatur could lead to the potential reallocation of the $25 million dollars already secured for the Project, in addition to the $3 million in expenses already incurred on architecture and engineers and design work.[79]

Although Plaintiff characterizes the current overcrowding at the MGRA Visitor Center as a self-inflicted harm by the agency, the 2015 and 2019 issuances of Special Use Permits are not at issue in the present case. The Court is not persuaded by Plaintiff's arguments concerning these prior agency actions because regardless of its cause, the fact remains that the MGRA is overcrowded and in need of improvements.[80] Similarly, although the City and Borough of Juneau have limited cruise ship traffic, it remained the case that during the 2025 season, the number of visitors to the MGRA climbed to about 6,000 on some days, with over 1,900 people counted in the Visitor Center building on one day alone in August

---

[77] Docket 42 at 13 (citing Docket 42-1 at ¶ 31).

[78] Docket 42 at 13 (citing *Cook Inletkeeper*, 541 F. Supp. 3d at 993).

[79] Docket 42 at 13; Docket 42-1 at ¶¶ 18-19.

[80] Docket 42-1 at ¶ 25 (explaining how "large numbers of visitors during peak times cause significant traffic congestion, lines at existing restrooms, and packed spaces"); Docket 42-1 at ¶ 29 (highlighting safety concerns with the current parking options).

2025.[81]

Further, the Court is not persuaded by Plaintiff's assertion that "changes in the federal landscape" minimize the disruptive consequences of vacatur.[82] Plaintiff's contention that "the Forest Service lacks the resources to implement the EIS and ROD or make the changes that would be required in a timely manner on remand" is contrary to the Declaration of Forest Supervisor Nelson.[83]

The Court is persuaded that the Forest Service's agreement to not increase commercial use permits during the remand weighs in favor of a remand without vacatur.[84] Presently, the 2023 ROD "does not authorize any immediate or automatic increase in commercial service day allocation."[85] And "because the Forest Service will not implement any increase to permitted commercial service days under this Project decision during the remand period,"[86] remand without vacatur will not cause harm to Plaintiff's interest in limiting commercial use of the MGRA, which formed the basis of her standing, for at least two years.[87]

---

[81] Docket 42-1 at ¶¶ 23-24.

[82] Docket 41 at 13.

[83] *Compare* Docket 41 at 12-13, *with* Docket 42-1 at ¶ 19.

[84] "The Forest Service anticipates that it will be able to complete the additional analysis required within a year or two of the Court's decision on remedy." Docket 42-1 at ¶ 42.

[85] Docket 42-1 at ¶¶ 40-41.

[86] Docket 42 at 14 (citing Docket 42-1 at ¶¶ 40-42).

[87] Docket 42-1 at ¶ 42.

In its Order on Summary Judgment, the Court found that Plaintiff met her burden to establish standing. Docket 37 at 15 n.74. The order cited to Plaintiff's Affidavit of Standing, which had set forth evidence that she owns property adjacent to the road access to the MGRA and that she

And although Plaintiff is correct to note that "federal courts have been reluctant to give economic considerations the same weight as environmental ones,"[88] here, vacatur would disrupt both economic and environmental considerations. Concerning economic considerations, while Plaintiff is correct that construction has not started, other activities have been completed, as "the Forest Service has spent approximately $3 million on architecture and engineering" that "cannot be recovered if the work does not go forward."[89]  If the Court were to vacate the 2023 ROD and FEIS, the Forest Service indicates that it would require at least two additional years to publish a new EIS and decision.[90]  As a result, Forest Supervisor Nelson avers that the "$25 million in funding the Forest [Service] was able to secure for this project would no longer be available after that length of time."[91]

Concerning environmental considerations, vacating the 2023 ROD would

---

and her family "have used the MGRA extensively year around [sic] for hiking, skiing, and outdoor education."  Docket 25-1 at 2.  The Affidavit also alleged that "[t]he considerable increase in traffic (e.g., an estimated 40 buses per hour) . . . from the project's expansion of visitor capacity and commercial transporter allocations will substantially increase the level of bus and vehicle traffic congestion, noise, and safety concerns [and] . . . adversely affect property values in [her] neighborhood," and that an "increase[] in permitted visitors will adversely affect [her] enjoyment and use of the MGRA and will diminish [her] ability to use the area for seeking greater solitude for recreation, research, wildlife viewing, and spiritual and aesthetic enjoyment." Docket 25-1 at 2-3.

[88] Docket 41 at 14.

[89] Docket 42-1 at ¶ 18.

[90] Docket 42-1 at ¶ 39.

[91] Docket 42-1 at ¶ 39.

Case No. 1:24-cv-00013-SLG, *Miller v. U.S. Forest Service, et al.*
Order on Remedy
Page 20 of 22
Case 1:24-cv-00013-SLG   Document 43   Filed 05/08/26   Page 20 of 22

delay remedying certain environmental harms that are presently occurring; for example, vacatur would delay the proposed infrastructure projects to renovate trails to avoid bear encounters and to replace culverts to protect salmon spawning.[92]  And planned projects such as erosion repair and abatement on trails align with the Multiple Use and Sustained Yield Act's directive that the national forests, including the Tongass, be administered "for outdoor recreation, range, timber, watershed, and wildlife and fish purposes."[93]  In addition, the Forest Service's planned projects to expand longer trails, improve cross-country ski and mountain bike trails in the Dredge Lakes area, and build a new public use cabin in the campground appear to primarily benefit the use of the MGRA by locals and non-commercial visitors, not cruise ship passengers.[94]  Thus, this is "a case where vacatur of a faulty rule risks environmental harm, an effect we have previously found to support leaving a rule in place on remand."[95]

On balance, the Court finds that the disruptive effects of vacatur in this case outweigh the minimal disruptive effects of remand without vacatur and warrant a remand without vacatur.

---

[92] Docket 42-1 at ¶¶ 26-28.

[93] 16 U.S.C. § 528; Docket 42-1 at ¶¶ 26-28.

[94] Docket 42-1 at ¶ 9.

[95] *Mont. Wildlife Fed'n*, 127 F.4th at 51 (first citing *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405-06 (9th Cir. 1995); and then citing *W. Oil & Gas Ass'n v. EPA*, 633 F.2d 803, 813 (9th Cir. 1980)).

**CONCLUSION**

In light of the foregoing, IT IS ORDERED that the Forest Service's December 2023 Record of Decision for the Mendenhall Glacier Visitor Facility Improvements Project is hereby **REMANDED WITHOUT VACATUR** to the Forest Service for the limited purpose of remedying the May 2023 Final Environmental Impact Statement's error identified in the Court's Order on Motion for Summary Judgment at Docket 37.

On remand, the Forest Service shall remedy this error by supplementing the EIS to clarify the Purpose and Need Statement and supplement the analysis of alternatives, and shall modify the Record of Decision as warranted.

During the remand, the Forest Service shall abide by its commitment to not increase commercial use permits in the MGRA until it has filed a notice with this Court that it has complied with the terms of this remand order.

The Court further retains jurisdiction during the pendency of the agency's supplemental NEPA review. Defendants shall file a status report with the Court within six months of the date of this order and every six months thereafter until the supplemental NEPA analysis is complete. Any party may move for a status conference upon a showing of good cause.

IT IS SO ORDERED this 8th day of May, 2026, at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE